Darren G. Reid (11163)
HOLLAND & HART LLP
222 S. Main Street, Suite 2200
Salt Lake City, Utah 84101
Telephone: (801) 799-5800
Facsimile: (801) 799-5700
dgreid@hollandhart.com

*Attorneys for Plaintiffs and Judgment Creditors*

---

## IN THE FIFTH JUDICIAL DISTRICT COURT
## IN AND FOR WASHINGTON COUNTY, STATE OF UTAH

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD.; ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.; CHRIS ROTH; NATASHA ERICKSON, M.D.; and TRACY JUNGMAN, N.P.;<br><br>Plaintiffs and Judgment Creditors,<br><br>v.<br><br>AMMON BUNDY, an individual; AMMON BUNDY FOR GOVERNOR, a political organization; DIEGO RODRIGUEZ, an individual; FREEDOM MAN PRESS LLC, a limited liability company; FREEDOM MAN PAC, a registered political action committee; and PEOPLE'S RIGHTS NETWORK, a political organization and an unincorporated association;<br><br>Defendants and Judgment Debtors. | **EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Case No. 246501034<br><br>Judge Eric A. Ludlow |

St. Luke's Health System Ltd. ("SLHS") and St. Luke's Regional Medical Center, Ltd.

("SLRMC," and collectively with SLHS, "St. Luke's"), Chris Roth ("Mr. Roth"), Dr. Natasha D.

Erickson ("Dr. Erickson"), and Tracy W. Jungman, NP ("NP Jungman") (collectively "St.

Luke's Parties" or "Plaintiffs" or "Judgment Creditors"), by and through their attorneys of

record, Holland & Hart LLP, hereby respectfully request that, pursuant to Utah R. Civ. P.

65A(e), the Court immediately enter a temporary restraining order and preliminary injunction against Defendants and Judgment Debtors Ammon Bundy ("Bundy"), Ammon Bundy for Governor ("Bundy Campaign"), Diego Rodriguez, Freedom Man Press, LLC, Freedom Man Pac, and Peoples Right Network ("PRN") (collectively "Defendants" or "Judgment Debtors").

I. **CONCISE STATEMENT OF RELIEF REQUESTED & GROUNDS THEREFORE**

Judgment Creditors obtained a **$51,928,306.20 judgment** and **permanent injunction** (the "Judgment") against Defendants in Idaho state court.[1] *See* Declaration of Darren G. Reid ("Reid Decl."), ¶ 4, attached as **Exhibit 1**; *see generally* Default Judgment, attached as Exhibit B thereto. Judgment Creditors ask this Court to immediately freeze all assets in a Mountain America Credit Union account ostensibly owned by Abish-husbondi Inc. (the "Abish-husbondi account")—and any other related accounts—pending an Idaho court's separate resolution of a reverse veil piercing proceeding. That proceeding, in which Abish-husbondi is named alongside the other Judgment Debtors, will decide the alter-ego relationship between defendant Ammon Bundy and the supposedly separate entity Abish-husbondi, which Bundy singularly established and wholly controls. *See* Reid Decl., ¶ 4; *see generally* Veil Piercing Complaint, attached as Exhibit A thereto. Bundy and Abish-husbondi received notice and will have a full opportunity to be heard on the question of alter ego in that action.

Judgment Creditors have an enforceable judgment against Bundy, and Bundy has made clear he will go to any length to avoid paying it. Bundy has abused the corporate cloak to

---

[1] Plaintiffs filed a certified and exemplified copy of the Judgment on October 13, 2023, in the Third Judicial District Court, in and for Salt Lake County, State of Utah; and Plaintiffs filed another certified and exemplified copy of the Judgment on April 15, 2024, in this Fifth Judicial District Court. Consequently, the Judgment has had—and will have—the same legal force and effect as a judgment rendered in a Utah state court pursuant to the Utah Foreign Judgment Act, Utah Code § 78B-5-303.

frustrate Judgment Creditors' collection efforts. *See* Reid Decl., ¶ 11. Bundy has established a well-documented pattern of behavior reflecting his attitude that he "owes [Judgment Creditors] nothing." *Id.* The judgment-frustrating purposes that Abish-husbondi serves are plain on their face. Bundy is Abish-husbondi's sole incorporator, officer, and shareholder. *Id.* ¶ 17. Abish-husbondi does not observe corporate formalities. *Id.* ¶ 18. And account records show that Bundy and Abish-husbondi commingle assets to serve Bundy's individual interests. *Id.* ¶ 20.

Significantly, in deposition on April 15, 2024, Judgment Creditors discovered at least three distinct scams where Bundy has tried to hide assets and money from Judgment Creditors by using the corporate veil of Abish-husbondi Inc. *See* Declaration of Anne Henderson Haws ("Haws Decl.), ¶¶ 2-16, attached as **Exhibit 2**.

Once Bundy learns that Judgment Creditors have identified his Abish-husbondi bank account at Mountain American Credit Union (or other related accounts), he will have every incentive to move any funds in the account to an unidentified account, and he has demonstrated willingness to do so. *Id.* ¶¶ 9-11. This Court must be equally nimble. Granting this ex parte motion will ensure that Judgment Creditors can ultimately garnish funds that are rightly attributed to Bundy and the Defendants.

## II.     STATEMENT OF FACTS

Bundy rallied a mob to harass Judgment Creditors for their treatment of a critically ill infant, leveraging misinformed rage into financial support and a political platform for Bundy's gubernatorial campaign in Idaho.

The infant's parents brought the infant into St. Luke's[2] for treatment of severe dehydration and malnutrition. (Reid Decl., Findings of Fact, Conclusions of Law and Order for Permanent Injunctive Relief, attached as Exhibit D thereto, ¶¶ 1-3.) The infant was in serious distress. Judgment Creditor Natasha D. Richardson stabilized him using a nasogastric feeding tube. Dr. Richardson then created a follow-up treatment plan to be administered by a home health nurse. (*Id.* ¶ 7.) She further ensured that all bills for the follow-up treatment would be paid via Medicare and at no cost to the infant or his parents. (*Id.* ¶¶ 5-9.)

The infant's parents did not follow the treatment plan or allow the home health nurse to visit. (*Id.* ¶ 11.) At a subsequent well-check visit, another nurse practitioner determined that the infant had again lost weight and was at risk of the life-threatening complications that accompany malnutrition and dehydration. (*Id.* ¶12.) That nurse practitioner, a mandatory reporter under Idaho law, called Idaho's Department of Health and Welfare Child Protection Services ("CPS"). (*Id.* ¶ 14.) After the parents repeatedly refused to produce the infant for another well-check (*id.* ¶¶ 18-20), law enforcement stopped them on a drive with the infant. (*Id.* ¶ 21.)

At that traffic stop, Emergency Medical Services determined that the infant was in imminent danger. (*Id.* ¶ 23.) They transferred him to St. Luke's via ambulance. (*Id.* ¶¶ 23-24.) After a significant hospital stay and an adjudicative hearing, CPS returned the infant to the monitored custody of its parents. (*Id.* ¶¶ 35, 38, 45.) CPS's and St. Luke's interventions saved the infant's life in the face of his parents' inaction.

This is not the story Bundy told. Despite having no relationship with the infant, Bundy organized protests at St. Luke's during the infant's stay. (*Id.* ¶¶ 30, 31, 32, 40, 41.) Bundy made

---

[2] The infant was treated at several St. Luke's facilities. This motion refers to those facilities, collectively, as "St. Luke's".

repeated public statements insisting that St. Luke's had kidnapped the infant, that medical providers were abusing the infant, and that the abuse was all in furtherance of an imagined plot to sexually traffic the infant. (*Id.* ¶¶ 56, 58, 59.) After spreading these inflammatory falsehoods, Bundy released personal information about St. Luke's personnel involved in the infant's care. (*Id.* ¶ 59.)

Bundy did not believe the horrific story he spun. (*Id.* ¶ 70.) He used the outrage it spawned to solicit financial contributions to his campaign for Idaho's governor and his other marketing organizations. (*Id.* ¶¶ 61, 64, 67.) It was a grift, for political power and financial gain. Bundy executed it without regard to the health and safety of the infant or the medical and law enforcement personnel protecting him.

Bundy refused to defend his outrageous misrepresentations in court. Following a jury trial, where Judgment Creditors presented his statements and described their impacts, default judgment was awarded against him in Idaho district court. (Reid Decl., ¶¶ 7, 14.) Bundy fled the state shortly thereafter. (*Id.* ¶ 16.) He has refused to pay any of the damages awarded against him. (*Id.* ¶ 10-12.) To end Bundy's obfuscation, Judgment Creditors sought an alter ego determination in Idaho state court as to Abish-husbondi (the "Alter Ego action"). (*See generally* Reid Decl., Ex. A.) In the Alter Ego action, Judgment Creditors detail the wealth of evidence they have demonstrating Bundy and Abish-husbondi's shared identity and unity of interests. (*Id.* ¶¶ 44-76.) Bundy wholly owns and controls Abish-husbondi. (*Id.* ¶ 14.) Bundy has, moreover, admitted to using the entity to conceal assets from Judgment Creditors' collection efforts. (*Id.* ¶ 17.) Bundy repeatedly transferred and deposited his personal funds into Abish-husbondi accounts, and then used those accounts to pay his personal expenses directly. (*Id.* ¶¶ 56-60.) As

Judgment Creditors homed in on Bundy's corporate abuses, he drained an Abish-husbondi account to less than $50.00. (*Id.* ¶ 61.)

But Bundy maintains significant funds in a Utah-based Mountain America Credit Union account in Abish-husbondi's name. (Reid Decl., ¶ 22.) Accordingly, Judgment Creditors have domesticated the judgment in Utah, to garnish that account (and other related accounts) following the likely outcome of the Alter Ego action. Judgment Creditors ask that this Court to issue a temporary restraining order, ex parte, to preserve the status quo pending the outcome of that action.

### III. LEGAL STANDARD AND ARGUMENT

A district court may issue a TRO and/or preliminary injunction upon a showing that: (1) "The applicant will suffer irreparable harm unless the order or injunction issues"; (2) "The threatened injury to the applicant outweighs whatever damage the proposed order or injunction may cause to the party restrained or enjoined"; (3) "The order or injunction, if issued, would not be adverse to the public interest"; and (4) "There is a substantial likelihood that the applicant will prevail on the merits of the underlying claim." Utah R. Civ. P. 65A(e).

"[T]he standards set forth in [Utah R. Civ. P. 65A(e)] are derived from" Tenth Circuit precedent, namely *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986), and *Otero Savings & Loan Ass'n v. Federal Reserve Bank*, 665 F.2d 275, 278 (10th Cir. 1981). *See* Utah R. Civ. P. 65A, advisory committee note (regarding paragraph (e)). Under this precedent, if a movant can satisfy the first three elements of the temporary restraining order/preliminary injunction test, a more "liberal definition of the 'probability of success' requirement" applies, requiring only that the plaintiff raise "questions going to the merits so serious, substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *See Otero*, 665 F.2d at 278.

As shown below, Judgment Creditors satisfy each of these four prerequisites, and the Court should immediately grant this motion. Until a scheduled hearing regarding a preliminary injunction, Judgment Creditors seek an order temporarily enjoining and restraining Ammon Bundy and all the named Defendants from accessing, using, or transferring any funds or assets located (a) in the Abish-husbondi Inc. account(s) at Mountain America Credit Union including but not limited to Account Number 501013664849 / ABA Routing Number 324079555; (b) in all other Abish-husbondi accounts located at banks or credit unions with a presence in Utah; (c) in all other accounts in the names of Defendants located at banks or credit unions with a presence in Utah; (d) all other accounts related to the following addresses located at banks or credit unions with a presence in Utah: P.O. Box 1062, Cedar City, UT 84721; 946 E 400 S, New Harmony, UT 84757; 389 S 300 E, Cedar City, 84720; and 4615 Harvest Lane Emmett, ID 83617; and (e) all other accounts related to Lisa Bundy or Dono Custos located at banks or credit unions with a presence in Utah.

### A. Absent An Injunction, Judgment Creditors Will Continue to Suffer Irreparable Harm.

Injunctive relief is fundamentally preventive in nature, and an injunction serves to "preserve the status quo pending the outcome of the case." *Zagg, Inc. v. Harmer*, 2015 UT App, 52, ¶ 8, 345 P.3d 1273, 1275 *citing Hunsaker v. Kersh*, 1999 UT 106, ¶ 8, 991 P.2d 67, 69 ("Injunctive relief is not purely limited to cases where no other possible remedy will be available. Its broader purpose is preventive in nature."). A court can issue injunctive relief "to prevent the perpetration of a threatened wrong or to compel the cessation of a continuing one." *System Concepts, Inc. v. Dixon*, 669 P.2d 421, 428 (Utah 1983). Consequently, the "irreparable harm" justifying an injunction includes wrongs (i) "of a repeated and continuing character" or (ii) "which occasion damages that are estimated only by conjecture, and not by any accurate

standard." *Hunsaker*, 1999 UT 106, ¶ 9, 991 P.2d at 69 (citing *System Concepts*, 669 P.2d at 427-28. This "does not limit injunctive relief to those harms which could never be assigned a dollar value," but "merely acknowledges that monetary compensation does not always make an injured party whole." *Id.*

If this Court does not freeze the Abish-husbondi account (and other related accounts) pending the Alter Ego action, the Judgment Creditors will be unable to attach any funds in the Abish-husbondi account once they are, in fact, successful. Bundy would likely argue that Judgment Creditors have a monetary remedy available, to directly collect the judgment against him from him or any other of the named defendants he also controls. This has no merit. As already explained, Bundy is intentionally managing his finances and assets so that no funds will ever fall subject to the Judgment Creditors' reach. Without judicial intervention, Bundy's continual abuse of the corporate form will ensure that the Judgment Creditors are never made whole.

Ex parte relief is appropriate here for the same reasons. If Bundy learns that Judgment Creditors plan to freeze the Abish-husbondi account, he will transfer all funds from it to another undisclosed account while the Alter Ego action is pending. An action he has taken previously to frustrate collection efforts. *See* Reid Decl., ¶ 21; Haws Decl., ¶¶ 2-16. Instead, an ex parte temporary restraining order must issue to preserve the status quo while investigation and litigation proceeds.

### B. An Injunction in Judgment Creditor's Favor Heavily Outweighs Any Potential Damage an Injunction May Cause Bundy and Defendants

Judgment Creditors will suffer significantly greater harm in the absence of the requested relief than Bundy or the other defendants will suffer if the Court grants the requested restraining order. Judgment Creditors are on the cusp of losing significant recoverable assets while the

Idaho court determines the Alter Ego Action. The balance before the Court is whether funds in an alleged corporate account should be held, temporarily, while the Idaho court assesses the propriety and legitimacy of the corporation's form. Judgment Creditors are not asking that these funds be frozen without end. Judgment Creditors merely ask that this Court temporarily limit the use or transfer of funds or assets considering Bundy's express willingness to abuse the corporate form for his own benefit and Judgment Creditors' detriment. *See* Reid Decl., ¶ 10.

Meanwhile, Bundy and Defendants would only be restricted from doing what they are already lawfully obligated not to do—use Abish-husbondi as a sham corporation to transfer and conceal assets in an abuse of the corporate form. This is not harm. *See Novell v. Timpanogos Research Group Inc.,* 1998 WL 177721, at *25; URCP 65A(e)(3). Bundy and Defendants understand full well that they are legally and ethically obligated to observe corporate formalities instead of perpetrating a fraud on the Judgment Creditors and the Court. They are simply failing to live up to their legal obligations.

To the extent that Bundy can demonstrate that Abish-husbondi has legitimate corporate expenditures it must immediately satisfy, or risk irreparable harm of its own, he may petition this Court for an alternative remedy. In any case, any threat to Bundy is one he has brought upon himself, with full knowledge of the implications of his actions. It is not a viable consideration in equity as it is only Bundy's knowing and intentional efforts to conceal assets from Judgement Creditors that necessitated a freeze in the first instance.

Moreover, Judgment Creditors' domestication of the Idaho judgment in Utah and separate institution of the Alter Ego action ensure that due process concerns otherwise implicated by post-judgment enforcement in Utah are not in play here. "Due process of law requires that a court 'hears before it condemns, proceeds upon inquiry, and renders judgment only after trial.'"

*Sorensen v. Crossland*, 2024 UT App 41, ¶ 14 (quoting *Riggins v. District Court*, 89 Utah 183, 51 P.2d 645, 660 (Utah 1935)). Consistent with the preservation of due process, Judgment Creditors brought an independent action against the alleged alter ego with the requisite notice, service of process, and other attributes of due process. Further, Abish-husbondi will have a full opportunity of notice, discovery, and an opportunity to be heard before potentially being found liable of any wrongdoing.

   C.  **Public Interest Favors Injunctive Relief.**

  The public interest strongly favors granting the relief that Judgment Creditors seeks here. Judgment Creditors have a right to collect on their judgment. There is no cognizable public interest in allowing Bundy and Defendants to shield lawfully collectible assets through unlawful, nefarious, and wrongful means. The public interest here heavily favors entry of injunctive relief ensuring that Bundy cannot continue to evade collection efforts through illicit means.

   D.  **Judgment Creditors Have a Substantial Likelihood of Success on The Merits.**

  Judgment Creditors show a substantial likelihood of success on the merits. Utah R. Civ. P. 65A(e)(4). Judgment Creditors' claims, allowing them to garnish Bundy's Abish-husbondi account or other sham accounts, are based on a theory of reverse veil-piercing. A creditor can reach the assets of a corporation to satisfy the debt of a corporate insider based on a showing that the corporate entity is really the alter ego of the individual. *See M.J. v. Wisan*, 2016 UT 13, ¶ 76, 371 P.3d 21; *see also Lunneborg v. My Fun Life*, 421 P.3d 187, 199 (Idaho 2018).

  To prevail on their alter ego theory, Judgment Creditors must show that (1) there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow. *See Messick v. PHD Trucking Serv.*, 678 P.2d 791, 794 (Utah Sup.Ct. 1984). The presence of certain permissive factors may indicate

such a relationship: (1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders; and (8) the use of the corporate entity in promoting injustice or fraud. *See Olson v. Olson,* 2010 UT App 22, ¶ 13, 226 P.3d 751 (quoting *Colman v. Colman*, 743 P.2d 782, 786 (Utah Ct. App. 1987) (upholding a finding of reverse veil piercing based on the presence of the foregoing permissive factors).

### 1. Bundy Influences and Governs Abish-Husbondi.

Bundy organized Abish-husbondi on his own. *See* Reid Decl. Ex. I. He remains the sole officer, director, and shareholder. *Id.* As the sole officer, director, shareholder, and employee, Bundy has complete direction and control over the company. Abish-husbondi has demonstrated no corporate accountability or identifiable lawful purpose. *See* Reid Decl. ¶ 18. Thus, Bundy's control over the organization remains absolute.

### 2. There is a Unity of Interest Between Bundy and Abish-Husbondi.

Bundy has not been coy as to his use of Abish-husbondi to frustrate collection efforts by the Judgment Creditors. On the contrary, Bundy has publicly stated, on multiple occasions, that he was hiding his assets in such corporate vehicles. *See* Reid Decl. ¶ 10. With only Bundy at its helm, Abish-husbondi has completely capitulated to his fraud.

Abish-husbondi's willing participation in Bundy's admitted abuse of its form makes the point plain. The company's only interest is to promote Bundy's agenda. In recent depositions of Tom Branson, Rebecca Branson, and Global Trading & Investments, Inc. ("Global Trading"), their testimony revealed that Bundy was involved in at least three distinct scams to hide assets

and money from the Judgment Creditors by using the corporate veil of Abish-husbondi Inc.  *See* Haws Decl. ¶ 6.

- First, the Bundys sold an Arizona property held in their name but included wire instructions in the loan documents that the final credit for all payments would be to Abish-husbondi.  Then, the Bundys assigned the payments on the loan agreement to Global Trading, meaning the borrower paid off the note on the deed of trust and the proceeds were held by Global Trading and ultimately distributed to the Abish-husbondi Mountain America Credit Union account.  *See* Haws Decl. ¶¶ 7-12.

- Second, Bundy "transferred" 710,000 shares of the stock of Abish-husbondi to Global Trading and accepted the sham exchange of a $15,000 check deposited into an Abish-husbondi bank account in Idaho.  Bundy then caused Ammon Bundy for Governor to cut a check to Tom Branson in the amount of $15,000.  *See* Haws Decl. ¶¶ 13-14.

- Third, Bundy "purchased" shares in the Branson's company, Global Clean Energy Holdings."  The Branson's testified that Bundy gave them money to hide in Global Energy Holdings to prevent the Judgment Creditors' collection efforts.  When their relationship soured with Bundy, the Branson's liquidated Bundy's shares and sent the funneled money back to him.  *See* Haws Decl. ¶¶ 15-16.

Further evincing the lack of oxygen between Bundy and Abish-husbondi: Bundy has deposited his personal funds for his personal use in the corporate account Judgment Creditors seek to attach.  *See* Reid Decl. ¶ 20; Haws Decl. ¶¶ 7-12.  This is classic co-mingling, a factor the Utah Court of Appeals has specifically identified as reflecting an improper unity of interest.  *See Olson,* ¶ 226.

Moreover, Judgment Creditors' extensive discovery efforts suggest that Abish-husbondi follows no formalities normally incident to corporate operation.  *See* Reid Decl. ¶ 18.  And why would Abish-husbondi bother?  The sole party with financial interest in the company also solely controls it, and his personal mission has eclipsed any corporate purpose, to the extent it ever had one.  There are no meetings to hold, no minutes to take, no resolutions to ponder and pass.  *Id.*  Any distinction between Bundy and Abish-husbondi is without difference.

> 3. **Adherence to Abish-Husbondi's Corporate Fiction Would Sanction Fraud and Promote Injustice.**

Bundy holds the civil justice system in total contempt. He refused to participate in a jury trial offering him the opportunity to defend his baseless accusations. He now denies the effect of a unanimous jury verdict, insisting he "owes nothing" to the Judgment Creditors. *See* Reid Decl. ¶ 10. This is, of course, false. Bundy owes Judgment Creditors over $51 million. And that debt was involuntarily obtained: there is nothing more Judgment Creditors could have done to protect themselves from the damages inflicted by his threats and harassment.

Allowing Bundy to shift his assets from one corporate shell to another would effectively sanction Bundy's continued denial of the jury's verdict. It will nullify Judgment Creditors' award, making collection impossible.

Ultimately, the Idaho court is substantially likely to decide the Alter Ego action in favor of Judgment Creditors.

> E. **Judgment Creditors' Bond Requirement, If Any, Should Be *De Minimis*.**

The Court should dispense with Rule 65(A)(c)'s security requirement. Judgment Creditors seek only to preserve the current status quo—any funds currently held in the Abish-husbondi account should remain there while the Idaho court assesses the Judgment Creditors' rights to such funds. Such a temporary freeze does no actual damage to Bundy or Abish-husbondi. It only stops him from spending a limited amount of theoretically corporate funds for a limited length of time.

Further, there is no question that Judgment Creditors have the financial capacity to make good on the financial obligations that Rule 65(A)(c) seeks to protect. Therefore, little to no security is necessary for this Court to award temporary injunctive relief to Judgment Creditors.

## IV.  CONCLUSION

For all the reasons stated, an ex parte order should issue, temporarily enjoining and restraining Bundy and Defendants from using, accessing, or transferring any funds or assets from the Abish-husbondi and related accounts. The temporary freeze should remain in place until the Idaho court hears and decides Judgment Creditors' Alter Ego action and the propriety of preliminary injunctive relief.

DATED this 19th day of April, 2024.

HOLLAND & HART LLP

*/s/Darren G. Reid*
Darren G. Reid

*Attorneys for Plaintiffs and Judgment Creditors*

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2024, I caused to be electronically filed the foregoing **EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** with the Clerk of the Court using the GreenFiling system.

/s/ Christa L. Fries

31868028_v1

15