FILED* US Bankruptcy Court-UT
DEC 17 2024 PM 3:52

Ammon Bundy
P.O. Box 1062
Cedar City, Utah
84720-1062

# UNITED STATES BANKRUPTCY COURT,
## DISTRICT OF UTAH

Ammon Edward Bundy     (       Case No: 24-23530
                                 (       Chapter 7
                                 (       WILLIAM T. THURMAN

## DISCLOSER AND RESPONSE TO THE MANY ST. LUKES MOTIONS SEEKING TO DESTITUTE AMMON BUNDY AND HIS FAMILY

Ammon Edward Bundy, comes now to disclose and respond to the many St. Luke's motions

seeking to destitute Mr. Bundy and his family. Mr. Bundy is in hope that by presenting this

information, this court will determine that Mr. Bundy filed bankruptcy in good faith and

therefore protect him and his family by discharging the approximately $53,000,000.00

inconceivable debt, an astonishing debt that St. Luke's is used to harm and damage Mr. Bundy

and his family. Mr. Bundy asks the court to allow him and his family a fresh start.

## BACKGROUND FOR THE COURT

In early March of 2022, Mr. Bundy received a call from Marissa Anderson. She was surrounded by

police officers threatening to take her baby away. The Anderson family are good friends of the



Bundy family, spending much time together. The Bundy's consider the Chavoya/Anderson family

one of the most loving, caring and politically active families in the United States. The love and care

they display to each other and to their friends is inspiring to all those who know them. Marissa's

father Diego and Mr. Bundy, during 2020, became two of the most public figures in Idaho speaking

out against the Governor's COVID lockdown orders. Especially against the massive federal funds that were being distributed into Idaho's institutions due to Governor Little holding Idahoans under executive emergency powers for over 2 years.

During this public scrutiny against the most powerful people in Idaho, police officers surrounded Diego's family and forcefully took his grandson under the false pretense of malnutrition. (See Exhibit A) Eventually, the accusations against the family were all proven to be false. Over time, the state gave baby Cyrus back, dropped the CPS case all together and dismissed the charges against Marissa the mother, Levi the father and Miranda the aunt.

Mr. Bundy does not find it a coincidence that St. Luke's Hospital, the #1 PRIVATE beneficiary of the federal COVID funds coming through Governor Little's office and the Idaho Department of Health and Welfare (IDHW), the #1 PUBLIC beneficiary of the COVID funds, are the two institutions that carried out the assault against the Anderson family. A family who just happen to be some of Mr. Bundy's closest friends. This assault on an innocent young family came about by St. Luke's Health System and IDHW falsely report their baby's condition and send the police after them.

Mr. Bundy was extremely concerned for Anderson's baby, the family and the injustice of the situation when the Meridian police pulled baby Cyrus from his mother's arms. Mr. Bundy showed up at St. Luke's hospital where the baby was taken. He demanded that the baby be given back to his family where he belonged, but instead Meridian Police officers arrested Mr. Bundy and took him to the Ada County Jail.

Speaking of the situation, Mr. Bundy said,

> *"I must say, even though the Meridian Police officers were completely in the wrong and*
> *acted to enforce the will of people grossly abusing the law, they were also lied to by officials*
> *from the Idaho Department of Health and Welfare (CPS). They were told that baby Cyrus*
> *was Failing to Thrive (FTT) and that he must be taken to the hospital for immediate*
> *care."* (See Exhibit B)

The Idaho Department of Health and Welfare (CPS) mis-represented the truth about baby Cyrus,
causing this entire situation. (See Exhibit C) Baby Cyrus was and has always been cared for and
loved to the extreme by his parents and family. His mother was breastfeeding and he had been
thriving since birth, even though at the time he was not reacting well to solid foods (not atypical for
his age). CPS with the help of Meridian Police officers took Cyrus away from his main source of
nutrition (his mother), which was very concerning to many people, including Mr. Bundy.

Mr. Bundy expressed,

> *"I had the ability to bring attention to the matter and did so at the hospital by demanding*
> *that baby Cyrus be returned to his nursing mother."*

Because of this incident, as mentioned, Mr. Bundy was arrested.  He suffered at the hands of Ada
County Prosecutors for over a year.

The CPS case against baby Cyrus's parents was dropped, the criminal case against baby Cyrus's aunt
was dismissed, the criminal case against baby Cyrus's mother was dropped, but the case against Mr.
Bundy continued on and St. Luke's Health System sued Mr. Bundy in an attempt to save face over

the matter. Claiming that Mr. Bundy had lied about them and that they had only acted to save baby Cyrus's life. (See Exhibit D)

However, the medical records and police body cameras tell an entirely different story than what St. Luke's attorneys crafted later in the lawsuit. The evidence clearly shows that baby Cyrus was not taken to the hospital for medical reasons, but he was forcefully taken from his parents that night and brought to the hospital to be transferred to foster parents arranged by IDHW (CPS). Waiting at the hospital were foster parent(s) planning to take baby Cyrus home with them.

St. Luke's own medical record read:

> "He [baby Cyrus] *was brought to the Meridian ED* [emergency department] *for evaluation. Health and welfare identified a foster family but due to protesters surrounding the hospital regarding this case, it was felt that discharge with the family foster family from the ED was unsafe for all involved."* (See Exhibit E)

This record proves that baby Cyrus was healthy enough to be sent home with foster parents and that the doctors believed that he did not need to stay in the hospital. Contrary to St. Luke's story later.

The ambulance records also say the following:

> *PT [i.e. patient] is a 10 month old male, acting appropriately for age. PT is looking around at surroundings and interacting appropriately...Breathing appears non-labored with no accessory muscle use noted...No acute life threats noted. PT does not appear to be in any physical stress.* (See Exhibit F)

The St. Luke's attorneys changed the story and got the staff, including doctors, to go along with it. They created a story that baby Cyrus was so ill that if they did not admit him into the hospital he would have died. (See Exhibit G) They needed the public to believe that Meridian Police officers, IDHW (CPS) workers and the St. Luke's staff were the heroes that saved the baby's life by taking him from his parents.

The Problem with this narrative is that the doctors own medical records and the police body camera footage tell a different story.

Because protesters (including Mr. Bundy) gathered outside the hospital that night, the plan changed from sending baby Cyrus home with foster parents to transporting baby Cyrus to the Boise hospital in an attempt to hide him. This transfer was not for medical reasons, like St. Luke's lawyers and staff claimed later.

The admin doctor, Dr. Rachel Thomas, is caught on camera saying the following:

> *"Here's the thing. I need to have more degrees of separation to protect this poor foster mom who's going to take this kid, everything else. So, what I want to do is admit this baby to Boise. <u>Not because it is medically necessary</u>. The baby has lost weight and needs to be not in all of this. But, what I want to do is send the baby to Boise, <u>because that's a few more degrees of separation</u>, and then sometime tomorrow when they don't know, get the baby out with CPS to the foster parents."*  (See Exhibit H)

She later said the following,

"He's totally stable."

Writing about Dr. Thomas and baby Cyrus, the reporting EMT wrote this:

*"...sending physician handed us the pt [i.e. patient] secured in his car seat. She indicated*
*the pt was in stable condition and requested that we leave promptly. She stated, "just*
*go! This is a healthy baby with no interventions"...no acute life threats noted."* (See
Exhibit I)

The original St. Luke's doctor who first saw baby Cyrus, Dr. Natasha Erickson, confirmed that
baby Cyrus was not brought to the Boise hospital for medical reasons. In her medical notes she
wrote:

*He [Baby Cyrus] was brought to the Meridian ED for evaluation. Health and welfare*
*identified a foster family but due to protesters surrounding the hospital regarding this case,*
*it was felt that discharge with the foster family from the ED was unsafe for all*
*involved. For this reason, the patient was transferred to Boise for further care.* (See
Exhibit J)

Another St. Luke's medical record further solidifies that baby Cyrus was not transferred to the
Boise hospital for medical reasons, but instead to hide him from those that might follow the
foster parent home.

> *"At this time there are social difficulties in this situation, <u>it was felt the patient was most</u>*
> *<u>appropriate for admission as there is concern about CPS attempting to leave the hospital</u>*
> *<u>with the child being followed to the foster care family's home.</u>"* (See Exhibit K)

The ambulance declarations, St. Luke's medical records and police body cameras all clearly show that baby Cyrus was well enough to go home with foster parent but they were concerned about protesters so the plans changed from sending Cyrus home with a foster family to moving him to the Boise hospital, *"<u>not because it is medically necessary</u>"* but to hide him so they could get him to foster parent(s) without people knowing. This is a completely opposite story from what attorney Erik Stidham and St. Luke's CEO, Chris Roth, conjured up later in the lawsuit.

> Note: The above explanation and proof of the misrepresentations crafted by St. Luke's council, staff and CEO are only a small part of the overall. This document cannot hold all the evidence of direct distortions and falsifications that the St. Luke's party has participated in to try and change a narrative that was negative toward them.

It took about 6 days to get baby Cyrus back to his parents. The people at the Idaho Department of Health and Welfare (CPS) and Judge Laurie Fortier did not like the public scrutiny they were receiving and gave baby Cyrus back after about a week of hundreds of people protesting at the St Luke's Hospital, the CPS office and the Judge's home. A few weeks later, St. Luke's Hospital sued Diego Rodriguez (Cyrus's Grandfather) and Mr. Bundy for saying negative things about them, similarly to what is stated above. St. Luke's retained Holland & Hart, LLP, a law firm that also represents Governor Little and the Idaho Department of Health & Welfare.  For years, Diego and Mr. Bundy have received mountains of court documents. (See Exhibit L)

Mr. Bundy reported,

> *"Holland & Hart is sending documents to my business, home and associates, by personal*
> *service companies, Gem County Sheriff's deputies, US Postal Service, Fed-Ex and UPS.*
> *Some documents are too big to print so they send electronic files in packages to contain it all.*
> *Without exaggerating, I could have filled up a garbage dumpster to contain the amount of*
> *legal documents I have received from Holland & Hart. After speaking to an Idaho law firm*
> *(in hopes to defend myself) I was told that it would take at least 3 full time attorneys to*
> *respond to Holland & Hart's litigation on this case. Because this case may continue for*
> *several years, it is not impractical to calculate that it would take hundreds of thousands of*
> *dollars to properly defend against the onslaught of litigation paid for by donations given to*
> *St. Luke's Hospital."*

Mr. Bundy was informed by two credible, independent sources (one a high-ranking Ada County
Official and the other an attorney who works with St. Luke's hospital) that St. Luke's CEO gave
Holland & Hart *"a blank check"* to financially destroy Mr. Bundy for speaking out against them
about taking baby Cyrus.

Rather than taking action to ensure that the situation with baby Cyrus does not happen again, St
Luke's CEO, Chris Roth, authorized millions of dollars of donations given to St. Luke's Health
System to pay a law firm to financially destroy baby Cyrus's family and those who stood with them.

An Idaho resident expressing concern, said the following,

> *"I don't believe this is why people donate to St. Luke's Hospital. People donate to St. Luke's Hospital under the impression that their donations are going to medically help children and other patients, not to fund a team of $600 per hour attorneys sent to even a political score."*

Mr. Bundy speaking of this attack back in 2022 said,

> *"I have no idea when any of this will end. St. Luke's CEO, Chris Roth, has given Holland & Hart a blank check to financially destroy Diego and I. Mis-using the courts, they have put us under constant threat of losing everything we have worked for our entire lives. Never once have I knowingly stepped inside a St. Luke's medical facility in Idaho. Never have I or my family received any medical treatment from a St. Luke's provider. I owe them nothing, yet they are trying to take everything. Anything I said about them (which was very minimal) [at the time] I believe to be absolutely true, but they are using the courts to chill free speech and punish anyone who exposes them to the public. All of this, when they are the people who participated in stealing a baby from loving parents. Holland & Hart receiving open payments from St. Luke's Hospital to destroy lives by abusing the court is a prime example of Judicial Terrorism."*

St. Luke's Health System obtained a $53 million dollar default judgment against Mr. Bundy and Diego Rodríguezes. Mr. Bundy did not participate in the proceeding as he was in the middle of a gubernatorial campaign and believed the attack was to distract and drain him of time and resources.

## THE BUNDY FAMILY'S FINANCIAL CIRCUMSTANCES

It is obvious that St. Luke's executives with their lawyers are going to continue to pursue Mr.

Bundy and his family until the Bundy's are destitute and, on the street, or until Mr. Bundy is

either in jail or dead.

St. Luke's executives have already taken their home, valuing at approximately $1.4 - $1.8

million. (See Exhibit M) They have taken the shares in Mr. Bundy's company and seized all the

commercial properties. Destroying all income Mr. Bundy received by his employment in this

business. St. Luke's executives have also seized all of the Bundy's bank accounts and made it

impossible to have any normal banking transactions. The Bundy family has been surviving on a

cash basis for nearly a year now. In the past, Mr. Bundy has taken the position not to give St.

Luke's executives and lawyers any information that would further help plunder them and hurt

other people. However, in another attempt for peace and protection from the court, Mr. Bundy

discloses more information relating to business finances to this court (all personal finances have

already been disclosed in the bankruptcy schedules).

For clarification, Mr. Bundy believes it is worth saying that he only filed bankruptcy privately

and did not file bankruptcy for any corperation. Mr. Bundy has never been required by this court,

at any time known to him, to give up the financial information of a corporation. To his

knowledge he has never been compelled in this case, and therefore he offers this information

voluntarily so the court will protect him and ultimately give him and his family peace.

## MR. BUNDY'S CORPORATE DEALINGS

Mr. Ammon Bundy does not have clear ownership or control of any acting corporation at this time. St. Luke's Health System recently stole all of the shares in the only acting corporation Mr. Bundy had ownership in, Abish- Husbondi Inc. Since this July (2024), Mr. Bundy has been sent lease payments for commercial property owned by Absh-husbondi Inc. These payments have been used primarily to pay corporate utilities bills and the expenses to keep up the commercial properties. Also, $2,000 - $2500 of the cash have consistently been sent to help a family in need living in Grouse Creek, Utah. A family who lost the financial support of their father and husband. This Abish charitable contribution has been ongoing for many years now.

Currently, to provide for his family, Mr. Bundy contracts with Bundy Motors and other entities for cash payments. Mr. Bundy is a seasoned business man and a certified master diesel mechanic/technician. With his abilities and knowledge, he works on close family and friend's diesel equipment and has developed diesel engine related products owned by Bundy Motors. He also helps with tech support and sales at Bundy Motors.

Mr. Bundy gets paid by Bundy Motors an average of $1000 per week (cash), also, fuel for his truck, lunch and some clothing expenses. These terms were agreed upon (non-written agreement) with his brother Ryan, owner of Bundy Motors. Mr. Bundy also gets paid cash by various different people and entities that he contracts with to repair their trucks and equipment. He is extremely grateful for these people and their willingness to trade his services for cash, allowing him to provide for his family. Mr. Bundy is very concerned that disclosing information about those who pay him cash for his services will open the door for St Luke's executives and

attorneys to make their life a living hell, like they have the Bundy's. He believes that if St.

Luke's executives and attorneys harass those who trade services with him, they will be less

inclined to trade with him further and others will be afraid to do the same, making it very

difficult for Mr. Bundy to provide for his family. <u>For this purpose, Mr. Bundy takes a significant</u>

<u>risk in conveying this information to this court and to the St. Luke's executives and attorneys.</u>

Early this year (2024) Mr. Bundy's father-in-law formed a company allowing Mr. Bundy to

deposit checks for services as a diesel mechanic. This company was not owned by Mr. Bundy

but was intended to allow Mrs. Bundy to have employment to provide for the family. Mrs.

Bundy worked for this company doing the books and received $700 a week. The only moneys

that Mr. Bundy transacted from this company were to pay a personal credit card used for parts

and supplies. Never did Mr. Bundy receive a paycheck or any payment from this company at any

time. Sometime in the Spring of 2024, just a few months after the company was formed, St.

Luke's executives and lawyers found out about Mrs. Bundy receiving $700 a week and seized

the business bank account. To this day it is seized and has an approximate $17,000.00 balance.

After this corporate bank account was seized, for a month or so, Mr. Bundy received some

checks for his services and lease payments. Seeking a way to deposit the checks so he could

purchase the needed food and supplies for his family, he began depositing them onto a credit

card account and in return using that card to purchase food, clothing, health care and other

needed supplies for his family. Meanwhile he began to ask those he was doing services for to pay

him cash. The checks were minimized but some transactions continued until Mr. Bundy filed

bankruptcy and the credit card company closed the account. Being there was a balance on the

credit card, Mr. Bundy asked one of his customers if he would write a check owed to him

directly to the credit card company to pay off the balance. The customer graciously did so. After

the closing of the credit card account the Bundy family survived strictly on a cash basis as

described above.

Just a few months ago, a kind lady, close to the Bundy family, without Mr. & Mrs. Bundy

knowledge, added a bank account to hers and sent them a debit card with the information to

deposit and use the card. Mrs. Bundy, with some cash she receives from her husband, uses this

account sparely for transactions that require a credit card. All other Bundy household

transactions are made with cash.

On one recent occasion, in preparation for their son to serve an LDS mission, Mr. & Mrs. Bundy

(with permission) used a Bundy Motors debit card to purchase clothing for their son. The kind

lady's debit card stopped working and the Bundys did not have enough cash to make the

purchase. Mr. Bundy traded a week and a half of work to refund Bundy Motors.

## ABISH-HUSBONDI INC. TRANSACTIONS

Several Abish-husbondi Inc transactions have been in question throughout this bankruptcy

proceeding. However, it seems to Mr. Bundy that any corporate transaction that does not relate to

Mr. Bundy personally should not be a matter that this court should be concerned with, at least a

question of jurisdiction certainly exists. However, in an effort to gain the confidence of the court

Mr. Bundy will attempt to disclose all the corporate transactions that St. Lukes has made issues

with and more.

Mr. Bundy incorporated Abish-Husbondi Inc as a C corporation in the State of Wyoming, with

100,000,000 shares. No personal funds were used to establish the Abish company. Shortly after

Mr. Bundy transferred over $2 million dollars into the Abish Wells Fargo bank account. These

funds came from the sale of a software that another entity owned by Mr. Bundy had created and

then sold. With the funds, that same year, Abish-husbondi Inc purchased several commercial

properties including the 22,000 square foot warehouse in Emmett Idaho. The intent was to

remodel the facility, clean up the property and lease it for profit. Mr. Bundy began remodeling

the warehouse room by room paying his sons and others to assist him. In the summer of 2022

Hayden and Bowen Bundy worked many weeks in the warehouse and were compensated with

$12 per hour and 10,000 Abish shares each. Mr. Bundy was continually compensated by direct

payments from Abish-Husbondi Inc for his work on the warehouse and management of the

Abish properties. He was also compensated 20,000 Abish shares.

In 2020, Mr. Bundy went to the Wells Fargo bank in Emmett to take out a deposit. The bank

personnel at the time required Mr. Bundy to wear a mask to enter the building. With no drive-up

window the bank was refusing to do business with Mr. Bundy unless he put on a mask. Mr.

Bundy called the sheriff's office and reported the bank for holding his money and not allowing

him to retrieve it. A deputy arrived and insisted that the transaction take place. Mr. Bundy

proceeded to retrieve nearly $500,000.00 in cash from the bank and then closed the account.

During this period of time Mr. Bundy as President of Abish-Husbondi Inc was doing business

transactions with one of his brothers. His brother was flipping trucks and Abish-husbondi Inc.

was financing him. Mr. Bundy wired funds for his brother to purchase the trucks and as they sold

his brother would pay off the loans. This went on until the COVID regulations damaged the

truck economy to the point that sales were very slow. In which, Mr. Bundy's brother paid off all

the loans and got out of the truck flipping business.

In June of 2021, Mr. Bundy announced his gubernatorial run. (See Exhibit N) Mr. Bundy,

complying with all campaign finance laws, recorded every required transaction with the Idaho

Secretary of State. The records are public information and available for anyone to view. Mr.

Bundy used over $150,000.00 to fund the startup of his campaign. Also, developing a campaign

software was a significant part of the earlier effort of Mr. Bundy and others during 2021. Hiring

Nate Jones as the primary developer, the first stage of the project was completed within 6

months. Mr. Jones was compensated $3000-$4000 a month, mostly cash, and was given 250,000

Abish-Husbondi Inc shares for his valuable skill and effective effort.

Backing up a few years. In March of 2015, Mr. & Mrs. Bundy moved to Emmett Idaho and

rented their Arizona home to Jane Valenzuela with an agreement that she would purchase the

home within 3 months. When the 3 months came due Mrs. Valenzuela was unable to find

financing and continued to rent from the Bundy's. A rental relationship pursued until July of

2019, when Mr. Bundy negotiated a loan agreement to finance Mrs. Valenzuela for the property

in the amount of $482,500.00. (See Exhibit O) The objective of the loan was to create a payment

history so Mrs. Valenzuela could better qualify for financing and then she would obtain more

traditional financing at a better rate. Mr. Bundy's never had a desire to finance Mrs. Valenzuela

but they knew it would help lower her monthly expenses and eventually help her to qualify for a

loan with a mortgage lender. To provide the financing for Mrs. Valenzuela, Mr. Bundy borrowed

the funds from Abish-husbondi Inc and paid the mortgage off, with a promise to pay back Abish

when Mrs. Valenzuela paid them.

In July of 2022 Mr. Bundy had received a significant payment for the sale of his fleet

maintenance company in Arizona. When hearing about the transaction Mr. Tom Branson offered

to invest the funds in a Global trading account that he was also invested in. Interested, Mr.

Bundy sent Branson $130,000.00. To further shield the investment the shares were purchased in

Mrs. Branson's name and a debit card with some account information was sent to Mr.

Bundy. (See Exhibit P) Mr. Bundy also believed that the Bransons would be a secure place to

hold the bulk of the Abish shares. Sometime around this time 700,000 Abish shares were issued

to Tom Branson.

Then towards the end of 2021 Mr. & Mrs. Branson where visiting the Bundy's and offered to

service the loan with Mrs. Valenzuela and help her obtain financing. They offered this service as

friends to Mr. Bundy free of charge. They had many years of experience in the mortgage

business and believed they could get Mrs. Valenzuela to qualify for a mortgage if a payment

history to their company was established.

In July 2022, Mrs. Valenzuela was approved for financing and the funds in the amount of

$507,167.63 to pay off the Bundy loan was sent to the Branson bank account without Mr.

Bundy's knowledge. When Mrs. Valenzuela contacted Mr. Bundy, thanking him for the many

years of working with her, she informed him that the *"refinance was finally done"* indicating that

her bank had funded her and sent the payoff to the Branson's bank account. (See Exhibit R)

Surprised, Mr. Bundy called Mr. Tom Branson and asked if he had received the funds, in which

he confirmed he had. Mr. Bundy then gave him instruction on how to wire transfer the funds to

an Abish-husbondi Inc bank account for final payment on the loan. However, Mr. Branson

proceeded to demand $165,000.00 of the money or he would not transfer the fund.

Alarmed and outraged, Mr. Bundy insisted that the funds be transferred immediately, in which

Mr. Branson hung up and would not answer his phone again. For several days Mr. Bundy tried to

communicate by phone and text but Mr. Branson would not answer or reply. Finally, Mr. Bundy

contacted Mrs. Branson and after minimal communication by text, no agreement to transfer the

funds was made, even after Mr. Bundy threatened to contact the authorities.

A few days later Mr. Bundy received a letter from Mr. Branson demanding that he no longer

contact them. Mr. Bundy replied with specific instruction to transfer the funds to the Abish-

hunsbondi Inc. with the exception of $10,000 to pay them for their services. Mr. Bundy received

a reply several days later by email in which Mr. Branson demanded $82,000.00 before he would

transfer the balance. Mr. Bundy insisted that $10,000 was more than agreed upon and that the

remainder should be transferred immediately. (See Exhibit S)

Sometime in August 2022, Mr. Branson wrote a letter to Mr. Bundy including a $34,000 check

and the certificate for the Abish shares. He said that he cashed out the Global shares that Mr.

Bundy had in his wife's name and that $34,000 was all that was left out of the $130,000.00 that was given him. In his letter Mr. Branson also informed Mr. Bundy that he was returning the Abish shares. However, Mr. Branson said nothing in the letter about returning the over half a million dollars he had in his bank account that belonged to Mr. & Mrs. Bundy to pay off the Abish loan.

At the end of August 2023, Mr. Bundy retained a Top 10 California law firm to help against the attacks from St. Luke's, including bankruptcy. However, Mr. Bundy was in need of a way to pay for the attorneys and asked Mark Eisenhut of Call & Jensen to contact Mr. Branson to see if he could talk some sense into him and retrieve the half a million dollars with the intent to use it as a legal fund.

Attorney Mr. Eisenhut emailed Mr. Bundy with this report:

> *"As for Tom Branson, I did get him to respond by email but he has yet to agree to give the money back. I don't see that happening soon unless pressure is put on him. Maybe a letter from you or even a lawsuit will help that. Just thoughts."* (See Exhibit T)

Shortly after this communication, Mr. Branson retained an attorney by the name of Joseph M. Chambers from Harris, Preston & Chambers. However, Mr. Eisenhut (Bundy's new attorney) contacted Mr. Bundy during this time, informing him that his partners did not want their firm to represent Bundy because it may jeopardize the California based law firm "*if word got out*". Evidently, the law firm represented several deep pockets *"woke clients"* and they were

afraid that representing Mr. Bundy may compromise relationships and financially hurt the Call & Jensen law firm.

Representing himself again, Mr. Bundy proceeded to negotiate the return of the funds through Mr. Branson's counsel. Around January 4th 2024 an Estoppel Certificate Release & Waiver written by the Branson's counsel was sent to Mr. Bundy dissolving any legal liability from the Branson's and agreeing to pay the Branson's $20,000. Both Mr. & Mrs. Bundy were required to sign the waiver in order to finally get the over half a million dollars transferred to them. (See Exhibit U)

Having all his Idaho bank accounts seized, Mr. Bundy opened another Abish-husbondi Inc business bank account in Cedar City, Utah at Mountain America Credit Union. This was early January 2024, before the Utah order was issued, banning Mr. & Mrs. Bundy from owning or controlling a bank account. The Branson's attorney transferred the $487,167.36 to the Abish bank account in Cedar City and the Bundy's considered their loan from Abish paid in full. (See Exhibit V)

As the President of Abish-husbondi Inc. Mr. Bundy used a portion of these funds to catch up on several business expenses. The balance, Mr. Bundy transferred from the Cedar City, Utah, Mountain American business account. Abish then purchased materials, intellectual property and a domain name from Mr. Bundy's brother (Arden), totaling $215,000. The remainder ($200,000), Mr. Bundy retrieved and in part used to repair and equip a service truck, purchase specialty equipment and to further establish the fleet maintenance services that he engaged in.

This service truck is used nearly every day to hold tools and transfer oils but currently the chassis portion is not operational at this time.

Mr. Bundy reminds the court that these funds where and/or are corporate funds, not Mr. or Mrs. Bundy's personal funds. As mentioned in Mrs. Bundy's motion to quash. Mrs. Bundy knew very little or nothing about any of these transactions. Even the home financing with Mr. Valenzuela was completed without Mrs. Bundy being involved other than to sign the needed documents.

In addition to loaning funds to Jane Venezuela and Arden Bundy, Abish-husbondi Inc made other loan agreements. One of these loans has yet to mature and Mr. Bundy has been receiving the payments for Abish by check and has held onto these checks for several months. His hope was that as President he would regain control over Abish and then deposit the checks as before. Using the default judgment as justification, St. Luke's executives and attorneys took all the shares from Abish-husbondi Inc., including the majority shares that did not belong to Mr. Bundy. In this illegal, act Mr. Bundy lost control of the company but is expecting this court to claw back the shares and redistribute them correctly. Since that has not happened yet, Mr. Bundy has simply held on to the lease and loan payment checks. (See Exhibits W)

## FURTHER DISCLOSURES

When Mr. Bundy withdrew all the Abish and personal funds and closed the Wells Fargo accounts during the COVID era (2021), Mr. Bundy had significant amounts of cash in his possession. As needed, Mr. Bundy would deposit the cash back into the new Abish credit union account to take care of the business needs such as property taxes, utilities, building and property

improvement expenses and paying subcontractors.  Here is a list of some of the cash deposit that

were made:

| Date | Amount |
|------|--------|
| August 14, 2020 | $69,000.00 |
| August 19, 2020 | $26,600.00 |
| December 14, 2020 | $50,000.00 |
| February 26, 2021 | $49,800.00 |
| May 17, 2021 | $40,000.00 |
| August 10, 2021 | $ 9,980.00 |
| August 18, 2021 | $59,800.00 |
| September 17, 2021 | $50,000.00 |
| May 31, 2023 | $14,800.00 |
| October 12, 2023 | $17,500.00 |

During the last quarter of 2021 (if his memory serves him correctly), Mr. Bundy deposited all of

the cash that was withdrawn except what was used to pay for expenses in cash directly. The

above 2023 cash deposits were made with other cash payments that were received from

additional transactions.


In January of 2016, Mr. Bundy was arrested and then held in federal prison for multiple years.

After enduring through two major federal trials, Mr. Bundy was acquitted on all charges and

released. The majority of that time he was held in solitary confinement.


Since his imprisonment Mr. Bundy has not paid any personal income taxes and refuses to do so

voluntarily.  He intends on abstaining from paying into coffers that are used to destroy his

family, friends and countrymen. Mr. Bundy has personal knowledge through experience that the

DOJ (especially the FBI and the U.S. Attorneys Office) is a cesspool of conspiracies, corruption

and murders and the thought of paying a dime to support such institutions is repulsive to him.

Mr. Bundy knows better than to be *"a good tax paying citizen"*, funding the destruction of his

family and his country through income taxes. However, Mr. Bundy has paid tens of thousands in

property taxes and he gladly pays all consumption taxes that he incurs. Mr. Bundy has not filed

any taxes for Abish -husbondi Inc., being that no profit has been recorded.

## CREDITORS MEETING QUESTIONS

On August 19, 2024, as scheduled, the meeting of creditors resumed. Mr. Bundy asserted a Fifth

Amendment protection on a number of St. Luke's questions. Mr. Bundy answered all of the

trustees and U.S Trustee's Office questions without asserting the Fifth Amendment. Here, Mr.

Bundy will clarify many of the questions that St. Luke's attorneys have made issue with.

• [Counsel]: Have you filed any personal tax returns since 2010?

-    The answer is Yes.

• [Counsel]: Mr. Bundy, have you filed any tax returns, personal tax returns, since 2018?

-    This question has been answered above.

• [Counsel]: Has Abish-husbondi filed any tax returns?

-    This question has been answered above.

• [Counsel]: Has Abish-husbondi ever filed any tax returns?

-    This question has been answered above.

• [Counsel]: . . . [C]an you explain to me what Mr. Jones provided in exchange for
his shares, the shares that you contend he owns in Abish-husbondi?

-       This question has been answered above.


• [Counsel]: Mr. Bundy, can you tell us what, if anything, you received personally

from Global Investments in exchange for any shares they [sic] may have owned

or currently own in Abish-husbondi?

-       This question has been answered above.


• [Counsel]: And did you—what did you discuss with Mr. Branson as it relates to

any ownership of shares in Abish?


-       [Debtor]: I just spoke to him about what his intent with those were, how he

viewed them and whether he wanted to defend or not or what—you know, what

was his—what was his desire in the matter.


[Counsel]: And what did Mr. Branson tell you?

-       This question has been clarified above.


• [Counsel]: Are you invoking the Fifth regarding any communications you had

with Mr. Branson regarding the shares in Abish, at least as far as that conversation

you say you had on Saturday?

[Debtor]: Yes.

-       This question was answered in full

• [Counsel]: Mr. Bundy, did you have any discussions with Mr. Jones recently regarding whether or not Mr. Jones owns any shares in Abish?


- [Debtor]: Not necessarily whether or not he owns any, but I did have a conversation with him about whether he wants to defend them or, you know, what his intention (inaudible).


[Counsel]: And what did Mr. Jones say in that regard?

- Mr. Jones has shown interest in defending his shares but is waiting to see what the bankruptcy court does with them.


• [Counsel]: Mr. Bundy, along those lines, relating to Abish, you'd indicated there's some other shareholders. Are distributions made from Abish to Mr. Jones, Global Investments, and to your sons?

- This question has been answered above.


• [Counsel]: Mr. Bundy, have you—has Abish distributed any payments at any point in time to Global Investments?

- This question has been answered above.


• [Counsel]: Mr. Bundy, you'd indicated that part of the business of Abish-husbondi was receiving rental payments; is that correct?

- [Debtor]: . . . The answer to the question was yes.

[Counsel]: Okay. And, Mr. Bundy, how were those rental payments distributed as among the shareholders in Abish-husbondi?

- Distributions were contingent upon the sale of Abish assets.


• [Counsel]: Does Abish-husbondi have any business other than the ownership of the commercial—the four commercial real estate properties in Emmett, Idaho, and the collection of rents relating to leasing of portions of those properties, any business other than that?

- This question has been answered above.


• [Counsel]: Mr. Bundy, I understand from testimony from the Branson's that you had Mrs. Branson purchase some stock holdings in her name, even though you funded and controlled those stock assets, in order to conceal funds from St. Luke's. Is that accurate?

- This question has been answered above.


• [Counsel]: Mr. Bundy, did you in fact receive a distribution from the Branson's and/or Global Investments regarding the stock holdings that you had Mrs. Branson take in your [sic] name in order to conceal those funds from St. Luke's?

- This question has been answered above.


• [Counsel]: How much did you receive in a distribution from Global Investments

for the stock that was held in Ms. Branson's name?

- This question has been answered above.


• [Counsel]: Mr. Bundy, did you engage in transactions with Global Investments in order to conceal assets from St. Luke's collection?

- This question has been answered above.


• [Counsel]: Mr. Bundy, did you engage in transactions with Mr. Jones since 2022 when St. Luke's filed its lawsuit in order to conceal assets from St. Luke's collection?

- This question has been answered above.


• [Counsel]: Since St. Luke's filed its lawsuit against you in 2022, Mr. Bundy, have you engaged in any transactions with your sons in order to hide assets from St. Luke's collections?

- This question has been answered above.


• [Counsel]: Did you or your wife provide any funding to your brother regarding either of those businesses, the steak house or the brake operation?

- [Debtor]: To answer that question—let's see. No.
- The answer is No


• [Counsel]: Did you and/or your wife provide any financial support for either the

Bundy Brake and Exhaust or the Bundy Steak House?

-   This question has been answered above.


• [Counsel]: Mr. Bundy, have you transferred . . . any funds to any family members in order to conceal those assets from St. Luke's and its efforts to collect the judgment?

-   This question has been answered above.


• [Counsel]: Mr. Bundy, we have records that indicate that, on January 5th, 2024, that $487,000 was transferred from Global Investments to you to a Mountain America account. Can you tell us where those funds are now?

-   This question has been answered above.


• [Counsel]: Mr. Bundy, do you still have in your possession or control any of the $487,000 that were transferred to you on or around January 5th, 2024?

-   This question has been answered above.


• [Counsel]: Mr. Bundy, have you taken any steps to conceal from my clients any of that $487,000 that were transferred to you on or around January 5th, 2024?

-   This question has been answered above.


• [Counsel]: Did you have a—did you sell property in Arizona and hold a note on it[?]

- This question has been answered above.

-

[Counsel]: Okay. Who held the note?

- This question has been answered above.

• [Counsel]: Mr. Bundy, can you tell me who was the borrower on that note?

- This question has been answered above.

• [Counsel]: Did you have real estate property in Arizona that you sold to an individual and then carried a note on that debt?

- This question has been answered above.

• [Counsel]: Mr. Bundy, I'll represent to you that we understand that about $450,000 associated with that real estate was transferred to you sometime in late 2023 or early 2024. Can you tell me where those funds are now?

- This question has been answered above.

• [Counsel]: Mr. Bundy, where is—can you identify for me what, if any, assets there are within Abish-husbondi?

- This question has been answered above.

• [Counsel]: Mr. Bundy, do you and/or your wife own any stocks?

- The answer is No.

• [Counsel]: Mr. Bundy, do you . . . and/or your wife . . . own any bonds?

- The answer is No.

• [Counsel]: Mr. Bundy, do you and your wife own more than a half a million dollars in assets in the form of stocks?

- This question has been answered above.

• [Counsel]: Mr. Bundy, do you and/or your wife own more than a million dollars in stocks?

- This question has been answered above.

• [Counsel]: Mr. Bundy, do you and your wife own any commodities?

- The answer is No.

• [Counsel]: Mr. Bundy, do you and your wife own any gold or other precious metals?

- The answer is No

• [Counsel]: Mr. Bundy, do you and your wife—and/or your wife own any cryptocurrency?

- The answer is No

• [Counsel]: Mr. Bundy, have you or your wife created any trusts in order to avoid

a collection by St. Luke's of its judgment?

- The answer is No.


• [Counsel]: Mr. Bundy, have you or your wife transferred any assets into trusts in

order to avoid St. Luke's' efforts to collect its judgment?

- The answer is No


• [Counsel]: Mr. Bundy, have you and/or your wife used any foreign bank accounts

in order to hide assets from St. Luke's collection efforts?

- The answer is No


• [Counsel]: Mr. Bundy, do you currently have any bank holdings in foreign

countries?

- The answer is No.


## CONCLUSION

Mr. Bundy advocated for a young family that had their baby medically kidnapped. The hospital

that was involved, sued Mr. Bundy to make the stealing of the child look legitimate. The hospital

spent millions of dollars in donation money on attorneys to obtain a $53,000,000 default

judgement against Mr. Bundy. The hospital took Mr. Bundy's home, orchard, all of his shares

and commercial properties and then seized him and his wife's bank accounts, forcing Mr. Bundy

to provide for his family for nearly a year on a cash basis only. Mr. Bundy filed for bankruptcy

to obtain relief from St. Luke's litigation against him and his family. St. Luke's filed an objection asking the court not to allow Mr. Bundy or his family to keep anything they had, including tools, clothing, a small amount of cash and any means of transportation. St. Luke's hospital subpoenaed Mrs. Bundy seeking for her to be a witness against her husband. St. Luke's also subpoenaed Mr. Bundy and more than a dozen other people or businesses with the name of Bundy. St. Luke's filed a motion seeking the court not to allow Mr. Bundy to go bankrupt in hopes that the court would not discharge the debt so they could continue to torment and harass Mr. Bundy and his family until the $53,000,000 is paid off. A hearing is set for January 13, 2024.

Mr. Bundy discloses, to the best of his ability, his corporate dealings, his family's financial circumstances, Abish-Husbondi Inc. transactions, other applicable disclosures and answers the questions he plead the Fifth on in the Creditors Meeting. Mr. Bundy does so with full expectation that St. Luke's executive and attorneys and/or other entities will use this information against him and his family. However, Mr. Bundy is in hope that by presenting this information, this court will determine that Mr. Bundy filed bankruptcy in good faith and therefore protect him and his family by discharging the approximately $53,000,000 inconceivable debt, an astonishing debt that St. Luke's is using to harm and damage Mr. Bundy and his family. Mr. Bundy asks the court to allow him and his family a fresh start.

**DATED THIS DAY,** the 10th of October, 2024.

Ammon Bundy

| CERTIFICATE OF SERVICE

I certify that on this day I served a copy of the attached to:

UNITED STATES BANKRUPTCY COURT, DISTRICT OF UTAH

|  | 350 S Main St, Salt Lake City, UT 84101 | [X] | USPS Mail |
|---|---|---|---|
| Mark C. Rose, Trustee | mrose@mbt-law.com | [X] | Email |
| Erik Stidham | efstidham@hollandhart.com | [X] | Email |

**DATED THIS DAY,** the 10th of October, 2024.

Ammon Bundy

Exhibit A

https://freedomman.gs/cyrus/videos/

Exhibit B

https://pplsrghts.net/f6984a7c-eafc-4082-a3b4-e99dfe129733

Exhibit C

https://freedomman.gs/cyrus/story/

Exhibit D



## Exhibit E



and declared immediately. He was brought to the Meridian ED for evaluation. Health and welfare identified a foster family but due to protesters surrounding the hospital regarding this case, it was felt that discharge with the foster family from the ED was unsafe for all involved. For this reason, the patient was transferred to Boise for further care.

*"He [Baby Cyrus] was brought to the Meridian ED [emergency department] for evaluation. Health and welfare identified a foster family but due to protesters surrounding the hospital regarding this case, it was felt that discharge with the family foster family from the ED was unsafe for all involved."*

## Exhibit F



## Exhibit G

**DOCTOR SAYS BABY 'WOULD HAVE DIED'**

Thomas has worked with an organization called Flourish Collective to provide medical care to people in Haiti. She said she has treated hundreds of children for malnutrition and dehydration, two of the biggest killers of Haitian children. So strongly did she feel about her work there, according to Thomas, that she got a tattoo of the organization's motto: "Little by little, we'll get there."

Thomas said in court that when Rodriguez's 10-month-old grandchild was brought to the St. Luke's emergency room — where she was the lead physician at the time — her first thought was that "he looked like a baby from Haiti." The baby's stomach was distended, his eyes were hollow and he was unable to sit up, she testified.

After the defendants began attacking Thomas online, saying she had lied and posting private information about her — including her photo, address and phone number — the doctor said she had to have difficult conversations with her daughter and her daughter's school about their family being in potential danger. Her daughter became anxious enough that she began seeing a counselor.

After all the actions of Bundy's far-right followers, Thomas said she is leaving Idaho to try to heal from the emotional toll of the past year.



## Exhibit H



Watch video here: https://youtu.be/R4YfWZNRdds

## Exhibit I



The report, as seen above, from Baby Cyrus's medical records plainly declare:

*The sending physician handed us the pt [i.e. patient] secured in his car seat. She indicated the pt was in stable condition and requested that we leave promptly. She stated, "just go! This is a healthy baby with no interventions"…no acute life threats noted.*

## Exhibit J

H&P by Natasha D. Erickson, MD at 3/12/2022 0304

### PEDIATRIC HOSPITALIST ADMISSION NOTE

**ADMITTING ATTENDING**
Natasha D. Erickson, MD

**ADMISSION DIAGNOSES**
Active Problems:
  Malnutrition (HCC)
  Failure to thrive (child)

**CHIEF COMPLAINT**
Weight loss

**HISTORY OF PRESENT ILLNESS**
Cyrus is a 10 m.o. male discharged from the hospital on 3/4, who presents with weight loss in the setting of failure to thrive. Patient was admitted from 3/1-3/4 after being referred for admission due to severe malnutrition. Initially the patient required NG feeds, but at discharge, he was taking bottle feeds without issue. He was discharged home with an NG in place and family was provided syringe feeding supplies in case the patient's po intake dropped off. Family did not go home with a feeding pump as they declined this, citing cost (they are self-pay). He was scheduled to see his PCP on 3/6, but did not show for the appointment. Home health was also not able to get in touch with the family. Case was discussed on 3/11 with Tracy Jungman with CARES who reported the child had not been seen and despite multiple attempts to contact the family, the patient had not returned for a weight check. Ultimately, health and welfare and law enforcement became involved. It is my understanding that a warrant was issued and the child was removed from the home and declared immediately. He was brought to the Meridian ED for evaluation. Health and welfare identified a foster family but due to protesters surrounding the hospital regarding this case, it was felt that discharge with the foster family from the ED was unsafe for all involved. For this reason, the patient was transferred to Boise for further care.

Generated on 3/24/22 10:33 AM                                                                 Page 119

## Exhibit K

 St Luke's

Anderson, Cyrus James
MRN: 4289116, DOB: 5/1/2021, Sex: M
Acct #: 455708612
Adm: 3/12/2022, Adm: 3/12/2022, D/C: 3/15/2022

**03/12/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)**

All Encounter Notes (group 1 of 3) (continued)

no frenulum injury, fontanelles are appropriate. Patient is tearful but consolable with being held. A bottle was offered to the child at this time the child immediately took a eating 6 ounces without difficulty. Weight was obtained and patient's weight is currently 6.31 kg, at discharge on the fourth patient was 6.545 kg. Blood work was obtained and patient is hypoglycemic which is consistent with poor feeding. Child has demonstrated that he is able and willing to feed while here in the department. At this time there are social difficulties in this situation, it was felt the patient was most appropriate for admission as there is concern about CPS attempting to leave the hospital with the child being followed to the foster care family's home. Furthermore child has significant findings of dehydration and malnutrition. I do not feel IV fluid resuscitation is necessary as child is able to take feeds without difficulty. Patient was transferred to St. Luke's Boise at this time for admission.

Exhibit L

https://freedomman.gs/cyrus/kidnappers/laurie-fortier-laura-thompson/

Exhibit M



Exhibit N

https://idahonews.com/news/local/ammon-bundy-announces-run-for-idaho-governor

Exhibit O

## *LOAN AGREEMENT*

$482,500.00                                  Date: July 01, 2019

For value received, the undersigned Jane Valenzuela (the "Borrower"), at 5245 W Dobbins Rd, Laveen, Arizona 85339, promises to pay to the order of Ammon Edward Bundy and Lisa M Bundy (collectively, the "Lender"), at 1881 W South Slope Rd, Emmett, Idaho 83617 (or at such other place as the Lender may designate in writing), the sum of $482,500.00 with interest from July 01, 2019, on the unpaid principal at the rate of 9.75% per annum.

### I. TERMS OF REPAYMENT

#### A. Payments

Unpaid principal after the Due Date shown below shall accrue interest at a rate of 15.00% annually until paid.

The unpaid principal and accrued interest shall be payable in monthly installments of $4,145.42, beginning on August 1, 2019, and continuing until July 1, 2049, (the "Due Date"), at which time the remaining unpaid principal and interest shall be due in full.

#### B. Application of Payments

All payments on this Note shall be applied first in payment of accrued interest and any remainder in payment of principal.

#### C. Late Fee

The Borrower promises to pay a late charge of $225.00 for each installment that remains unpaid more than ten day(s) after its Due Date. This late charge shall be paid as liquidated damages in lieu of actual damages, and not as a penalty. Payment of such late charge shall, under no circumstances, be construed to cure any default arising from or relating to such late payment.

#### D. Acceleration of Debt

If any payment obligation under this Note is not paid when due, the remaining unpaid principal balance and any accrued interest shall become due immediately at the option of the Lender.

Page 1

7) a misrepresentation by the Borrower to the Lender for the purpose of obtaining or extending credit; or

8) the sale of a material portion of the business or assets of the Borrower.

In addition, the Borrower shall be in default if there is a sale, transfer, assignment, or any other disposition of any real estate pledged as collateral for the payment of this Note, or if there is a default in any security agreement which secures this Note.

## VI. SEVERABILITY OF PROVISIONS

If any one or more of the provisions of this Note are determined to be unenforceable, in whole or in part, for any reason, the remaining provisions shall remain fully operative.

## VII. MISCELLANEOUS

All payments of principal and interest on this Note shall be paid in the legal currency of the United States. The Borrower waives presentment for payment, protest, and notice of protest and demand of this Note.

No delay in enforcing any right of the Lender under this Note, or assignment by Lender of this Note, or failure to accelerate the debt evidenced hereby by reason of default in the payment of a monthly installment or the acceptance of a past-due installment shall be construed as a waiver of the right of Lender to thereafter insist upon strict compliance with the terms of this Note without notice being given to Borrower. All rights of the Lender under this Note are cumulative and may be exercised concurrently or consecutively at the Lender's option.

This note may not be amended without the written approval of the holder.

## VIII. GOVERNING LAW

This Note shall be construed in accordance with the laws of the State of Arizona.

## IX. SIGNATURES

This Note shall be signed by Jane Valenzuela and Ammon Edward Bundy and by Lisa M Bundy.

Page 2

## II. SECURITY

This Note shall be secured by a Deed of Trust to real property commonly known as 5245 W Dobbins Rd, Laveen, Arizona 85339. The Lender is not required to rely on the above security instrument and the assets secured therein for the payment of this Note in the case of default, but may proceed directly against the Borrower.

## III. PREPAYMENT

The Borrower reserves the right to prepay this Note (in whole or in part) prior to the Due Date with no prepayment penalty. Any such prepayment shall be applied against the installments of principal due under this note in the inverse order of their maturity and shall be accompanied by payment of accrued interest on the amount prepaid to the date of prepayment.

## IV. COLLECTION COSTS

If any payment obligation under this Note is not paid when due, the Borrower promises to pay all costs of collection, including reasonable attorney fees, whether or not a lawsuit is commenced as part of the collection process.

## V. DEFAULT

If any of the following events of default occur, this Note and any other obligations of the Borrower to the Lender, shall become due immediately, without demand or notice:

1) the failure of the Borrower to pay the principal and any accrued interest when due;

2) the liquidation, dissolution, incompetency or death of the Borrower;

3) the filing of bankruptcy proceedings involving the Borrower as a debtor;

4) the application for the appointment of a receiver for the Borrower;

5) the making of a general assignment for the benefit of the Borrower's creditors;

6) the insolvency of the Borrower;

This Loan Agreement is executed and agreed to by:

*Ammon Edward Bundy*

Ammon Edward Bundy
aebundy@valetfleet.com
June 05, 2019 at 01:05 pm
Recorded at IP 174.208.4.88

*Jane valenzuela*

Jane valenzuela
janeleal64@yahoo.com
June 05, 2019 at 06:36 pm
Recorded at IP 172.58.78.240

Exhibit P



Exhibit R



Exhibit S



## Your email today…

**IdahoAviator - Tom** <IdahoAviator13@protonmail.com>                                    Thu, Aug 24, 2023 at 11:59 AM
To: "aebundy@bundyfarms.com" <aebundy@bundyfarms.com>

Also, from the preliminary discussions with my tax accountant… he thinks that it might be possible to include the taxes in my fee portion. That is the reason why that has to happen. This way there should not be a need to keep the 165K… I am not interested in that. If we simply deduct my fee of 82K, there is a good possibility that my legal counsel and the tax accountant can make that be sufficient. I cannot yield from that. I am trying to minimize things for you…. And make things happen in a legal way.

Tom


Sent from Proton Mail mobile


-------- Original Message --------
On Aug 24, 2023, 11:52 AM, Ammon Bundy < aebundy@bundyfarms.com> wrote:



## Your email today…

**Ammon Bundy** <aebundy@bundyfarms.com>
To: IdahoAviator - Tom <IdahoAviator13@protonmail.com>

Thu, Aug 24, 2023 at 12:11 PM

Tom, there is no way I'm paying you 80+ thousand dollars for what you did. No way. That is robbery.



## Your email today…

**IdahoAviator - Tom** <IdahoAviator13@protonmail.com>                 Thu, Aug 24, 2023 at 12:16 PM
To: aebundy@bundyfarms.com

Well... that means we have to go different direction on this. And that will not go well for you.

Sent from Proton Mail mobile

-------- Original Message --------

Exhibit T



## Signed Engagement Letter

**Ammon Bundy** <aebundy@bundyfarms.com>
To: Mark Eisenhut <meisenhut@calljensen.com>

Wed, Aug 23, 2023 at 6:10 PM

Thanks

 **Call & Jensen Engagment Letter.pdf**
619K

---

**Mark Eisenhut** <meisenhut@calljensen.com>
To: Ammon Bundy <aebundy@bundyfarms.com>
Cc: Sam Brooks <sbrooks@calljensen.com>

Thu, Aug 24, 2023 at 9:37 AM

Hi Ammon –

I am introducing you to my partner, Sam Brooks. He is as good as they get. We are in mediation today, but we will do our best to look into the possibility of getting a motion before the court to set aside the default.

I called the local counsel, Craig, but have not heard back from him yet.

Thank you,

Mark

**MARK L. EISENHUT**

Shareholder

**Call & Jensen, APC**

610 Newport Center Drive, Suite 700

Newport Beach, CA 92660

(949) 717-3000

meisenhut@calljensen.com

Page 1

Text Message • SMS
Aug 23, 2023 at 6:24 AM

Mark, would you be willing to talk about one other matter. I would not take much of your time and it may develop into my retaining you. If you're willing let me know. Thank you.

Aug 23, 2023 at 7:47 AM

Of course, I'll be happy to speak with you whether you ultimately retain me or not.

When is a good time?

If you're available in 10 minutes, that would be a great time for me. Otherwise I can do noon.

I'll call you in 10 minutes,

Aug 23, 2023 at 1:12 PM

I have rounded up the $50,000. Do you have wire instructions to send it? I also have a good attorney to pro hoc off of.

I just saw that the engagement letter has the wire information. Got it!

Craig Atkinson

Craig Atkinson
Atkinson Law Office


Aug 23, 2023 at 5:45 PM

Awesome, that is great news! Sorry for some reason I didn't see this until now.

Can you please email a signed engagement letter?

Yes, I'll do it now.

Let me know if the money transferred or when it does. BTW, Craig Atkin at Atkin law is a good guy and a good asset. I believe we can trust him.

Page 2



## Exhibit U

### ESTOPPED CERTIFICATE, RELEASE & WAIVER

### Recitals

Global Trading & Investments, Inc., an Idaho corporation (**"GT&I"**) is in possession of certain funds belonging to Ammon E. and Lisa M. Bundy (collectively **"Bundy"**). GT&I and its principals desire to distribute the funds to Bundy (or to such party or parties as Bundy directs) and upon distributions be released of any further liability with regards to said funds.

### Estoppel, Release & Waiver

NOWTHEREFORE, for good and valuable consideration, and GT&I's reliance on Bundy's execution of this instrument, the parties to this agreement represent and agree to the following:

**A.    Waiver of Accounting.** Bundy waives any further accounting of the funds. Upon receipt of the signed release GT&I shall cause to be disbursed to Abish-husband, Inc., the sum of $487,167.36 ($507,167.36473,000 less $$20,000.00).

**B.    Full & Complete Distribution.** Except for the $20,000 fee the distribution represents a full and complete satisfaction of Bundy's interest in the funds and GT&I's obligation to Bundy.

**C.    Release.** Bundy releases and forever discharges GT&I, their officers, directors, shareholders, agents, attorneys, accountants and/or other representatives, from all actions, claims and demands whatsoever including but not limited to any claim(s) relating to the Loan Servicing and Stock Investment Arrangements, and any other act, matter, cause, or thing whatsoever arising out of the aforesaid transactions or the administration of such funds received from Bundy. *Bundy understands that they have the right to obtain advice concerning this instrument from independent legal counsel of their choice, at their cost, and represents that they have either done so prior to executing this instrument or have knowingly elected voluntarily to waive any such right at this time.*

**D.    Estoppel Certificate.** Bundy understands and agrees that by executing this instrument that GT&I and its agents are relying on the Bundy's representation in this instrument in making the distribution as directed by Bundy, instead of interpleading the funds into a court to obtain court approval. Bundy understands and agrees that if they sign this instrument, they will be forever estopped from challenging this instrument in any fashion.

**E.    Indemnification.** Bundy agrees to indemnify and hold harmless (from Bundy's own assets) GT&I, its officers, directors, shareholders, agents, attorneys, accountants and/or other representatives against any cost or expense (including counsel

Page 1

fees) or liability arising out of any acts which breach this instrument including, but not limited to, any legal or non-legal action which seeks to challenge, void or set aside this instrument (whether successful or unsuccessful) initiated by Bundy.

**F.    Entire Understanding and Agreement - Integration Clause.**   This Instrument constitutes the entire understanding and agreement between the parties and supersedes any and all prior or contemporaneous negotiations, representations and/or agreements, whether written or oral. This instrument may be amended only by written instrument expressly referring hereto, and duly signed by both the Bundy and GT&I. In the event any provision or portion hereof is held to be invalid or unenforceable, the remaining provisions and/or portions shall remain valid and enforceable.

_____          _____
Signature                                Signature

_____          _____
Printed Name                             Printed Name

STATE OF __Utah__     )
                      :ss.
County of __Iron__    )

On the __5th__ day of __January__ 202~~3~~4, before me, __Alexis Winkler__ , (NAME OF NOTARY) the undersigned Notary Public, personally appeared, __Ammon and Lisa Bundy__.

     ___ who is personally known to me, or
     _x_ who proved to me on the basis of satisfactory evidence

to be the person(s) whose name is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same.  Witness my hand and official seal

_____
Notary Public

```
ALEXIS WINKLER
Notary Public - State of Utah
Comm. No. 720311
My Commission Expires on
Sep 3, 2025
```

(This area for official Notarial seal)

2 | Page

Page 2

Exhibit V



**MOUNTAIN AMERICA**
CREDIT UNION

**Mountain America Credit Union**
**Account Number Specification Sheet**
**Wire Instructions**

ID: 50

Description: Business Checking

This specification sheet is for the following credit union member(s):

ABISH HUSBONDI INC
3061 RIVERSIDE ROAD
MESQUITE, 89027

ABA Routing Number: 324079555

Account Number: 501013664849

Wire Instructions:

*Please note Mountain America Credit Union **does not** have a **"Swiftcode."** We do not handle exchange of foreign currency. The originating bank should have a corresponding bank in the United States they use to send wires through for this purpose. They will then forward to Mountain America Credit Union's routing number and the member's account number.

Incoming wire fee: $10.00

If you have further questions regarding these instructions, please contact the Mountain America Credit Union Service Center at 1-800-748-4302.

Exhibit W



CASHIER'S CHECK

P.O. Box 2331, Sandy, Utah 84091  •  1-800-748-4302  •  www.mocu.com        49-55/1031        DATE   11/14/24
                                                                                                      $1,138.57

PAY ** One Thousand One Hundred Thirty-Eight and 57/100 DOLLARS **

TO THE
ORDER     ARTSH-HUSBONDI
OF

YABLE THROUGH BOKF, NA, EUFAULA, OK

CASHIER'S CHECK

P.O. Box 2331, Sandy, Utah 84091  •  1-800-748-4302  •  www.mocu.com        49-55/1031        DATE   11/13/24
                                                                                                      $1,138.57

PAY ** One Thousand One Hundred Thirty-Eight and 57/100 DOLLARS **

TO THE
ORDER     TO: ARTSH- HUSBONDI INC
OF

AYABLE THROUGH BOKF, NA, EUFAULA, OK