Ammon Bundy
P.O. Box 1062
Cedar City, Utah
84720-1062

Amo
FILED* US Bankruptcy Court-UT
DEC 30 2024 PM12:34

# UNITED STATES BANKRUPTCY COURT,
## DISTRICT OF UTAH

Ammon Edward Bundy               (          Case No: 24-23530
                                 (          Chapter 7
                                 (          WILLIAM T. THURMAN

## RESPONSE ST. LUKE'S CREDITOR'S MOTION FOR RELIEF
## FROM BANKRUPTCY STAY

Ammon Edward Bundy, comes now to respond to the St. Luke's motions seeking the court to lift

the automatic stay. Lifting the bankruptcy stay would result in St. Luke's continuing the

collection efforts of an approximate $53,000,000.00 inconceivable debt, an astonishing debt that

St. Luke's has and will continue to use to harm and damage Mr. Bundy and his family if

allowed. Mr. Bundy asks the court to protect him and his family from the ongoing lawfare.

## IMPORTANT BACKGROUND FOR THE COURT

In early 2022, Marissa and Levi Anderson's baby (Cyrus) began vomiting when they fed him

certain solid food. For months they consulted several doctors and nutritionists. The nutritionist

and doctors began recommending different foods and feeding schedules in the effort to help

minimize the emesis. However, in March 2022, after following one of the recommended diets

and schedules, baby Cyrus (10-month-old), vomited multiple times that day. Concerned for



dehydration, (because of the vomiting) one of Cyrus' doctors recommended that Levi and

Marissa took him to St. Luke's hospital for an IV (St. Luke's was the closest hospital that would

perform an IV on infants).

Eventually Cyrus was seen by Dr. Natasha Erickson of St. Luke's Health System and an IV was

administered. The Andersons believed that once Cyrus was hydrated, they would take him home

that night and continue working with their doctors and nutritionist until Cyrus could better digest

normal foods.

However, instead of working with the Andersons, Dr. Erickson became adversarial to them,

demanded baby Cyrus stay in the hospital. Baby Cyrus weighed 14 lbs. which put him low on

the BMI (Body Mass Index) chart. Cyrus' parents are small people genetically (weighing less

than 250 lbs. combined) and Cyrus had been vomiting that day, causing his weight to be lower

than normal when they checked him in.

Complying with Dr. Erickson's medical demands, the Andersons stayed in the hospital that

night. By morning, Cyrus was hydrated and doing well, he had breastfed and drank a bottle

multiple times with minimal vomiting, the doctor reported, *"excellent weight gain"*. (See Exhibit

A) However, when Marissa asked Dr. Erickson if they could be discharged, she threatened them,

saying that if they leave against her medical advice, she would refer them to CPS. (See Exhibit

B) Dr Erickson's threat and postering terrified Marissa and Levi and their extended family. (See

Exhibit C) To exacerbate the Andersons anxiety and concerns, shortly after Dr. Erickson

threatened them with calling CPS, a social worker showed up in their hospital room asking

several interrogating and invasive questions. (See Exhibit D) Levi and Marissa and the extended family were very concerned that St. Luke's and CPS were postering to take their baby away. Terrified, Levi and Marissa complied with all of Dr. Erickson's medical demands and stayed in the hospital for an additional two days, all the time having deep concerns about the way they were being treated and about the medical bill that was being racked up.

Finally, the morning of the fourth day, Dr. Erickson gave her approval for the Andersons to leave the hospital with their baby, on the condition that they continue to follow her orders. During their stay, Dr. Erickson had provided no helpful diagnosis, only that he was underweight and malnourished, (something the Andersons and their doctors were already aware of and working to remedy). (See Exhibit E) However, Marissa & Levi agreed to obey Dr. Erickson's orders because they were frightened that if she did not get her way she might actually report them to CPS. Once Cyrus was discharged, the family was determined to never go back to St. Luke's because of how they were treated, how they were made to feel like they had done something wrong and how they felt threatened with their baby.

The next week Marissa and Cyrus attended three doctor appointments, including two weigh-in appointments that Dr. Erickson set up with a local clinic. That Friday, another weigh in appointment was set by Dr. Erickson, but Marissa called in and canceled the appointment because she was not feeling well. When the report came back to Dr. Erickson that Marissa had missed the appointment, she spoke with the clinic assistant (Aaron Dykstra) and he contacted CPS. (See Exhibit F) The missed appointment would have been the fourth doctor's appointment that Cyrus and Marissa had attended in five days.

Shortly after the cancellation, St. Luke's CARES Center staff (Tracy Jungman) got involved

(likely by the referral of Dr. Erickson) and they left multiple demanding messages. These

messages alarmed the family, especially after they looked up what St. Luke's "CARES" stood

for (Children At Risk Evaluation Services) (See Exhibit G). As loving, innocent and caring

parents, Marissa and Levi with their extended family were scared to bring baby Cyrus to any St.

Luke's facility. Cyrus' young parents were afraid that St. Luke's employees were going to take

their baby and deprive him of their needed care and love, even when they had done nothing

wrong. Even when they had been working with other doctors to help Cyrus. (See Exhibit H)

When they brought Cyrus to St. Luke's in need, rather than helping with a true diagnosis, the

staff threatened the family and caused them not to trust anyone working for the St. Luke's Health

System. Dr. Erickson's threats caused the family to be very cautious and concerned when it came

to anyone working for the St. Luke's Health System.

When seeking help from hospital staff, people are in the most vulnerable times of their lives.

Cyrus' young parents were no different, ANY talk about calling CPS rather than working with

the parents would cause anxiety and terror to any family, especially when it comes from

someone in authority like a doctor, like Dr. Natasha Erickson.

At the recommendation of a St. Luke's employee, that Friday night, Meridian Police Officers

surrounded the family at a gas station, detained Levi, arrested Marissa and took the baby away.

(See Exhibit I) These young exceptional parents did nothing but care, love and protect their

baby. (See Exhibit J) They went to St. Luke's hospital for help and instead St. Luke's employees

threatened and conspired with the police and CPS to take their baby away, reporting to the police

that the parents where in *"non-compliance with medical recommendations"*. (See Exhibit K) Mr.

Bundy remind the court that Marissa had taken Cyrus to multiple doctors many times that week.

Citizens in the United States believe that doctor's recommendations are usually helpful and wise

to follow, but <u>voluntary</u>. However, St. Luke's staff must believe that their recommendations

should be obeyed and if not, you go to jail and your children are taken from you. How absurd!

St. Luke's attorneys later denied that baby Cyrus was taken because of the recommendation(s) of

any St. Luke's employee. Lead attorney Erik Stidham made the point in the lawsuit that,

"*Defendants falsely stated that (1) the St. Luke's Parties initiated and caused the State's

intervention relating to the Infant, d*enying St. Luke's involvement. (See Exhibit L) However,

the truth is clear in medical records and police body cameras; Baby Cyrus was taken at the

recommendation of one or more of St. Luke's employees. (See Exhibit M)

While baby Cyrus was being taken, Marissa contacted Mr. Bundy in horror. With his influence

he immediately began to advocate for the family until miraculously baby Cyrus was returned six

days later.

The entire incident looked terrible for St. Luke's. IDHW quickly dropped the case against Levi

and Marissa and the criminal charges against Marissa where promptly dismissed by the state as

well. (See Exhibit N) But rather than correcting the issues from within the organization and

moving forward, St. Luke's CEO, Chris Roth, hired several teams of attorneys at Holland & Hart

to force a nonfactual public narrative. They crafted a story that St. Luke's staff were the hero's rather than a cause for the baby being taken from innocent parents. The St. Luke's attorneys had the audacity to claim that the parents were neglecting the baby and would have died if they did not take him away from his parent. Also, that Mr. Bundy only advocated for the family to *"gain money and publicity"*, that he had no basis for his advocacy except to get popular and rich.

Read what authoring attorney Erik Stidham wrote in the first line of the lawsuit,

> *"Defendants engaged in a grift, recklessly exploiting the dire medical condition of an Infant to gain money and publicity for themselves. Seeking to benefit financially, to enhance their standing among their followers..."* (See Exhibit O)

St. Luke's attorneys and executives sought to make good evil and evil good, knowing full well that Mr. Bundys efforts to help this little family were not motivated for himself.

When they took Cyrus, Meridian Police had him transported to St. Luke's hospital. Dr. Racheal Thomas, the admin doctor in the emergency department, "cared" for Cyrus that evening. But months later after consulting with the Holland & Hart (St. Luke's) lawyers, she changed her story and grossly misrepresented the facts, even contradicting her own medical notes and reports. It is unclear if these misrepresentations were in conspiracy with St. Luke's lead attorney, Erik Stidham, in preparing for trial or if she made them up herself.

Dr. Racheal Thomas' lies include, among others, that:

> 1. Baby Cyrus looked like a Haiti baby that was malnutritioned and would have died if he was not taken to the hospital. *(See - A picture of Cyrus when he was in*

the "care" of Dr. Thomas), (See - Video of Cyrus right before the police took him

from his mother.) (See - EMT report that evaluated Cyrus before he was admitted

to the hospital) (See Exhibit P)

2.    Baby Cyrus was too weak to sit up on his own when they admitted him. (See

– Picture of Cyrus sitting up and playing in the St. Luke's hospital soon after they

admitted him.), (See - Doctor's record reporting that Cyrus was sitting up on his

own that night.) (See Exhibit Q)

3.    Cyrus was transferred to Boise St. Luke's hospital for medical reasons. (See -

Dr Thomas' and other medical records stating that they did not admit him to the

Boise hospital for medal reason but to evade the protesters outside.)

4.    That Cyrus needed to stay in the hospital because of his condition. (See - Dr.

Thomas trying to discharge Cyrus to a "foster mom" shortly after he was brought

to the hospital. Not for medical reason) (See- Medical reports stating that Cyrus

transferred to Boise "not for medical reasons") (See Exhibit R)

5. That she is moving out of the country because of Mr. Bundy and what he said.

(See – Dr. Thomas explaining on social media posts that she is temporary moving

out of the country for "work opportunity".) (See Exhibit S)


Dr Racheal Thomas was not truthful and was prompted by Erik Stidham to say these things in

front of a jury, under oath.


Many other misrepresentations were proffered to the jury as well. Such as Mr. Bundy causing the

hospital to go on lockdown or Mr. Bundy being a white supremist that wanted the St. Luke's

CEO to hang for being a traitor to the white race. (See Exhibit T) Never once did St. Luke's attorneys or witnesses mention to the jury that baby Cyrus' father is Caucasian but his mother and family (that Mr. Bundy is very close to) are of Hispanic descent. No white supremacist would advocate for a mixed-race family. But truth and facts seem to not matter to the St. Luke's team, only protecting their names, incomes and using their power to punish anyone who expresses dissenting concerns about their harmful actions.

After the family got baby Cyrus back, Mr. Bundy was publicly grateful and returned to his gubernatorial campaign trail. He did not say much more about the situation until, St. Luke CEO, Chris Roth, Dr Natasha Erickson and CARES Nurse Tracy Jungman sued him. The legal maneuvering was designed to make their bad actions against an innocent family look like something else. Even after the lawsuit began Mr. Bundy said very little about it for many months. It was not until he was forced to respond in defense that he began to publicly speak out.

Due to the legal expenses it would require to practically defend himself against the largest institution in Idaho and being in the middle of a governor's race, Mr. Bundy never appeared in the case. Eventually a $53 million default judgment was issued against him and to find relief from the aggression of the St. Luke's attorney's <u>litigating with 6 teams of attorneys in 5 states and in 9 separate courts,</u> Mr. Bundy filed bankruptcy in July of 2024.

## ST. LUKE'S PRESENTED NO LEGAL CAUSE FOR RELIEF

*"Cause for relief from the automatic stay includes the lack of adequate protection of an interest in property of the party seeking relief from the stay. There is no requirement for adequate protection of a claim to the extent that it is unsecured or secured only by a valueless junior lien."* 11 U.S.C.A. § 362(d)(1), In re Braniff Airways, Inc., 42 B.R. 443 (Bankr. N.D. Tex. 1984, In re Smithfield Estates, Inc., 48 B.R. 910 (Bankr. D. R.I. 1985), In re Lopez-Soto, 764 F.2d 23, 2 Fed. R. Serv. 3d 662 (1st Cir. 1985).

*"To establish a prima facie case of cause to lift the automatic stay due to a lack of adequate protection, the creditor seeking relief must provide evidence that the value of the collateralized property is declining or is threatened to decline in value as a result of the automatic stay."* In re JCP Properties, Ltd., 540 B.R. 596 (Bankr. S.D. Tex. 2015).

*"Adequate protection requires that an entity must realize the indubitable equivalent of its interest, meaning the value of its bargained for rights".* U.S. v. Reynolds, 38 B.R. 725 (W.D. Va. 1984)

*"Various factors have been held relevant in determining whether protection is adequate, such as risk, the stability of collateral, the likelihood of reorganization, the credibility of a protection plan, the effect of a senior lienholder's right to post petition interest in reducing the security of a junior lienholder, and the effect of payments to a senior lienholder in reducing its claim and thus increasing the security of a junior lienholder. Other various factors have been held irrelevant,*

*including a prepetition decline in value and the existence of a junior lien."* In re Rankin, 49 B.R.

565 (Bankr. W.D. Mo. 1985); Matter of DeBoer, 63 B.R. 26 (Bankr. D. Neb. 1986). In re

Woodbranch Energy Plaza One, Ltd., 44 B.R. 733 (Bankr. S.D. Tex. 1984).


In St. Luke's Motion for Relief, they put a bunch of periods after *"for cause ...."* but failed to

meet the legal standards for relief from an automatic stay. St. Luke's counsel argues

that, *"The term 'for cause' is not defined in the Bankruptcy Code." Id. "The decision to lift a*

*stay is thus one of the court's discretion. Id."* Referencing Busch v. Busch (In re Busch). (See

Exhibit U) Mr. Bundy does not disagree. However, St. Luke's failed to mention that all of

the *Curtis factors* used in the Busch case are beholden to the bankruptcy proceeding and

monetarily related to the estate, as shown above. Mr. Bundy argues that the courts discretion to

lift the stay should not be autonomous from the monetary nature of the bankruptcy proceeding or

its association to the estate. St. Luke's gives no legal cause that is monetarily related or

beneficial to the bankruptcy or the estate.


In their pleading, St. Luke's emphasized (2), (7), & (12) of the Curtis Factors as authority for the

court to lift the automatic stay, therefore Mr. Bundy will address them.


**(2) Lack of any connection with or interference with the bankruptcy case.** It would be hard

to calculate the interference that relief would have on the bankruptcy case. One of the

fundamental debtor protections in the bankruptcy code is to give the debtor a *"breathing*

*spell"* from creditors and stop all collection efforts and all harassments. This bankruptcy

fundamental cannot be underestimated, especially in this matter. If relief was granted, Mr. Bundy

would be harassed further by the St. Luke's attorneys on many fronts. In their own words they recommend that this court lift the stay and *"permit St. Luke's Creditors the full slate of legal options, including the ability to initiate contempt proceedings,"* (emphasis added) The St. Luke's parties with their attorneys have demonstrated over and over the desire to have Mr. Bundy arrested and jailed. This action alone would completely interfere with this bankruptcy case and would affect Curtis factor (1) as well; **(1) Whether relief would result in a partial … resolution of the issues.** St. Luke's attorneys are consistently drumming up false accusations, filing for contempt proceedings with every public mention of St. Luke's that proceeds out of Mr. Bundy's mouth. Factor **(7) whether litigation in another forum would prejudice the interests of other creditors,** would be impacted also. Non completions or major interference of the bankruptcy proceedings would prejudice the other creditors.

Curtis factor (9) should be closely considered, **(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor.** In nearly all of the prior St. Luke's litigation against Mr. Bundy, the St. Luke's parties sought for judicial liens to pay for their attorney and court fees. For example, in a contempt proceeding in 2022, St. Luke's plaintiffs were awarded attorney's fees. They quickly obtained a writ of execution, ordering Gem County sheriff to take possession of Mr. Bundy's properties, including leaning his house. This was long before the 53-million-dollar judgment was determined. As another example; in federal court (District of Idaho) Mr. Bundy filed to transfer the St. Luke's lawsuit to the U.S Courts, seeking Constitutional protection. The court denied Mr. Bundy's request and at the submission of St. Luke's attorneys, over $18,000 of attorney fees were awarded. If Mr. Bundy recalls correctly, St. Luke's filed for contempt of court when Mr. Bundy did not pay the 18K to them

and the contempt proceeding was ongoing until the bankruptcy stay was automatically placed.

Also, in the mentioned "Utah Case" St. Luke's asked the court, once again, to fine Mr. Bundy, sanction him and award them their attorney fees along with finding Mr. Bundy in contempt of court.

**Factor (10) the interests of judicial economy and the expeditious and economical resolution of litigation.** Litigating in multiple courts in several states, by permitting "*St. Luke's Creditors the full slate of legal options…*" would cause a scheduling nightmare for Mr. Bundy and therefore this court.  In the past, (litigating in 9 courts in 5 states) a court proceeding was taking place every few days. Mr. Bundy does not have the means to hire representation in every court and in all the states that St. Luke's *"full slate of legal options"* would bring. In theory, Mr. Bundy would have the right to attend each proceeding in each court in each state. With the blank check St. Luke's issued the Holland and Hart law firm to go after Mr. Bundy, these proceedings could be endless and the expeditious and economic resolution of litigating this bankruptcy case would be negatively impacted.

**Finally, (12) impact of the stay on the parties and the balance of harms.** St Luke's attorneys can only allege that Mr. Bundy is violating a protective order. They have shown no true nor direct harm that Mr. Bundy's recent words have caused them. Mr. Bundy is careful with his choice of words in public and elsewhere to ensure that they are true and genuine. His recent publications, that seemed to have initiated the St. Luke's motion to stay, was precisely pointing out an observation that Mr. Bundy came to over the years of St. Luke's litigating against him. This observation was in correlation to United Health Insurance, CEO, Brian Thomson, who was

shot to death. In Mr. Bundy public communications he emphasized that he believed he understood why the man shot Brain Thomson. Many times, throughout the video Mr. Bundy expressed that he did not condone the action and that it was contrary to what he understood Jesus taught. In fact, he said that the shooter *"may lose his sole"* for it. (See Exhibit V)

Mr. Bundy also expressed a belief that Chris Roth and Erik Stidham are wicked people who have conspired together to intentionally harm him and his family by abusing the courts with corporate money. (Exhibit W)

How St. Luke's invents harm and contempt by Mr. Bundy's words is yet to be discovered. However, the harm that St. Luke's executives and attorneys have caused Mr. Bundy is clear for all to see. No house, no bank accounts, no funds to pay an attorney, all assets seized, multiple warrants, destroyed incomes, endless litigation…. If the court grants the relief, Mr. Bundy and his family will undoubtedly receive the bulk of the harm once again.

## ST. LUKE'S DOES NOT NEED RELIEF FROM THE STAY TO FILE FOR CRIMINAL CONTEMPT

The bulk of the St. Luke's litigation against Mr. Bundy in Utah (Utah Case) is an effort to collect on the astonishing $53 million dollar judgment. (See Exhibit X) St. Luke's has turned every court in this case into their own person collection agency.

Here is St. Luke's pattern: - File an ex-parte request to seize everything the Bundy's own in the jurisdiction; Once granted, file a complaint claiming how St. Luke's parties are the

victims and how damages are being done to them by Mr. Bundy; Then, litigate with

thousands of pages of legal documents and procedures to overwhelm Mr. Bundy; When

Mr. Bundy does not or cannot respond any longer, file for Contempt of Court, seeking

fines, sanctions, jail time and attorney fees; Do this over and over in every jurisdiction that

Mr. Bundy has any interest in.

Most people hire a collection agency, but St. Luke's has no need when the courts will do their

dirty work for them.


If the court lifts the automatic stay, St. Luke's will continue their pattern of collection. St. Luke's

does not need relief from the stay to file criminal contempt against Mr. Bundy as portrayed in

their Motion for Relief. 11 USC 362 (b)(1). Therefore, the only logical purpose for St. Luke's to

seek the court for relief is so they can continue the harassment and torment of Mr. Bundy and his

family.


**RELIEF WOULD FURTHER DISPARAGE MR. BUNDY UNLESS THE ESTATE CAN**

**BE LIQUIDATED TO PAY FOR ATTORNEY FEES**


The St. Luke's parties through their attorneys are seeking relief from the automatic stay which

would allow them once again to litigate against Mr. Bundy using teams of attorneys in 5 states,

in 9 separate courts, 10 counting this court.  St. Luke's council is trying once again to overwhelm

Mr. Bundy with legal proceedings, knowing that Mr. Bundy does not have the means to hire a

team of attorneys who would or could practically defend him against their multi-billion-dollar

corporation.

Hiring attorneys at this time would be especially difficult being that Mr. Bundy's assets have

been seized by the state as part of the bankruptcy procedure. Granting St. Luke's motion for

relief from the automatic stay in this case would be similar to the police taking a man's gun,

handcuffing him and then refusing to defend him and his family against violent criminals in their

attack. The reason Mr. Bundy chose to file bankruptcy at this time was due to the immense St.

Luke's harassment and litigation that was making it difficult for him to provide for his family.


In the last year St. Luke's has taken or destroyed four income streams that Mr. Bundy had

created to sustain his wife and children, not to mention their home. *The automatic stay provision*

*is one of the fundamental debtor protections in the Bankruptcy Code."* Otero López v. Dep't of

Treasury (In re Otero López), *492 B.R. 595, 601 (Bankr.D.P.R.2013). "It gives the debtor a*

*"breathing spell" from creditors and stops all collection efforts, all harassment, and all*

*foreclosure actions. H.R.Rep. No. 95–595.* Even though St. Luke's attorneys have directed their

enormous flow of lawfare into this bankruptcy case, the orifice caused by the automatic stay has

given Mr. & Mrs. Bundy a much needed "breathing spell".  However, lifting the stay at the same

time restricting assets from being liquidated would require Mr. Bundy to either go into further

debt to hire attorneys or disengage from all litigation and create other ways to defend and

provide for his family. The right and duty to defend and provide is inalienable to every father and

husband.

## **CONCLUSION**

The St. Luke's "Creditors" participated in taking a baby from loving and caring parents who did nothing wrong but seek help from St. Luke's staff. In an effort to change the narrative about their actions and suppress the truth, St. Luke's filed a lawsuit against Mr. Bundy. St. Luke's spared no expense on teams of attorneys, untimely obtaining a $53 million dollar judgment against Mr. Bundy. St. Luke's took Mr. Bundy's home, farm, commercial properties, bank accounts and several income sources and obtained multiple warrants for his arrest. All with in the courts, using nonprofit money to pay for an army of lawyers. For relief, Mr. Bundy filed for bankruptcy and an automatic stay was placed on the St. Luke's attorneys.

St. Luke's attorneys are now asking this court to lift the stay for no legal cause, claiming they are being damaged because of it. St. Luke's argued the Curtis Factors, but give no monetary relation or benefit to the bankruptcy proceeding or the estate. St. Luke's attorneys incorrectly argue that they need the stay lifted so they can file for contempt of court, when 11 USC 362 provides means without lifting the stay. If relief was granted, Mr. Bundy and his family would be further harassed and destitute and would have no way to hire attorneys without liquidating the estate or going into further debt. If relief was granted, the bankruptcy proceedings would be extremely interrupted or halted altogether, possibly prejudicing the other creditors and causing the case to be extended multiple times. Further, St. Luke's litigating without the stay would historically result in Mr. Bundy owing even more money to St. Luke's in awards for attorney fees, especially if Mr. Bundy is financially unable to hire defending counsel. Therefore, Mr. Bundy requests the court to deny St. Luke's relief from the automatic stay.

**DATED THIS DAY,** the 20th of December, 2024.


Ammon Bundy

| CERTIFICATE OF SERVICE

I certify that on this day I served a copy of the attached to:


UNITED STATES BANKRUPTCY COURT, DISTRICT OF UTAH

|  | 350 S Main St, Salt Lake City, UT 84101 | [X] | USPS Mail |
| Mark C. Rose, Trustee | mrose@mbt-law.com | [X] | Email |
| Erik Stidham | efstidham@hollandhart.com | [X] | Email |


**DATED THIS DAY,** the 20th of December, 2024.

Ammon Bundy

Exhibit A

Problem
Malnutrition (Hcc)

FEN/GI: Patient was noted to be well below the 3rd percentile for weight on admission. Admission CBC, CMP was unremarkable. Patient had bilious vomiting the night of admission and he was sent for a stat UGI which was normal. The patient was initially started on oral feeds but he did not demonstrate interest in po feeding. For this reason, he was briefly on IVF until an NG was placed on hospital day 2 and enteral feeds with breastmilk was started. Due to the degree of malnutrition, there was concern for risk of refeeding syndrome and the patient was started at 2/3 caloric goal (hydration requirements only) and feeds were gradually advanced. Labs were monitored closely and the patient did not demonstrate any evidence of refeeding syndrome. SLP was consulted this admission that evaluated the patient's feeding. Gradually, the patient began showing improved oral intake with bottle feeding. Mother was asked to hold off on breastfeeding the infant so that a more accurate measure of intake would be possible. She was able to pump during this admission and noted her milk supply had gone down. Fortunately, the patient demonstrated excellent weight gain with NG and then ultimately po feeding. Family was very eager to leave the hospital and continue to work on feeds outpatient with their PCP. The patient does not have insurance, and so cost of remaining in the hospital was a significant factor for this family. The family was not interested in going home with a feeding pump for NG feeds as the patient seemed to be doing well with po feeds at time of discharge (he successfully completed 2 po feeds with ease prior to discharge). However, as a compromise, the patient was sent home with an NG in place and feeding syringes so that if his PO feeding dropped off, they would have a method to feed the patient.

Exhibit B

Electronically signed by Natasha D. Erickson, MD at 3/1/2022 6:53 PM

Assessment & Plan Note by Natasha D. Erickson, MD at 3/1/2022 1839

10 month old male admitted with failure to thrive and recurrent episodes of vomiting. He is severely malnourished. Initially mother's milk supply was reported to be good, but it is dwindling. I suspect that perhaps milk supply has been more diminished than mother has perceived given the severity of the patient's malnutrition. With the changing history of where the patient has reportedly received care, I am concerned that the patient's history is also unclear and he may have been struggling with weight issues for longer than formerly appreciated. I am unable to obtain any growth curves and it appears the patient never had a newborn screen.
He continues to have some vomiting, but it is intermittent. His weight is up today, but this may reflect fluids that were initially given, particularly since the patient has not been on full calorie feeds. Refeeding labs are reassuring today.

It is quite clear the patient is going to need NG feeds for an extended period of time, in addition to close PCP follow up, outpatient home nursing, feeding therapy, etc. I have discussed the patient with his PCP, Nadia Kravchuk, NP, who also expressed a high level of concern for the severity of malnutrition. She stated that she is not comfortable managing outpatient NG feeding for an infant. However, she has referred to her practice partner who has much more experience with such issues, including placing NG feeds on infants. The patient is scheduled to see Aaron Dykstra on Monday.

The patient's thyroid studies are suppressed. I have discussed this with peds endocrinology. It is possible that he is euthyroid sick due to his severe malnutrition. However, suppressed TSH and free T4 could also suggest central hypothyroidism.

Given the patient has not had any significant monitoring for development, it is possible that there is an underlying medical disorder resulting in the patient's failure to thrive. However, prior to pursuing what could be a very extensive (and possibly unfruitful, let alone expensive) evaluation, would like to continue to advance tube feeds and monitor weight gain, particularly since the majority of cases of failure to thrive is due to insufficient caloric intake.

I have had several conversations with the family today that the patient should remain hospitalized while we continue to work on feeds and monitor for weight gain. I would not recommend discharge today and leaving AMA would result in a CPS referral. Family states they are willing to stay as long as needed. Appreciate social work seeing the family.

Exhibit C



Exhibit D



Anderson, Cyrus James
MRN: 4289116, DOB: 5/1/2021, Sex: M
Acct #: 455250629
Adm: 3/1/2022, Adm: 3/1/2022, D/C: 3/4/2022

---

**03/01/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)**

All Encounter Notes (continued)

**ELECTRONICALLY SIGNED:**
Gracie M. McDermott MS, RDN, CSP, LD
3/3/2022
4:09 PM

Electronically signed by Gracie M. McDermott, RD at 3/3/2022 4:09 PM

---

Progress Notes by Katherine L. Ricken, LCSW at 3/3/2022 1248

**Social Work Progress Note**

**Situation-**
Patient is a 10 month old male admitted for malnutrition. Patient has been intermittently vomiting over the past 3-4 weeks. Parents thought he had a stomach bug, but had him evaluated for allergies and he was found to be allergic to gluten and dairy. He was seen at the pediatrician's on 3/1/22 and found to have lost 4 lbs since his 6 month check-up.
SW was consulted for financial support as parents are self pay and were mentioning financial concerns last night and considered leaving AMA. SW met with mother (Marissa) at bedside and completed evaluation. Of note, care team does not feel this is a result of neglect at this time.

| | 03/03/22 1309 |
|---|---|
| **Referral Data** | |
| Referral Source | Nurse |
| Referral Name | Miranda Mosher |
| Reason for Consult | Other (Comment) |

**Background-**
Marissa and her husband, Levi, live in Meridian. This is their first child. Marissa is a homemaker and Levi works in sales as a contractor. He has not been working during patient's hospitalization; Marissa says his work has been supportive of his absence.
Marissa says the family has all their basic needs met and their financial concern lies within insurance and hospital bills. She is connected with PFA and says they are working on hospital bill forgiveness for her. She says that they make too much income to qualify for Medicaid.

**Assessment-**
Patient was lying in crib and playing quietly with toys. Marissa seemed appropriately attentive to him and says that "he's our biggest priority." She says they will stay in the hospital as long as is recommended for the patient's health and "we will figure out the rest later."

SW encouraged Marissa to continue conversations with PFA. Provided two meal vouchers. Marissa declined any

---

## Exhibit E

### Order Details

| Frequency | Duration | Priority | Order Class |
|---|---|---|---|
| None | None | Routine | Internal Referral |

### Associated Diagnoses

Malnutrition, unspecified type (HCC) [E46] · Primary

### Comments

Hospital discharge likely home on ng feeding for dehydration and malnutrition. Tolerates po bottle.

### Order Questions

| Question | Answer |
|---|---|
| Region | Treasure Valley |
| New or Established? | New patient |
| Treatment | Eval and Treat |

### Reason for Exam

Dx: Malnutrition, unspecified type (HCC) [E46 (ICD-10-CM)]

### Order Providers

| Electronically Signed by | Encounter Provider |
|---|---|
| Natasha D. Erickson, MD | None |

## Exhibit F

### 03/01/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)

Other Orders (group 2 of 2) (continued)

| 0002896230 | ANDERSON,CYRUS JAMES | xxx-xx-0000 | 1720 Westgate Dr |
|---|---|---|---|
| | | | BOISE, ID 83704 |

### Order Details

| Frequency | Duration | Priority | Order Class |
|---|---|---|---|
| None | None | Routine | Clinic Performed |

### Associated Diagnoses

Severe protein-calorie malnutrition (HCC) [E43]

### Comments

Follow up with primary care provider, Aaron Dykstra, within 3 days as previously scheduled for hospital follow-up. No follow up labs or tests are recommended at this time.

### Order Questions

### Reason for Exam

Dx: Severe protein-calorie malnutrition (HCC) [E43 (ICD-10-CM)]

### Order Providers

| Electronically Signed by | Encounter Provider |
|---|---|
| Natasha D. Erickson, MD | None |

Exhibit G



Exhibit H



Exhibit I



Exhibit J
Levi, Marissa & Cyrus Anderson



Exhibit K

POCT blood glucose                    37
   Collection Time: 03/12/22  6:37 AM
Result                  Value        Ref Range
   BEDSIDE              78           60 - 100
   GLUCOSE                           mg/dL

**Radiology Studies:**
None

**Photo Documentation:**
Yes see above

**Medical Assessment:**
Cyrus is a 10 m.o. male with failure to thrive and cyclical vomiting admitted with recent weight loss after gaining weight
appropriately during recent hospitalization.  Was declared in imminent danger prior to admission due to concerns for
nutritional neglect and parental non-compliance with medical recommendations.

Exhibit L

children for financial gain.

    4.      Defendants falsely stated that the St. Luke's Parties were participants in this

nefarious organized ring and had participated in the kidnapping and mistreatment of the Infant.

Among other things, Defendants falsely stated that (1) the St. Luke's Parties initiated and caused

the State's intervention relating to the Infant, (2) the Infant had no need for medical care from the

St. Luke's Parties, (3) the St. Luke's Parties provided unnecessary and improper medical

treatment to drive up medical bills for the Infant's parents, (4) the St. Luke's Parties harmed the

Infant, (5) the St. Luke's Parties had the authority to release the Infant but were illegally refusing

to do so, and (6) that St. Luke's was conspiring with Idaho Governor Brad Little (Bundy's

political opponent) in targeting the Infant.  The Defendants made these false statements and

Exhibit M

Pg. 1

## HISTORY OF PRESENT ILLNESS

Cyrus is a 10 m.o. male discharged from the hospital on 3/4, who presents with weight loss in the setting of failure to thrive. Patient was admitted from 3/1-3/4 after being referred for admission due to severe malnutrition. Initially the patient required NG feeds, but at discharge, he was taking bottle feeds without issue. He was discharged home with an NG in place and family was provided syringe feeding supplies in case the patient's po intake dropped off. Family did not go home with a feeding pump as they declined this, citing cost (they are self-pay). He was scheduled to see his PCP on 3/6, but did not show for the appointment. Home health was also not able to get in touch with the family. Case was discussed on 3/11 with Tracy Jungman with CARES who reported the child had not been seen and despite multiple attempts to contact the family, the patient had not returned for a weight check. Ultimately, health and welfare and law enforcement became involved. It is my understanding a warrant was issued and the child was removed from the home and declared immediately. He was brought to the Meridian ED for evaluation. Health and welfare identified a foster family but due to protesters surrounding the hospital regarding this case, it was felt that discharge with the foster family from the ED was unsafe for all involved. For this reason, the patient was transferred to Boise for further care.

Generated on 3/24/22 10:33 AM                                                              Page 119

Pg. 2

I was contacted by Health and Welfare regarding the referral on the afternoon of March 11. I reviewed the medical records, and reported that I had significant concerns for Cyrus' health and welfare because of the weight loss and ongoing non-compliance regarding medical recommendations. I also contacted Meridian PD (who was already aware of the patient), and shared my concerns with them. CARES appointment was then scheduled for that afternoon, but family did not show for appointment. There was reportedly significant difficulty in locating Cyrus and his parents, but once he was located last night, he was declared in imminent danger and placed in the custody of health and welfare. He was then transported to St. Luke's ED in Meridian for medical evaluation. In the ED, patient was noted to be cachectic. Initial labs included a glucose of 59, BUN of 18, and AST of 60. Patient appeared somewhat listless. Transfer to St. Luke's Children's Hospital in Boise was arranged for continued evaluation and care. CARES consult requested.

Exhibit N



Exhibit O

Freedom Man Press LLC ("FMP"), Freedom Man PAC ("FM PAC"), and the People's Rights

Network ("PRN"), collectively "Defendants," and allege as follows:

## NATURE OF THE CASE

1.      Defendants engaged in a grift, recklessly exploiting the dire medical condition

of an Infant to gain money and publicity for themselves. Seeking to benefit financially, to

enhance their standing among their followers, and to grow the membership of and revenues from

PRN, Bundy (a former candidate for Governor and founder and leader of the activist People's

Rights Network) and Rodriguez (an aspiring political and religious figure, acolyte of Bundy, and

consultant and spokesperson for the Bundy Campaign) acted in concert with the other

Defendants to launch a knowingly dishonest and smear campaign that claimed Idaho State

employees, the judiciary, the police, primary care providers, and the St. Luke's Parties engaged

in widespread kidnapping, trafficking, sexual abuse, and killing of Idaho children.

2.      In furtherance of their smear campaign, Defendants used slick marketing tactics

and disinformation to launch a coordinated attack of defamation and organized business

disruption against the St. Luke's Parties. Defendants incited and agitated their followers with

Exhibit P

## DOCTOR SAYS BABY 'WOULD HAVE DIED'

Thomas has worked with an organization called Flourish Collective to provide medical care to people in Haiti. She said she has treated hundreds of children for malnutrition and dehydration, two of the biggest killers of Haitian children. So strongly did she feel about her work there, according to Thomas, that she got a tattoo of the organization's motto: "Little by little, we'll get there."

Thomas said in court that when Rodriguez's 10-month-old grandchild was brought to the St. Luke's emergency room — where she was the lead physician at the time — her first thought was that "he looked like a baby from Haiti." The baby's stomach was distended, his eyes were hollow and he unable to sit up, she testified.

After the defendants began attacking Thomas online, saying she had lied and posting private information about her — including her photo, address and phone number — the doctor said she had to have difficult conversations with her daughter and her daughter's school about their family being in potential danger. Her daughter became anxious enough that she began seeing a counselor.

After all the actions of Bundy's far-right followers, Thomas said she is leaving Idaho to try to heal from the emotional toll of the past year.

Pg. 2



The emergency room physician, Dr. Rachel Thomas, testified that the 10-month-old baby's stomach was distended, his eyes were hollow and he was unable to sit up, reminding her of severely malnourished babies she had treated in Haiti, according to the Idaho Statesman newspaper. Police said at the time that medical personnel determined the child was malnourished and had lost weight.

Exhibit Q

Pg. 1



Anderson, Cyrus James
MRN: 4289116, DOB: 5/1/2021, Sex: M
Acct #: 455708612
Adm: 3/12/2022, Adm: 3/12/2022, D/C: 3/15/2022

---

**03/12/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)**

Media (Encounter and Order) (group 1 of 2) (continued)

Clinical Photos - Scan on 3/14/2022  2:27 PM

Clinical date/time: 3/14/2022 1427                    User: Jamie E. Price, MD
Description: —

Scan (below)



Pg. 2

 St Luke's

MRN: 4289116, DOB: 5/1/2021, Sex: M
Acct #: 455708612
Adm: 3/12/2022, Adm: 3/12/2022, D/C: 3/15/2022

### 03/12/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)

All Encounter Notes (group 1 of 3) (continued)

Mild temporal wasting is noted consistent with concerns for malnutrition.

HENT:
  Head: Normocephalic. Anterior fontanelle is flat.
  Nose: Nose normal.
  Mouth/Throat:
  Mouth: Mucous membranes are moist.

Eyes:
  Conjunctiva/sclera: Conjunctivae normal.

Cardiovascular:
  Rate and Rhythm: Normal rate and regular rhythm.
  Pulses: Normal pulses.
  Heart sounds: Normal heart sounds. No murmur heard.

Pulmonary:
  Effort: Pulmonary effort is normal. No respiratory distress or nasal flaring.
  Breath sounds: Normal breath sounds. No stridor.

Abdominal:
  General: Abdomen is flat. Bowel sounds are normal. There is no distension.
  Palpations: Abdomen is soft.
  Tenderness: There is no abdominal tenderness.

Musculoskeletal:
  General: No swelling, tenderness or signs of injury.
  Cervical back: Neck supple. No rigidity.

Skin:
  General: Skin is warm.
  Capillary Refill: Capillary refill takes 2 to 3 seconds.
  Turgor: Normal.

Neurological:
  Comments: **Fairly hypotonic in the morning, but tone improved following fluids. Tired throughout the day,
but arouses easily. Prefers to be held by staff and continues to be interactive with staff.**

**Following fluids, tone improved and appears more normal for age. No head lag noted and able to sit
unassisted. Rolls to crawl independently across the crib while supervised.**

Pg. 3

#### Flowsheet Notes

[N1]

| Author | Author Type | Service | Note Type | Status | Filed Time |
|---|---|---|---|---|---|
| Sky Pajak, PT | Physical Therapist | Physical Medicine and Rehabilitation | Progress Notes | Signed | 03/13/22 1420 |

Note Text

**PEDIATRIC PHYSICAL THERAPY EVALUATION:**

**Pertinent information for providers:** PT eval completed to assess gross motor skills, pt currently 10 months old, pt is
able to sit independently for 5 minutes while reaching for toys within reach, but unable to reach across midline for toys
out of reach, unable to maintain midline head control during full pull to sit, able to maintain quadruped once placed but
unable to achieve quadruped independently, unable to roll between supine and prone with much encouragement but
RN reports that pt has rolled supine to prone when going to sleep. Pt showing gross motor delay at 6 month age
range, pt will benefit from additional PT to assist in progression of gross motor skills at age appropriate level.

**Problem List**

Exhibit R

**Video of Dr. Racheal Thomas saying:**

*"Here's the thing. I need to have more degrees of separation to protect this poor foster mom who's going to take this kid, everything else. So, what I want to do is admit this baby to Boise. Not because it is medically necessary. The baby has lost weight and needs to be not in all of this. But, what I want to do is send the baby to Boise, because that's a few more degrees of separation, and then sometime tomorrow when they don't know, get the baby out with CPS to the foster parents."*

*Video:* [https://youtu.be/8Du-jbE022I?feature=shared](https://youtu.be/8Du-jbE022I?feature=shared)

*Pg.1  EMT records, (this is a healthy baby…):*



Pg. 2

Pg. 3

**Medical Record, stating that Cyrus was not transferred to Boise medical reasons (Foster Family):**

H&P by Natasha D. Erickson, MD at 3/12/2022 0304

#### PEDIATRIC HOSPITALIST ADMISSION NOTE

**ADMITTING ATTENDING**
Natasha D. Erickson, MD

**ADMISSION DIAGNOSES**
Active Problems:
   Malnutrition (HCC)
   Failure to thrive (child)

**CHIEF COMPLAINT**
Weight loss

**HISTORY OF PRESENT ILLNESS**
Cyrus is a 10 m.o. male discharged from the hospital on 3/4, who presents with weight loss in the setting of failure to thrive. Patient was admitted from 3/1-3/4 after being referred for admission due to severe malnutrition. Initially the patient required NG feeds, but at discharge, he was taking bottle feeds without issue. He was discharged home with an NG in place and family was provided syringe feeding supplies in case the patient's po intake dropped off. Family did not go home with a feeding pump as they declined this, citing cost (they are self-pay). He was scheduled to see his PCP on 3/6, but did not show for the appointment. Home health was also not able to get in touch with the family. Case was discussed on 3/11 with Tracy Jungman with CARES who reported the child had not been seen and despite multiple attempts to contact the family, the patient had not returned for a weight check. Ultimately, health and welfare and law enforcement became involved. It is my understanding a warrant was issued and the child was removed from the home and declared immediately. Health and welfare identified a foster family but due to protesters surrounding the hospital regarding this case, it was felt that discharge with the foster family from the ED was unsafe for all involved. For this reason, the patient was transferred to Boise for further care.

Generated on 3/24/22 10:33 AM                                                              Page 119

Pg. 4

**Medical Records stating that the reason they did not send Cyrus with foster parents was because of protesters outside, not because of medical reasons:**



Anderson, Cyrus James
MRN: 4289116, DOB: 5/1/2021, Sex: M
Acct #: 455708612
Adm: 3/12/2022, Adm: 3/12/2022, D/C: 3/15/2022

---

**03/12/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)**

All Encounter Notes (group 1 of 3) (continued)

no frenulum injury, fontanelles are appropriate. Patient is tearful but consolable with being held. A bottle was offered to the child at this time the child immediately took a eating 6 ounces without difficulty. Weight was obtained and patient's weight is currently 6.31 kg, at discharge on the fourth patient was 6.545 kg. Blood work was obtained and patient is hypoglycemic which is consistent with poor feeding. Child has demonstrated that he is able and willing to feed while here in the department. At this time there are social difficulties in this situation, it was felt the patient was most appropriate for admission as there is concern about CPS attempting to leave the hospital with the child being followed to the foster care family's home. Furthermore child has significant findings of dehydration and malnutrition. I do not feel IV fluid resuscitation is necessary as child is able to take feeds without difficulty. Patient was transferred to St. Luke's Boise at this time for admission.

Exhibit S



**Rachel Thomas**
Jul 29 · 🌐

I think most people know, but figured in case it hasn't
come all the way down the grapevine yet I'd make an
official social media announcement lol. The Thomas family
is off on our next adventure. This one is a little bit longer.
We will be moving to New Zealand in September for a year,
I have a work opportunity and I'm looking forward to time
to focus on my life- work balance versus my work – life
balance. I love that my family is so supportive of my crazy
ideas and always ready for an adventure! And if, for some
reason, you find yourself in Blenheim, New, Zealand, come
visit!



Exhibit T

96.    Rodriguez became a daily presence at the hospital.  Rodriguez conducted
defamatory "press conferences" outside the St. Luke's Boise hospital.

97.    Incited by Defendants, the crowd of followers harassed patients and staff, and
disrupted patient care.  Patients reported feeling anxious and fearful because of Defendants'
noisy and menacing protests.

98.    On March 15, 2022, Defendants went so far as to cause St. Luke's to go into
lockdown for more than an hour.  During this time, nurses, doctors, and other employees could
not enter or exit the building.  St. Luke's directed patients to other facilities and rerouted
ambulances to other sites.

Trial Audio - 5:02:34 — Speaking to the jury - Chris Roth & Erik Stidham equivalating Mr. Bundy to a white supremacist - DOR "Day of the Rope".

Audio Link: https://youtu.be/3Bcg80hmo3c

Exhibit U

Erik F. Stidham (Admitted pro hac vice)
Robert A. Faucher (Admitted pro hac vice)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-7714
Telephone: (208) 342-5000
efstidham@hollandhart.com
rfaucher@hollandhart.com

Darren G. Reid (11163)
Engels Tejeda (11427)
Benjamin D. Passey (19234)
HOLLAND & HART LLP
222 S. Main Street, Suite 2200
Salt Lake City, UT 84101
Telephone: (801) 799-5800
dgreid@hollandhart.com
ejtejeda@hollandhart.com
bdpassey@hollandhart.com

*Attorneys for St. Luke's Health System, Ltd., St. Luke's Regional Medical Center, Ltd.,
Chris Roth, Natasha Erickson, M.D., and Tracy Jungman, NP*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| In re: | Bankruptcy No. 24-23530 |
|---|---|
| AMMON EDWARD BUNDY | Chapter 7 |
| Debtor. | Honorable William T. Thurman |

### ST. LUKE'S CREDITOR'S MOTION FOR RELIEF FROM BANKRUPTCY STAY

Pursuant to Section 362(d)(1) of the Bankruptcy Code, St. Luke's Health System, Ltd., St.

Luke's Regional Medical Center, Ltd., Chris Roth, Natasha Erickson, M.D., and Tracy Jungman,

NP (together "St. Luke's Creditors"), by and through their counsel, respectfully move this Court

for an order terminating the automatic stay  so that the St. Luke's Creditors may seek enforcement

of a  permanent injunction that prohibits Debtor Ammon Bundy ("**Debtor Bundy**") from engaging

1

Pg. 2

in ongoing defamation of the St. Luke's Creditors, and requires him to remove defamatory statements from internet sites and accounts he controls. The St. Luke's Creditors further request a waiver of the stay imposed by Fed. R. Bankr. Procedure 4001(a)(3) on any order granting the Motion because of the ongoing harm caused by the Debtor and his continuous violation of the pre-petition injunction, and his recent escalation of publishing defamatory allegations against the St. Luke's Creditors.

This Motion is supported by the following Memorandum and the Exhibits attached hereto.

## **MEMORANDUM**

### I.    BACKGROUND

1.    In August 2023, an Idaho state court entered a permanent injunction ("Permanent Injunction") and $53 million default judgment ("Judgment') against Debtor Bundy and other defendants to that case (*St. Luke's et al v. Bundy et al.*, in the District Court of the Fourth Judicial District of the State of Idaho, County of Ada, Case No. CV01-22-06789) (the "Idaho Case"). A true and accurate copy of the Permanent Injunction is included herewith as **Exhibit A**. The Permanent Injunction directs Debtor Bundy to cease posing and disseminating defamatory statements against St. Luke's Creditors. Ex. A at 37. It likewise directs Debtor Bundy to stop making statements that any of the St. Luke's Creditors are criminals, including that they participate in unlawful kidnapping of children. *Id.* The Permanent Injunction also directed Debtor Bundy to remove existing defamatory statements from internet sites and accounts he controls. *Id.*

2.    For more than a year, Debtor Bundy has violated the Permanent Injunction. And recently, Debtor Bundy has increasingly targeted the St. Luke's Creditors with dangerous false statements in violation of the Permanent Injunction. For example, just about a week ago, Debtor

Pg. 3

Bundy escalated his prior defamatory rhetoric in violation of the Permanent Injunction by: (1) making false statements about the facts underlying the judgment; and then (2) targeting the St. Creditors for his followers.

In two live-stream videos posted by Debtor Bundy to his YouTube channel, Debtor Bundy told his followers that:[1]

    a.    "The key people in this that are pushing this are the CEO of St. Luke's, Chris Roth, and of course, he's trying to protect St. Luke's because they're a children's hospital, they're a big hospital chain, they run on a $600 million annual budget. And he's trying to protect his corporation from becoming reputable for taking babies. But that's exactly what happened." Dec. 5 Video at 4:14.

    b.    "I don't want you to send money, what I want you to do is stand up for what is right... I don't want you to think that you've done your job as a citizen of this country by sending me money after some place like St. Luke's Health System has done what they did to me... What I want is for justice to be served. And I'll tell you what, the head attorney on this is a wicked, wicked person. His name is Erik Stidham and he works for Holland & Hart. And he is a wicked, wicked individual... It's authorized by the St. Luke's Board of

---

[1] "Crazy Court Hearing", Dec. 5, 2024,
https://www.youtube.com/live/qsF5QEYnulo?si=N2zvX9doAIwAzRbf (last visited Dec. 9, 2024) ("Dec. 5 Video"); "Deny, Defend, Depose – CEO & Lawyers," Dec. 7, 2024, available at https://www.youtube.com/live/2oNBT1nowDk?si=Fgi2tVkICUpGnDj1 (last visited Dec 9, 2024) ("Dec. 7 Video"). The rough transcripts of these videos are attached hereto as **Exhibit B**.

Directors, and primarily who sits on the Board of Directors, Chris Roth."
"And I tell you what, I don't condone it but I completely understand now
why that murder happened to what was his name - Brian Thompson - of the
United insurance group... Someone came up and shot him in the back
multiple times. And I don't agree with that, but I completely understand it.
Cause I suppress those feelings every day. I do in the sense that I'm a
Christian person and so I am not supposed to think that way." Dec. 5 Video
at 18:40.

    c.    Bundy said Brian Thompson was probably shot because an individual was
wronged by that corporation and CEO: "Because they think they're gods.
Just like Chris Roth. He's pushed this and pushed this and he's got this buddy
Erik Stidham, and he gave him a blank check." Dec. 5 Video at 21:30

    d.    "I think we're going to see this happen more and more I think we're going
to see people become more and more disgruntled more and more um feeling
like they got to take justice into to their own hands[.]" Dec. 7 Video at 17:16.

    3.    Debtor Bundy's recent decision to violate the Permanent Injunction, a court order,
is not new behavior. It follows a long history of Debtor Bundy's refusal to follow orders of courts,
including orders of the Idaho court that he not engage in harassing or defaming behavior of the St.
Luke's Creditors. For example:

    a.    A contempt trial was scheduled to begin on November 13, 2023, in the
Idaho court that issued the Judgment and Permanent Injunction. That trial
was to adjudicate Bundy's violations of a protective order and preliminary

Pg. 5

injunction that governed the during the course of the Idaho proceedings. Specifically, the contempt charges related to Debtor Bundy's defamation and harassment of the St. Luke's Creditors (the plaintiffs in the Idaho case) and also his harassment and doxing of the witnesses, judges, and lawyers involved in that lawsuit. Attached hereto as **Exhibit C** is a true and correct copy of St. Luke's Creditors' Contempt Trial Brief filed on November 3, 2023. Debtor Bundy did not appear on first day of the contempt trial, and the Idaho court issued a warrant for his arrest—which is outstanding.

b.  On October 20, 2023, St. Luke's Creditors also filed a Motion for Contempt against Ammon Bundy and his entities People's Rights Network and Ammon Bundy for Governor in the Idaho Case for violations of the Permanent Injunction. A true and correct copy of Motion for Contempt against Bundy is attached as **Exhibit D**.

c.  Attached hereto as **Exhibit E** is a true and correct index of Debtor Bundy's violations of the Idaho court's August 25, 2023 Permanent Injunction.

4.  Debtor Bundy moved to Utah on or around November 14, 2023.

5.  In April 2024, St. Luke's Creditors commenced an action in the Fifth Judicial District Court, in Washington County, Utah, to enable them to enforce the Judgment and Permanent Injunction in Utah, where Bundy now lives (the "Utah Case"). Attached hereto as **Exhibit F** is a true and correct copy of the docket of the Utah Case.

6.  In the Utah Case, St. Luke's Creditors asked the Utah court to immediately freeze all assets in bank accounts in the name of Debtor, as well as entities he established and controlled,

5

until the conclusion of a separate Idaho court action to pierce the corporate veil was adjudicated. Debtor Bundy had abused the corporate cloak to frustrate St. Luke's Creditors' collection efforts. Attached hereto as **Exhibit G** is a true and correct copy of the moving motion for preliminary relief filed in the Utah Case.

7.    On April 22, 2024, the Utah Court granted St. Luke's Creditors' motion for preliminary relief, finding that absent an injunction, St. Luke's Creditors faced continued irreparable harm to their ability to collect the $52 million Judgment. Attached hereto as **Exhibit H** is a true and correct copy of the Utah court's order granting preliminary relief.

8.    St. Luke's Creditors also requested that the court hold judgment debtors, including Debtor Bundy, in contempt of court and require them to appear personally at the Utah Court and explain why they violated the Judgment. The Utah Court ordered judgment debtors to appear personally at the Fifth District Court in Utah's Washington County to explain whether they violated the Judgment. Debtor Bundy did not appear at the May 20, 2024 hearing. Attached hereto as **Exhibit I** are true and correct copies of the moving papers for the sanctions, including contempt, and the Utah court's order to appear.

9.    Concurrently with the above, St. Luke's Creditors filed a motion for a supplemental proceeding for an examination to identify Debtor Bundy's property, which the Court granted. Attached hereto as **Exhibit J** are true and correct copies of the moving papers for a supplemental proceeding, and the Utah court's order granting the same.

10.    The examination of Debtor Bundy was set in St. George, Utah, near Debtor Bundy's now suspected residence, on June 20, 2024. *Id.* (Order Granting Motion for Supplemental Proceeding). Part and parcel to the order, Debtor Bundy had the option of filling out answers and

Pg. 7

questions about his property, which if answered fully and truthfully, would eliminate his need to attend the Debtor's examination.[2] *Id.* The Court held that if Debtor Bundy failed to comply with its order, it had the option to impose sanctions against Debtor Bundy. *Id.*

11.     Debtor Bundy did not supply written information to St. Luke's Creditors about his assets. He also failed to attend his examination on June 20. St. Luke's Creditors were compelled to ask the Utah Court to enforce its order and for sanctions. Attached hereto as **Exhibit K** is a true and correct copy of the supplemental evidence submitted by St. Luke's creditors in support of their motion to enforce the order and for sanctions. The evidence was of statements made by Debtor Bundy and his acolytes demonstrating Debtor Bundy had no plans to comply with the Judgment. *Id.* The Utah Court set an evidentiary hearing on St. Luke's Creditors' motion to enforce and for sanctions for September 5, 2024. Attached hereto as **Exhibit L** is a true and correct copy of the notice setting the evidentiary hearing.

12.     On July 17, 2024, Debtor Bundy filed this action for protection under Chapter 7 of the Bankruptcy Code—this proceeding. The filing of the petition resulted in an automatic stay of all pending litigation, including the Utah Case.

13.     St. Luke's Creditors now seek an order from this Court that lifts the automatic stay in the Utah Case, allowing St. Luke's Creditors to ask the Utah court to enforce the terms of the Permanent Injunction.

**II.     LEGAL STANDARD**

---

[2] This procedural history is provided for context, only. St. Luke's Creditors do not seek by this motion permission from the Court to seek discovery from Debtor Bundy in the Utah Case related to his assets or property—understanding that any discovery related to Debtor Bundy's assets and liabilities must now be pursued in this bankruptcy proceeding and/or any attendant adversary proceeding.

14.     St. Luke's Creditors' request for relief from the automatic stay is governed by

Section 362(d)(1) of the Bankruptcy Code, which provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause . . . .

15.     The automatic stay imposed by Bankruptcy Code Section 362(a) applied to the

Utah Case. The primary purpose of an automatic stay "is to protect the debtor and its estate from

creditors." *In re Curtis*, 40 B.R. 795, 798 (Bankr. D. Utah 1984). And, "the policy underlying the

automatic stay is to protect the debtor's estate from 'the chaos and wasteful depletion resulting

from multifold, uncoordinated and possibly conflicting litigation.'" *Id.,* at 799 (quoting *In re

Frigitemp. Corp.*, 8 B.R. 284, 289 (S.D.N.Y. 1981)). In some circumstances it is "appropriate to

modify the automatic stay 'for cause' to permit an action to proceed before another tribunal. The

term 'for cause' is not defined in the Bankruptcy Code." *Id*. The decision to lift a stay is thus one

of the court's discretion. *Id*. "The moving party has the burden to show that 'cause' exists to lift

the stay, after which the burden shifts to a debtor to demonstrate why the stay should remain in

place." *Busch v. Busch (In re Busch)*, 294 B.R. 137, 140-41 (B.A.P. 10th Cir. 2003) (citing 11

U.S.C. §§ 362(d)(1), 362(g)).

16.     One of the factors courts "consider when determining whether to modify the stay

is whether doing so would permit pending litigation involving the debtor to continue in a

nonbankruptcy forum." *Id.,* at 141. "Twelve factors were identified in *In re Curtis,* 40 B.R. 795,

799-800 (Bankr. D. Utah 1984), as some of the issues a bankruptcy court might consider when

determining whether to lift the stay to permit pending litigation in another forum" (the "*Curtis*" factors). *Id.* The *Curtis* factors are widely used by bankruptcy courts. *Id.*

17.     The *Curtis* factors are: "(1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms." *In re Sonnax Indus.*, 907 F.2d 1280, 1286 (2d Cir. 1990). Courts only consider the relevant *Curtis* factors. *See id.*

### III.   ARGUMENT

18.     St. Luke's Creditors, through this Motion, seek an order lifting the automatic stay so that they may ask the Utah court to enforce the Permanent Injunction to stop Debtor Bundy's ongoing defamation of St. Luke's Creditors. The Court should grant the motion because, when considering the relevant *Curtis* factors (2), (7), and (12), lifting the stay will not interfere with this case or prejudice the interests of the other creditors, and will reduce harm on St. Luke's Creditors, who are currently hamstrung by the automatic stay from obtaining further relief to stop Debtor

Pg. 10

Bundy's continued violations of the Permanent Injunction and to require him to take down posts that violate the order.

19.    ***Lifting the stay will not interfere with these proceedings.*** Permitting the Utah Case to proceed so that St. Luke's Creditors may obtain relief to enforce the terms of the Permanent Injunction against Debtor Bundy will not result in any interference in this case, which is focused on sorting through Debtor Bundy's debts and assets and giving him a fresh start as to any dischargeable debt. "Systems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which has become oppressive, and to permit him to have a fresh start in business or commercial life, freed from the obligation and responsibilities which may have resulted from business misfortunes." *Wetmore v. Markoe*, 196 U.S. 68, 77, 25 S. Ct. 172, 49 L. Ed. 390 (1904). As in *Westmore*, Debtor Bundy "will receive a fresh start by being relieved of dischargeable debts incurred prepetition." But his bankruptcy petition does not relieve him of his responsibility to adhere to the terms of the Permanent Injunction. The fact of this proceeding and the automatic stay initiated thereby should not function as a shield for Debtor Bundy to prevent St. Luke's Creditors from protecting themselves against his continued defamation and increasingly violent rhetoric.

20.    ***Lifting the automatic stay of the Utah case will not prejudice the interests of the other creditors—the federal and state tax creditors.*** By lifting the stay in the Utah case so that St. Luke's Creditors may enforce the Permanent Injunction, there will be no impact to the proceedings in this bankruptcy case to determine and order the rights of creditors to any payment from Debtor Bundy of any debts determined to be non-dischargeable. The lifting of the stay will only enable

St. Luke's Creditors an avenue to seek relief for Debtor Bundy's public statements made in violation of the Permanent Injunction—which has no bearing on the function of this Court.

21.    ***The automatic stay of the Utah case harms the significant interests of St. Luke's Creditors in having a court with jurisdiction over Bundy enforce the terms of the Permanent Injunction.*** *Curtis* factor number 12 is exceedingly weighty in this instance. Debtor Bundy has consistently ignored the judicial process to avoid his wrongful conduct. All the while, he asks to receive the benefits of the judicial process—as evidenced for example, by his filing for protections and discharge of debt through this Chapter 11 proceeding. And such is his right. Yet, the judicial process also exists to enforce the rights of others.

22.    St. Luke's Creditors are suffering harm and will continue to suffer harm to their own rights, independent of Debtor Bundy's rights to this bankruptcy process, if the automatic stay is not lifted in the Utah Case, where they may appropriately seek relief to enforce the Permanent Injunction. Among the factors to be considered in determining whether the automatic stay should be modified for cause are the good or bad faith of the debtor and the injury to the movant if the stay is not modified." *J E Livestock, Inc. v. Wells Fargo Bank, N.A.* (*In re J E Livestock, Inc.*), 375 B.R. 892, 897 (B.A.P. 10th Cir. 2007). Here, Debtor Bundy continues to act in bad faith — using the shield of the bankruptcy proceeding and the automatic stay to prevent St. Luke's Parties from asking the Utah court to enforce the Permanent Injunction.

23.    The stay of the Utah Case prevents the Utah court from conducting any sanctions or contempt proceedings arising out of Debtor Bundy's disobedience of court orders made before the stay issued — operative here, the Permanent Injunction. *See SEC v. Wolfson*, 309 B.R. 612, 620 (D. Utah 2004) (citing with approval *David v. Hooker, LTD*, 560 F.2d 412, 418 (9th Cir. 1977)

Pg. 12

(ruling that actions to be stayed would not include contempt proceedings arising out of disobedience of an order made prior to the stay); *and SEC v. Bilzerian*, 131 F. Supp. 2d at 13-14 (finding that contempt proceedings are excepted from the automatic stay, not only under the regulatory exception, but also under the court's authority to uphold the dignity of the court and to vindicate the authority of the court to enforce its orders)). Here, the Court should lift the stay of the Utah Case and permit St. Luke's Creditors the full slate of legal options, including the ability to initiate contempt proceedings, to purse relief in that court related to Bundy's continued violations of the court-ordered Permanent Injunction.

24.     St. Luke's Creditors must be afforded the opportunity to ask the Utah court to enforce the Permanent Injunction. Without such relief, the interests of St. Luke's Creditors in ensuring for their ongoing safety, as well as that of their staff, healthcare providers, and patients is at risk. *See* Exhibit A, Findings of Fact and Conclusions of law (detailing the harm to St. Luke's Creditors, and St. Luke's staff, providers and patients caused by Debtor Bundy and conspiring defendants' actions).

IV.    CONCLUSION

25.     The Court should grant St. Luke's Creditors motion to lift the automatic stay in the Utah Case under Section 362(d)(1) of the Bankruptcy Code. St. Luke's Creditors have met their burden to show that a stay is warranted because the relevant *Curtis* factors weigh heavily in their favor, especially to prevent ongoing harm. Lifting the automatic stay in the Utah Case will not interfere with this case and will enable St. Luke's Creditors to seek necessary relief from Debtor Bundy's ongoing and recently escalated acts of defamation.

Pg. 13

DATED this 13th day of December, 2024.

HOLLAND & HART LLP

/s/ Erik F. Stidham
Erik F. Stidham (Admitted pro hac vice)
Robert A. Faucher (Admitted pro hac vice)
HOLLAND & HART LLP

/s/ Engels Tejeda
Darren G. Reid
Engels Tejeda
Benjamin D. Passey

*Attorneys for St. Luke's Health System, Ltd.,
St. Luke's Regional Medical Center, Ltd.,
Chris Roth, Natasha Erickson, M.D., and
Tracy Jungman, NP*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of December, 2024, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Mark C. Rose
McKay, Burton & Thurman, P.C.
trustee@mbt-law.com

U.S. Trustee
USTPRegion19.SK.ECF@usdoj.gov

I further certify that on December 13, 2024, a copy of the foregoing was served on the following non CM/ECF registered participants by electronic mail to Ammon E. Bundy at aebundy@bundyfarms.com and by First Class Mail, U.S. postage prepaid to the following addresses:

Ammon E. Bundy
896 E 400 S
New Harmony, UT 84757

Ammon E. Bundy
P.O. Box 1062
Cedar City, UT 84721

/s/ Erik F. Stidham
Erik F. Stidham

33796546_v1

14

Exhibit V

Video Ammon Bundy  Speaking about Deny, Defend, Depose 9 (Corporate Lawyers and CEO's)
https://www.youtube.com/live/2oNBT1nowDk?feature=shared

Exhibit W

Video of Ammon Bundy speaking of Chris Roth & Erik Stidham as Wicked People.
https://www.youtube.com/live/qsF5QEYnulo?feature=shared

Exhibit X

Darren G. Reid (11163)
HOLLAND & HART LLP
222 S. Main Street, Suite 2200
Salt Lake City, Utah 84101
Telephone: (801) 799-5800
Facsimile: (801) 799-5700
dgreid@hollandhart.com

*Attorneys for Plaintiffs and Judgment Creditors*

---

**IN THE FIFTH JUDICIAL DISTRICT COURT
IN AND FOR WASHINGTON COUNTY, STATE OF UTAH**

---

| | |
|---|---|
| ST. LUKE'S HEALTH SYSTEM, LTD.; ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.; CHRIS ROTH; NATASHA ERICKSON, M.D.; and TRACY JUNGMAN, N.P.; <br><br> Plaintiffs and Judgment Creditors, <br><br> v. <br><br> AMMON BUNDY, an individual; AMMON BUNDY FOR GOVERNOR, a political organization; DIEGO RODRIGUEZ, an individual; FREEDOM MAN PRESS LLC, a limited liability company; FREEDOM MAN PAC, a registered political action committee; and PEOPLE'S RIGHTS NETWORK, a political organization and an unincorporated association; <br><br> Defendants and Judgment Debtors. | **EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br> Case No. 246501034 <br><br> Judge Eric A. Ludlow |

St. Luke's Health System Ltd. ("SLHS") and St. Luke's Regional Medical Center, Ltd.

("SLRMC," and collectively with SLHS, "St. Luke's"), Chris Roth ("Mr. Roth"), Dr. Natasha D.

Erickson ("Dr. Erickson"), and Tracy W. Jungman, NP ("NP Jungman") (collectively "St.

Luke's Parties" or "Plaintiffs" or "Judgment Creditors"), by and through their attorneys of

record, Holland & Hart LLP, hereby respectfully request that, pursuant to Utah R. Civ. P.

Pg. 2 (skipped to conclusion page)

IV.    CONCLUSION

For all the reasons stated, an ex parte order should issue, temporarily enjoining and restraining Bundy and Defendants from using, accessing, or transferring any funds or assets from the Abish-husbondi and related accounts.  The temporary freeze should remain in place until the Idaho court hears and decides Judgment Creditors' Alter Ego action and the propriety of preliminary injunctive relief.

DATED this 19th day of April, 2024.

HOLLAND & HART LLP

/s/Darren G. Reid
Darren G. Reid

*Attorneys for Plaintiffs and Judgment Creditors*

14