IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH

```
- - - - - - - - - - - - - -x  Bankruptcy Number:
                           :  24-23530
In Re:                     :
                           :
AMMON EDWARD BUNDY         :
                           :
          Debtor.          :
                           :
- - - - - - - - - - - - - -x
```

REMOTE VIDEOTAPED DEPOSITION OF AMMON BUNDY

February 25, 2025

Pages 1 - 265

Reported by
Brooke R. Bohr
IDAHO CSR No. 753
Federal Certified Realtime Reporter
NCRA Registered Professional Reporter

```
 1                   AMMON EDWARD BUNDY,

 2   produced as a witness at the instance of the

 3   Creditors, having been first duly sworn, was

 4   examined and testified as follows:

 5

 6                     EXAMINATION

 7   BY MR. STIDHAM:

 8        Q.   All right.  Mr. Bundy, just a

 9   preliminary matter.  As we discussed before we

10   went on the record, I understand that you've

11   posted the link to this -- this examination to

12   some of your followers or posted it publicly;

13   is that true?

14        A.   I posted it to one person who commented

15   that I said I would post it to.

16        Q.   Okay.  And I did see the video you

17   posted last night.  And if I understood you

18   correctly in the video you posted last night,

19   you -- you would seem to be agreeing that the

20   folks that log on to watch this can be muted and

21   will not be participating or making any

22   statements during the examination.

23             Are we in agreement regarding that?

24        A.   That's up to you.

25        Q.   Okay.
```

1       A.   I have answered this question about

2   Arizona previously.

3       Q.   Okay.  But not -- not the Federal

4   Government.

5       A.   I actually am unsure about that.

6       Q.   Okay.  So where did the money go,

7   Mr. Bundy?  Where did that money go, the funds

8   from Fleet go?  I understand a portion of it went

9   to having Rebecca Branson make an investment for

10  you in her name.  Where else -- where did the rest

11  of the money go?

12      A.   I am unsure about that.  It is not

13  fresh on my mind.  I was always looking for, you

14  know, new investments.  And I may have deposited

15  into the Abish portion.  I'm not sure.  I'm

16  actually not sure.  I would have to review the

17  bank statements to verify what I did with that.

18      Q.   Okay.  Mr. Bundy, do you still have in

19  your possession or control any of the $487,000

20  that was transferred to you by Mr. Branson and/or

21  Global Trading on January 5th, 2024?

22      A.   Yes.

23      Q.   What portion of the $487,000 do you

24  still have under your custody and control?

25      A.   Let me check here.  I did address that.

Page 108

1    Hang on one second.

2          Q.   Mr. Bundy, I mean, can you just answer

3    the question?

4          A.   No, I can't.  I don't know the amount.

5          Q.   Okay.  Well, go ahead.

6               What are you referring to, just so the

7    record is clear?

8          A.   I'm referring to the response to the

9    "Many St. Luke's Motions Trying to Destitute

10   Ammon Bundy and His Family."  I disclosed all of

11   this information, and I --

12         Q.   Mr. Bundy, you understand we need to --

13   and we're getting a lot of additional information,

14   too, that we need to have you clarify under oath

15   what you said.  I mean, you didn't make that under

16   oath, and it is vague and it is full of a lot of

17   rhetoric.  I'm asking you a straightforward

18   question.  I really don't want you to read a

19   speech to me.

20               Do you still have any of that $487,000

21   under your custody and control?

22         A.   I already answered that.

23         Q.   And how much is it?

24         A.   I am looking.

25               Approximately 200,000.

Page 109

1          Q.    Okay.  Where is that $200,000?

2          A.    It is in my possession.  And that is

3    Abish-husbondi funds.  They are not personal funds

4    of mine.

5          Q.    So do you have an account with $200,000

6    in it that is -- that you contend is held by

7    Abish-husbondi?

8          A.    I did not say an account.

9          Q.    Well, where is the money, sir?

10         A.    I have it in my possession.

11         Q.    So in your possession?  Is it in a safe

12   somewhere?  Or what do you mean by in your

13   possession?

14         A.    It is in my possession.

15         Q.    So you have $200,000 in cash in your

16   possession?  Did you reflect that at all on your

17   bankruptcy filings?

18         A.    I think you're trying to --

19         Q.    My question is, did you reflect on

20   your bankruptcy filings that you have $200,000

21   cash in your possession?

22         A.    I was not required to.  This is

23   corporate funds.  They are not my funds.  I filed

24   bankruptcy personally.

25         Q.    How did -- how did the sale --

Page 110

1          A.    They are not my funds.

2          Q.    Mr. Bundy, how are those corporate

3    funds?  How is the $487,000 that was paid to

4    you, based on the sale of a residence that you

5    personally owned, corporate Abish-husbondi funds?

6          A.    I loaned the money from Abish-husbondi.

7          Q.    Where is the -- where is the contract

8    reflecting a loan from Abish-husbondi, to who?

9    Who -- by the way, who -- who was this loan from

10   Abish-husbondi to?

11         A.    It was the -- the loan was to Ammon

12   and Lisa Bundy.  And then we loaned the -- we paid

13   off the home and gave a loan to Jane Venezuela,

14   and that is all documented recorded.  And the

15   promise was when she paid off that loan, that I

16   would pay Abish-husbondi back.

17         Q.    Okay.  Mr. Bundy, I want to make sure

18   I'm tracking this.

19               She paid -- she paid off the loan after

20   the judgment for St. Luke's was in place, correct?

21         A.    Yes.

22         Q.    Okay.  So you knew that there was a

23   $53 million judgment against you, personally, at

24   the time that you received $487,000 for the sale

25   of a residence in Arizona that was in your

Page 111

1    individual name, correct?

2          A.   Correct.  Correct.

3          Q.   Okay.  And you have not produced any

4    documents showing any loan from Abish-husbondi to

5    you and your wife, have you?

6          A.   I do not believe so.

7          Q.   Are there -- was there ever a written

8    contract reflecting a loan from Abish-husbondi to

9    you and your wife of, it sounds like about a

10   half-million dollars?

11         A.   No.

12         Q.   Okay.  And who was it at Abish-

13   husbondi -- which of the shareholders at Abish-

14   husbondi decided and authorized a loan to you,

15   personally, of $500,000?

16         A.   I believe that this loan -- well, I'll

17   have to check.  But I believe it was done before

18   there were other shareholders.

19         Q.   So you as the sole shareholder of

20   Abish-husbondi contend that you made a loan

21   without any documentation to you and your wife

22   personally?

23              Is that what you're saying?

24         A.   Yeah.  There was nothing illegal or

25   unethical about that at all.

Case 1:24-cr-23580-J Doc 415-1 Filed 04/15/25 Entered 04/15/25 16:52:43 Desc Exhibit
Re: Ammon Edward Bundy   A   Page 8 of 46

Page 112

1          Q.   Okay.  What were the terms of the

2    loan that you authorized as the sole shareholder,

3    without any paperwork whatsoever, to you and your

4    wife personally?

5          A.   That when I was paid off, that we would

6    pay the loan to Abish.

7          Q.   Was it a no interest loan?

8          A.   It was a no interest loan.

9          Q.   Where is that written down in --

10   that there was a no interest loan that you as the

11   sole shareholder of Abish-husbondi authorized to

12   give to yourself?

13         A.   I already gave you that answer.  There

14   is no --

15         Q.   There's no writing?

16              Is it fair to say this is just

17   something that's in your head -- reflected in your

18   head?

19         A.   No.  It is very -- it is reflected in

20   the transactions.

21         Q.   Well, there's -- there's certainly a

22   bank statement that shows money going to you from

23   an account that you used for both personal and

24   business purposes.  But there's -- is there any

25   other --

Page 113

1          A.   So there is a record of a transaction

2   going from Abish-husbondi, Inc., to my personal

3   account -- to my personal account, as a loan.  It

4   is a large amount of money.  And then you'll see

5   the transaction pay off the loan.

6          Q.   When you say this, Mr. Bundy, you're

7   just talking about numbers on bank statements,

8   correct?  There's -- I just want to make sure what

9   we're talking about.  There's no contracts, no

10  other paperwork, just bank statement numbers,

11  correct?  Moving -- you're moving money around

12  your different accounts, correct?

13         A.   Well, no, that's not correct.

14         Q.   Well, were you -- were you the

15  individual who authorized moving -- well, let me

16  back up, so I make sure I know.

17             What is -- what is the amount of this

18  loan that you contend that you agreed to give to

19  yourself as a sole shareholder of Abish-husbondi,

20  with no terms other than it would get paid back

21  someday and no interest?

22         A.   So there were terms.

23         Q.   What were the terms?

24         A.   The terms was when it was -- when she

25  paid off the loan, which was agreed to as a

Page 114

1    short-term loan to her, then the amount that was

2    owed to Abish would be paid.  And that's exactly

3    what happened.

4         Q.   Just so we're clear.  I don't want

5    to be confused here.  You say there were terms --

6    they were terms that you say were just in your

7    head, right, they weren't written down anywhere?

8              Is that what you're saying?

9         A.   That's correct.

10        Q.   Okay.  And isn't it true --

11        A.   I am not done answering that question.

12        Q.   Sure.

13             My question, though, just -- but I want

14   to make sure you have the question.

15        A.   I'm not done answering that question.

16        Q.   The question was, those were just terms

17   in your head and not written down anywhere,

18   correct?

19        A.   Yes, but they are very evident in the

20   transactions.

21        Q.   Okay, Mr. Bundy.

22             And just so we're clear, any -- any

23   monies that came out of those accounts that you

24   contend were Abish-husbondi, whether it was paying

25   for Jimmy Johns or, you know, we can go through

Page 115

```
 1   it, Chinese food, personal -- personal credit

 2   cards, you're contending all of those were

 3   Abish-husbondi expenditures?

 4        A.   I don't know what transactions you're

 5   talking about.

 6        Q.   Well, who was in control of the

 7   Abish-husbondi accounts at Clarity Bank, Mountain

 8   America and Wells Fargo?

 9        A.   I was.

10        Q.   Okay.  So you're solely responsible for

11   all of the activity in that account; is that fair

12   to say?

13        A.   Yeah.

14        Q.   Okay.

15        A.   I think responsible for the day-to-day

16   transactions, yes.

17        Q.   So when the 200 -- let me -- I'm

18   jumping around to when you contend that you took

19   $200,000 cash and -- and now have it, I guess in a

20   safe somewhere, but it is purportedly

21   Abish-husbondi's money?

22        A.   Correct.

23        Q.   Why was there not a distribution to

24   anybody else who was a shareholder?

25        A.   Because it hasn't been distributed.
```

Page 116

1        Q.   Why hasn't it been distributed?

2        A.   We haven't distributed it.  We haven't

3    done --

4        Q.   Have you talked to Mr. Jones about the

5    fact that he's purportedly a shareholder and

6    you're keeping $200,000 in cash that you now

7    contend is Abish-husbondi money in a -- in a --

8    in a safe at your house?

9        A.   I do not now contend that.

10       Q.   Did you ever tell Mr. Jones about this

11   scheme?

12       A.   I object to your terminology.

13       Q.   Did you ever tell Mr. Jones about this

14   loan scheme?

15       A.   I object to your terminology.

16       Q.   You can object, but please answer the

17   question.

18       A.   I can't answer the question.

19       Q.   Did you ever tell Mr. Jones that --

20   did you ever tell Mr. Jones that you're holding

21   $200,000 in cash?

22       A.   I am not sure whether I discussed the

23   amount or not.

24       Q.   So you're contending even though

25   he's a majority shareholder, you didn't have any

Case 24-2358 (Bundy)   Doc 415-1   Filed 04/15/25   Entered 04/15/25 16:52:43   Desc Exhibit
Re: Ammon Edward Bundy   A   Page 13 of 46

Page 117

1   obligation to tell him how much money you're

2   purportedly holding in cash in your safe on behalf

3   of Abish-husbondi?

4       A.   I never said that at all.

5       Q.   Well, what did you tell him?

6       A.   I've been pretty open with him about

7   all of the processes that I've gone through.  I

8   haven't in any way tried to hide anything from him

9   or --

10      Q.   Well, do you think Mr. Jones would make

11  himself available to testify regarding these

12  transactions?

13      A.   I have no idea.  I can't --

14      Q.   Well, can I ask you if you -- if you

15  would request that he make himself available to

16  testify regarding this?

17      A.   You can ask.

18      Q.   Well, would you?

19      A.   Ask him?

20      Q.   No.  I'm asking you, just so we can

21  move this forward, will you tell your friend that

22  it would be helpful to have him testify under oath

23  regarding these transactions?

24      A.   Helpful for you or helpful for me?

25      Q.   Helpful at getting to truth, Mr. Bundy.

Page 118

1        A.   I can tell him that, sure.

2        Q.   All right.  I appreciate it.

3             So that's -- you said now that there's

4   $200,000 in cash in your possession out of the

5   $487,000 related to the sale of the home that you

6   owned in Arizona.

7             Where is the rest of the money?

8        A.   Related to the -- to the loan that was

9   paid back to Abish?

10       Q.   The -- well, I think it is disputable

11   as to whether it was a loan, but let's just keep

12   in terms of a number.

13             There was a $487,000 payment, based on

14   the sale of your home in Arizona, correct?

15       A.   Correct.

16       Q.   Okay.  And I think you testified that

17   you personally possessed or have in your

18   possession and control $200,000 of that $487,000,

19   correct?

20       A.   Correct.

21       Q.   Okay.  Where is the other $287,000?

22       A.   I used a portion of the funds to catch

23   up on several business expenses that needed to be

24   done.

25       Q.   Which -- I'm sorry.  Go ahead.

Page 119

1          A.   And the balance, I transferred to

2    Cedar City, Utah, Mountain America business

3    account.

4          Q.   Okay.  How much of the money is in the

5    Cedar City Mountain America business account?

6          A.   None.

7               Well, actually, you -- you may know

8    that better than me.  You seized that account.

9          Q.   Okay.  So let's -- let's back up,

10   because I want to understand better here the

11   testimony you just provided.

12         A.   Are you still there?

13         Q.   Yeah.  I'm just -- I'm just looking at

14   the transcript, so I make sure I understand what

15   you testified because I've got some follow-up

16   questions about that.

17              You stated -- my question was about

18   where did the other $287,000 go?  You say a

19   portion of the funds was used to catch up on

20   several business expenses that needed to be done.

21              So if we can pause just right there.

22   Could you explain to me what the several business

23   expenses were that you needed to catch up on?

24         A.   There was a whole slew.  I know that

25   there was a significant amount of property taxes

**Exhibit A**

Page 120

1    that we pay every year.  There was improvements on

2    the warehouse.  We were remodeling, in the middle

3    of remodeling the warehouse.  So there was a good

4    amount of expenses there.  And just, you know, the

5    day-to-day normal expenses of keeping the lights

6    on, paying the power bills, and, you know, all of

7    that.

8            Q.    So where -- where would -- where would

9    we go, as far as documents, to -- to identify what

10   exactly was paid and -- and -- and for what out of

11   the -- those funds that you're talking about?

12           A.    We could identify them in the bank

13   statements.

14           Q.    In the bank statements?

15           A.    Correct.

16           Q.    Do you have a sense for how much of

17   that $287,000 went to this expenditure that you

18   say was catching up on business expenses?

19           A.    Yeah, I could do a little bit of math,

20   if you want me to.

21           Q.    Sure.

22                  And -- and it will be helpful,

23   Mr. Bundy, to speed things up, when you say you're

24   doing the math, what -- if you can tell me what

25   you're referring to in order to do the math.

Page 121

1           A.   Well, just the balances and --

2           Q.   When you say balances, sir, are you

3    referring to a document that I could follow along

4    with?

5           A.   Yeah.

6                It is titled, "The Response to the

7    Many St. Luke's Motions Seeking to Destitute

8    Ammon Bundy and His Family," where all of this --

9           Q.   No.  I'm talking about bank statements,

10   Mr. Bundy.  I think you told me that the only

11   financial records for Abish-husbondi dealings are

12   we need to look at bank statements.

13               So where are the bank statements that

14   you are referring to?

15          A.   You have them.  They are in your

16   possession.

17          Q.   Okay.  So did you look at the bank

18   statements in order to come up with this

19   calculation as to how much of the $487,000 you

20   contend, after it was distributed to you, was

21   used to pay several business expenses for

22   Abish-husbondi?

23          A.   No, I did not use the bank statements

24   for that.

25          Q.   Okay.  How did you come up with that

Page 122

1    number?

2         A.   Well, I had the total, and then I have

3    the balances of what is left.  And that's where I

4    come up with that amount.

5         Q.   When you say you have the total,

6    just -- I want to track with you.  What total are

7    you talking about?

8         A.   The $487,157.36.

9         Q.   I appreciate it.

10        And then what are the balances that

11   you have that you used to subtract down to the

12   number?

13        A.   Well, the 200 that I have.

14        Q.   Okay.

15        A.   And then the 215,000 that I purchased

16   materials, intellectual property and a domain for.

17        Q.   Okay.  Were those disclosed on the

18   bankruptcy filing?

19        A.   No.  These are all corporate

20   transactions.

21        Q.   But I thought you said you don't own

22   Abish-husbondi anymore.  So who owns -- who owns

23   the -- who owns this intellectual property and

24   stuff?  Are you contending that -- are you

25   agreeing that given that St. Luke's now owns the

Page 123

1  shares of Abish-husbondi, it also owns these

2  assets?

3          A.   What I'm saying is that --

4          Q.   That's my question, sir.

5               Are these -- are these $215,000, are

6  these assets owned by Abish-husbondi or are they

7  owned by you?

8          A.   They are owned by Abish-husbondi.

9          Q.   Okay.  So -- so, in other words, as

10  the shareholder, if St. Luke's rightfully owns

11  Abish-husbondi shares, that -- those assets should

12  be given to St. Luke's, correct?

13          A.   Correct.

14          Q.   Okay.

15          A.   If -- if you owned them.

16          Q.   Okay.  And so the $215,000 -- and I --

17  I interrupted with those questions to understand

18  the 200,000 -- 215.

19               So to back up and let you finish your

20  calculation.  We started with 487.  We subtracted

21  $200,000 for the cash you have in your possession.

22  We subtracted $215,000 for a purchase made on

23  behalf of assets on behalf of Abish-husbondi,

24  correct?

25          A.   I believe, correct.  Yes.

**Exhibit A**

Page 124

```
 1        Q.   Okay.  Any other -- any other math
 2   that we need to do in order to get down to the
 3   amount that you contend was spent on several
 4   business expenses?
 5        A.   No.  That's -- you know, pretty
 6   general, but that is accurate.
 7        Q.   Okay.  So basically, 415,000 from 487,
 8   correct?
 9        A.   Hang on one second.
10             So you're saying, to understand
11   correctly, so 487 -- just a little over 487.
12   You're what?  The question is what?
13        Q.   We're trying to get down to that
14   amount, sir, that you contend was used on -- on
15   business expenses and -- and that needed to be
16   done.  So I took the $200,000 that you have cash
17   in your possession, the $215,000 that you contend
18   were assets purchased for Abish-husbondi, gets me
19   to 415.  And then I subtract that from 487,
20   correct?
21        A.   That's correct.
22        Q.   Okay.  So that then leaves us with the
23   amount that you contend was spent on several
24   businesses expenses?
25        A.   That's correct.
```

Page 125

1    Q.   Okay.  All right.  Where would we be

2    able to track those several business expenses?

3    Would we be able to see them in the bank

4    statements?

5    A.   Yes, I've already answered that

6    question.

7    Q.   Okay.  I just want to make sure.

8    And what's the timeframe for those

9    expenditures, so we can kind of narrow in on the

10   bank statements?

11   A.   Well, it would be from the period of

12   time of when I received it, which was -- let me

13   see, January -- let me see if this is correct.

14   January -- January 4th, right around there, I

15   think is what I was saying.  I believe that's

16   when the -- 2024 to the time they were

17   transferred.  Let me see, 2024.

18   I think I need to reference the -- the

19   estoppel and give you that date exactly when I got

20   it.  So I could do that if you --

21   Q.   Yeah, if you just pause for a second,

22   I'll put it up on the share screen.  Okay?

23   A.   Okay.

24   Q.   Okay.  Mr. Bundy, I'll share the

25   screen.

Page 145

1          Q.    For -- for space in the warehouse?

2          A.    I believe so.

3          Q.    Okay.  And so is it fair to say that

4    you had a lease in place with Emmett Door at this

5    time?

6          A.    Not personally.  So no, it is not fair

7    to say.

8          Q.    Fair enough.

9                Okay.  So you contend that there was a

10   lease in place in 2024 between Emmett Door and

11   Abish-husbondi; is that correct?

12         A.    Correct.

13         Q.    Okay.  Now, Mr. Bundy, I'm on

14   Exhibit 33 -- excuse me, page 33 of the exhibit.

15               Do you see that?

16         A.    Yes.

17         Q.    Okay.  And I'm looking at an entry out

18   of the -- out of the account that is labeled

19   Abish-husbondi private -- private savings --

20   primary savings, excuse me, on March 4th for

21   $425,000.

22               Do you see that?

23         A.    Yes.

24         Q.    Okay.  And it has got a notation there

25   that states:  "To Bundy, Ryan"?

Page 146

1          A.    Correct.

2          Q.    "Short-term loan."

3                Am I reading that correctly?

4          A.    Yes.

5          Q.    So was a short-term loan provided to

6    Ryan Bundy in the amount of $425,000 at this time?

7          A.    Yes.

8          Q.    Okay.  And what was the purpose of the

9    loan?

10         A.    He needed some cash flow.

11         Q.    What did he need it for?

12         A.    He's in -- he's in business in

13   construction.

14         Q.    What was the term of the loan?

15         A.    I can reference that, if you would

16   like.  He has since paid that back to me.

17         Q.    Okay.  Great.

18                So let me -- let me get some background

19   first, Mr. Bundy.

20                Was this a loan between Ryan Bundy and

21   who?

22         A.    Abish-husbondi.

23         Q.    Abish-husbondi?

24                And was there a -- is there a loan

25   document in writing reflecting this transaction?

Page 147

1          A.    Yes.

2          Q.    Okay.  Has that been produced in this

3    case?

4          A.    No.

5          Q.    Why not?

6          A.    Because this is a corporate

7    transaction.

8          Q.    Okay.  Well -- well, we can address

9    that later.

10               What were the terms of the loan

11   agreement?

12         A.    If you would like, we can go to that

13   document.  I can go to it, if you would like.

14         Q.    Do you have the loan document, sir?

15         A.    I have a copy of it, yes.

16         Q.    Yeah.  And I would just state that we

17   request a copy of that.  But, yeah, if you

18   wouldn't mind identifying the date and what the

19   terms were.

20         A.    So I think this is definitely the point

21   where I'm going to object to this line of

22   questioning and no longer answer because we're

23   dealing with corporate transactions.  You know, if

24   the Court agrees with me, great, if they don't

25   agree with me then -- and I'm compelled, then I'll

Page 148

1   do that.

2          But I'm -- I'm going to object to this

3   line of questioning.  I have entertained it for

4   quite some time now.  I've insisted that these

5   were corporate transactions.  I continue to insist

6   that they are corporate transactions.  I have

7   documentation to show they are corporate

8   transactions.  When I made them, I -- I had the

9   authority to make them as the president of

10  Abish-husbondi.  And so at this point -- I have

11  not, you know, personally benefited from them in

12  any way -- direct way.  So I'm going to object to

13  this line of questioning.

14        Q.   Okay.  Mr. -- Mr. Bundy, I need to --

15  I understand that is your objection -- your

16  objection.  I need to ask some questions around

17  that, so we can get it framed for the Court to

18  resolve.

19             At the time that this supposed

20  short-term loan was made from Abish-husbondi to

21  Ryan Bundy, were you the only shareholder at

22  Abish-husbondi involved in the decision to loan

23  the money?

24        A.   I am objecting to this line of

25  questioning.

Page 149

1          Q.   Well, was there anybody else at

2    Abish-husbondi involved in deciding to make a

3    loan to Ryan Bundy at or around the time you were

4    seeking to conceal money from St. Luke's?

5          A.   I have made lots of loans to many

6    different people.  I have leased a lot of

7    property.  I have purchased and sold properties.

8    I have done it according to the laws in whichever

9    state I'm involved in.  And I did not have to

10   consult any other individuals.  And -- and so that

11   is my answer.  And I object to this line of

12   questioning.

13          Q.   So I'm going to understand the answer

14   you did provide.

15               So at this point in time, March of

16   2024, your position is that you had the authority,

17   the sole authority on behalf of Abish-husbondi to

18   decide whether or not to loan more than $400,000

19   to your brother.  And you had no need to consult

20   Global Trading or Mr. Jones or any other share --

21   any other purported shareholders?

22          A.   Yeah.  And you would have to agree with

23   me.

24          Q.   Well, I mean, what -- so are you --

25   I want to make sure.  Even though you were the

Page 150

1    minority shareholder, even though Mr. Jones --

2    strike that.

3              Even though you contend that Mr. Jones

4    and Global Trading owned 90 percent of

5    Abish-husbondi at this time, your position is that

6    you had sole authority to make unilateral

7    decisions regarding $400,000 of Abish-husbondi

8    funds?

9         A.   You know -- well know this answer,

10   that the shareholders in a corporation are not the

11   controllers of what happens in the corporation.

12   You know that.  And so your question is nefarious,

13   and I object to this line of questioning.

14        Q.   Did you inform the shareholders in this

15   small, closely held company that you were making

16   this loan?

17        A.   I object to this line of questioning.

18        Q.   Okay.  Well, where -- where is your

19   authority -- your purported authority to act on

20   behalf of Abish-husbondi in this timeframe set

21   out?

22        A.   I was the president of Abish-husbondi.

23        Q.   Where is -- where is your authority --

24        A.   It never ever changed.  It never

25   changed.  I was the president.

Page 151

1        Q.    Okay.  All right.  But regardless,

2   just so we know, you, at this time period, were

3   made -- had complete and sole authority over

4   Abish-husbondi in this March 2024 timeframe,

5   correct?

6            A.    I have always had complete authority

7   over Abish-husbondi.

8            Q.    Okay.  That's --

9            A.    I've never disputed that.  I have

10   followed the laws and made many transactions.

11           Q.    When, Mr. Bundy -- you stated earlier

12   that this loan was paid back, this $425,000 loan

13   to -- to Ryan Bundy?  When was this paid back?

14           A.    I've already said that I object to this

15   line of questioning.

16           Q.    Well, it is --

17           A.    I'm objecting.

18           Q.    Are you -- was it paid back to you

19   personally?

20           A.    I object to this line of questioning.

21           Q.    So, Mr. Bundy, I want to be perfectly

22   clear.  Did you personally receive any funds out

23   of the -- out of the purported paying back by

24   Ryan Bundy of a $425,000 loan that shows being

25   disbursed on March 4th, 2024?

Page 152

1          A.   I've already answered that question,

2    and that is this has always been corporate funds

3    and has never transferred personally to me.  And I

4    have been consistent in that in your questioning,

5    in my documentation and everything that I have

6    given you and in my testimony.

7          Q.   Did Mr. -- did Ryan Bundy pay

8    Abish-husbondi back for this loan, but sending

9    the money somewhere else than Mountain America

10   Bank?

11         A.   I object to this line of questioning.

12   I've already answered that question actually.

13         Q.   No, you haven't.

14         A.   I object to that -- this line of

15   questioning.

16         Q.   Did Ryan Bundy give you $200,000 in

17   cash as part of the paying back of this purported

18   loan from Abish-husbondi to him in March -- on

19   March 4th of 2024 in the amount of $425,000?

20         A.   I don't understand your question.

21         Q.   So you say Mr. Bundy, Ryan Bundy, paid

22   back the $425,000 loan.  Did he pay back that

23   loan, in part, by giving you $200,000 in cash?

24         A.   So I object to the line of questioning.

25   I've already testified that I have $200,000 of

Case 1:24-cr-23580-Bundy  Doc 415-1  Filed 04/15/25  Entered 04/15/25 16:52:43 / 20 of 25 Desc Exhibit
Re: Ammon Edward Bundy  A  Page 30 of 46

Page 153

1    Abish funds.

2         Q.   Did it come from Ryan Bundy paying back

3    this loan?

4         A.   I object to this questioning.

5         Q.   What is your basis for objecting, sir?

6         A.   I've already gathered my basis.  I've

7    been objecting for quite some time now.

8         Q.   Okay.  So you're not going to tell

9    us when the $425,000 reportedly loaned by

10   Abish-husbondi in March -- on March 4, 2024, was

11   paid back; is that correct?

12        A.   I -- I object to this line of

13   questioning.

14        Q.   Can you show me anywhere in the

15   Mountain America statements for the Abish-husbondi

16   accounts in 2024, where it would reflect any

17   portion of a payback by Ryan Bundy of that loan?

18        A.   As you know, shortly after those funds

19   were transferred, you seized this account.  So I

20   would not have been even able to pay it back.  You

21   seized this bank account.

22        Q.   So how was -- how was the -- how was

23   the amount of the loan paid back by Mr. Ryan Bundy

24   to Abish?

25        A.   I object to this line of questioning.

Page 154

1    I've already objected.  And I've been very open

2    with you.  I -- I haven't --

3        Q.   Mr. Bundy, you haven't been open.

4    Mr. Bundy --

5        A.   I'm answering -- I'm answering the

6    question.

7        Q.   No, you haven't, Mr. Bundy.  There's a

8    question pending.

9        A.   I've showed you where the money went

10   to.  I've showed you that I -- to the extent that

11   I have it, I have a portion of it --

12       Q.   Mr. Bundy, let's take a break.

13       A.   And I've even said what I spent it on.

14   And yet, that has not satisfied you.

15       Q.   Mr. Bundy --

16       A.   I'm objecting to this line of

17   questioning.

18       Q.   Are you -- tell me when you're done

19   with your objection, Mr. Bundy.

20       A.   I'm done.

21       Q.   Okay.  And, you know, we don't need to

22   belabor it, Mr. Bundy, but we have the right to

23   test whether these were truly corporate

24   transaction and/or how you benefitted and/or how

25   they might continue to be part of the estate.

Page 155

1  Obviously, if you own an interest in

2  Abish-husbondi and you have $200,000 cash, that's

3  something I think that the trustee is going to be

4  very interested in.  I know St. Luke's is very

5  interested in that.

6          But let's go back to the $215,000

7  amount that you were stating was used from the

8  $487,000 to buy assets.

9          Do you remember that amount, sir?

10     A.   Yes.

11     Q.   Okay.  How was that $215,000 spent?

12     A.   So before I answer that question, I

13  do want to address your comment earlier, and

14  that is that the trustees have known about this

15  transaction and the details of this transaction

16  long before you even knew about it.

17     Q.   So are you telling me that the trustees

18  know you're holding $200,000 in cash?

19     A.   Yes.  Well, I have -- I have disclosed

20  that to them.

21     Q.   You disclosed to the trustees that

22  you're holding $200,000 in cash?

23     A.   I gave the trustee the same information

24  that I gave you in the document that is called

25  "Response to St. Luke's" -- or excuse me, Response

Page 156

1   to the Many St. Luke's Motions Seeking to

2   Destitute Ammon Bundy and His Family."

3          In that document, I have openly

4   discussed all of this, including the amount that I

5   have in my possession.  In fact, for the record --

6   for the record, I say in this document, to answer

7   your question now, Abish then purchased material,

8   intellectual property and a domain name, totaling

9   $215,000.  The remainder, Mr. Bundy retrieved, in

10  parentheses it says 200,000, Mr. Bundy retrieved

11  and in part used to repair and equip a service

12  truck, purchase special equipment and to further

13  establish the fleet maintenance service that he

14  engaged in.  This service truck is used -- and I

15  disclosed this all to the trustee, to the Court,

16  to anybody who wants to see it.

17       Q.   Okay.  All right.  So let's -- that's

18  the $215,000, correct?

19       A.   That's the 215,000 plus the 200,000.

20       Q.   Well, I -- I guess I'm confused.  Are

21  you saying the $200,000 is not in cash, but now it

22  was used for a truck?

23       A.   I didn't say the entire amount.  I said

24  in part.

25       Q.   How -- how much money in cash,

Page 157

1   **purportedly on behalf of Abish-husbondi, do you**

2   **have in your possession?**

3          A.   I -- once again, I object to this line

4   of questioning.  I know it is very interesting to

5   you.

6          **Q.   It is not interesting, Mr. Bundy.**

7          A.   And if you -- if you want to litigate

8   against me in -- in some collections court or

9   some other civil matter, you know, dealing with

10  this, you can do so, but I filed personal

11  bankruptcy.  These corporate funds --

12         **Q.   Mr. -- Mr. Bundy, I appreciate that's**

13  **your position.  I appreciate you chose to proceed**

14  **without an attorney for whatever reason.  But we**

15  **have a serious disagreement about that, and we're**

16  **certainly entitled to challenge whether or not**

17  **these are sham transactions on behalf of a**

18  **corporation in name only that is being by you --**

19  **being used by you as an alterego.  And that's what**

20  **this is about.  And so we're entitled to inquire**

21  **about that.**

22         A.   Actually, what this is about is you --

23         **Q.   Mr. Bundy --**

24         A.   -- politically suing me to take

25  everything I have because I spoke the truth about

1   your clients.  That's what this is about.  And so

2   you steal everything from me and --

3         Q.   Mr. Bundy, I -- Mr. Bundy, I really --

4   this is going very slow, and we have a lot left to

5   go --

6         A.   You are --

7         Q.   Mr. Bundy --

8         A.   That's what this comes down to.

9         Q.   Please stop making speeches.

10        A.   You are a thief.  You know you're a

11  thief.

12        Q.   Mr. Bundy --

13        A.   And just because you do it with the

14  law, doesn't make it right.

15        Q.   Mr. Bundy --

16        A.   You or your clients did not earn this

17  money.

18        Q.   Tell me when you're done, Mr. Bundy.

19        A.   Okay.  I'll tell you when I'm done.

20             You and your clients did not earn this

21  money.  You did not work for this money.  You have

22  stolen this money.  And I have been very clear and

23  open because I voluntarily filed for bankruptcy.

24  So I felt that I had to be -- disclose my personal

25  transactions.  And I have done so in a manner that

```
                                                    Page 159
 1   I was not even required legally to do so.

 2            And I have no problem with you asking

 3   the Court to force me to give this information up.

 4   That's something that we can discuss with the

 5   Court.  But for you to continue to object -- or

 6   continue to ask the questions after I've

 7   objected to this line of questioning, I think is

 8   inappropriate.  And for you to cast this -- this

 9   entire lawsuit and litigation as something other

10   than just a political retaliation and theft, it is

11   just wrong.

12       Q.   Mr. Bundy --

13       A.   That's exactly what is going on.

14            I'm not quite done.

15       Q.   This is my concern --

16       A.   You said you would wait.

17       Q.   This is my concern about your YouTube

18   streaming is you're just going to make speeches.

19   We need to get through this, Mr. Bundy.  It is a

20   serious issue that you're holding --

21       A.   Mr. Stidham -- Mr. Stidham, I was not

22   done.

23            For you to say that this is -- for you

24   to take everything from me, my entire, you know,

25   life's portfolio, if you will, millions of dollars
```

Page 160

1    from me, and then for me to call you out for the

2    thief you are and say that it is theatrics because

3    of a YouTube account, it is as ridiculous as your

4    complaint saying that Diego and I advocated for

5    his grandchild for money and fame.  You are a

6    liar.

7         **Q.   Mr. Bundy --**

8         A.   You are a liar.

9         **Q.   We need to move forward, Mr. Bundy.**

10        A.   I just -- you are a liar, and you will

11   be held accountable.

12        **Q.   Mr. Bundy --**

13        A.   Now -- now, Mr. Stidham, now I am done.

14        **Q.   Mr. Bundy, how much cash do you have on**

15   **hand right now, whether you purport it is with**

16   **Abish-husbondi or you concede that it is yours?**

17   **How much cash on hand do you have right now?**

18        A.   I object to this line of questioning.

19        **Q.   Do you know the answer to the question?**

20        A.   If you wish to litigate --

21        **Q.   Mr. Bundy, I'm just asking whether you**

22   **know the answer to my question.**

23        A.   -- for these corporate funds, you can

24   do so.

25        **Q.   Do you know the answer to the question**

Page 161

1   as to how much cash you have on hand that you

2   purport is being held for Abish-husbondi?

3          A.   I object to this line of questioning.

4          Q.   Okay.  So you're not going to answer

5   whether you know how much you have?

6          A.   I object to this line of questioning.

7          Q.   Okay.  All right, Mr. Bundy.  Let's go

8   back to the $215,000.

9               What was purchased for $215,000?  I

10  understand generally what you said about a domain

11  name, but I would like some more specific

12  information.

13              What was purchased?

14         A.   I object to this line of questioning.

15         Q.   So you're not going to tell me what was

16  purchased with the $215,000?

17         A.   Well, I already listed generally.

18         Q.   Well, Mr. Bundy --

19         A.   That was good enough.

20         Q.   Mr. Bundy, you know, we -- we're not --

21  we just need to verify, Mr. Bundy.  And if it

22  turns out these are legitimate expenditures, you

23  know, that's -- that's fine.  But why don't you at

24  least give me the domain name that you purchased?

25         A.   I object to this line of questioning.

1     Q.    Will you tell me the domain that was

2   purchased by you and/or Abish-husbondi?

3         A.    I object to this line of questioning.

4         Q.    Will you explain to me what

5   intellectual property was purchased by you and/or

6   Abish-husbondi?

7         A.    I object.

8         Q.    Okay.  Did you pay taxes on behalf of

9   Abish-husbondi for this $485,000 that came in to

10  Abish-husbondi in 2024?

11        A.    I've already answered that question.

12        Q.    So are you intending to pay taxes to

13  the State of Utah relating to the funds that came

14  in to Abish-husbondi in 2024?

15        A.    As you know yourself, you took over

16  the shares of Abish-husbondi.  You took and

17  dissolved Abish-husbondi and transferred it to,

18  I don't know, another corporation.  And so,

19  therefore, as far as I understand, I would not

20  even be able to do that.

21        Q.    Okay.  So, Mr. Bundy, understanding

22  what you just said, I -- I want to make sure I

23  haven't missed something here.

24        A.    Um-hum.

25        Q.    If Abish-husbondi has been dissolved,

Page 163

1   as you say, and you don't dispute that, the -- the

2   cash -- the 200,000 or so in cash, the truck and

3   the intellectual property and domain name, what

4   entity is holding that right now?

5        A.   I, once again, object to this line of

6   questioning.

7        Q.   Sure.

8             Can you at least tell me what entity

9   you contend holds this money?

10        A.   Yeah.  Abish-husbondi.

11        Q.   Okay.

12        A.   It is a very interesting situation,

13   right.

14        Q.   Mr. Bundy --

15        A.   You sold the shares and then dissolved

16   the company --

17        Q.   Mr. Bundy --

18        A.   So some of the assets, evidently, are

19   still in question, I guess.  I don't know.

20        Q.   All right, Mr. Bundy.  Let's take a

21   look at kind of the last bit of this exhibit,

22   and then we're going to take a quick break for

23   lunch.

24             But if we take a look at the last page

25   of what we marked as Exhibit 3, it is down here on

Page 192

```
 1   is.

 2        Q.    -- some domain?

 3        A.    I don't know what the value would be.

 4        Q.    Have you undertaken any effort to

 5   ascertain the current value?

 6        A.    No.

 7        Q.    Of -- just let me -- Mr. Bundy,

 8   remember, I need to get the full question out, so

 9   we're not talking over each other.

10        A.    Okay.

11        Q.    As you sit here today, Mr. Bundy, can

12   you estimate -- will you tell me, excuse me,

13   what your estimate is of the full value of your

14   ownership in Abish-husbondi, given the assets that

15   you currently control in the name of Abish-

16   husbondi?

17        A.    No.  I could not give you that value.

18        Q.    Okay.  Just so I am making sure we --

19   we talked about things, but we -- you know,

20   there's been stops and starts.  I just want to try

21   to sum up questions so we can move on.

22             As I understand it, you dispute issues

23   around Abish-husbondi.  Fair enough.

24             But as I understand your testimony, as

25   we sit here today, you personally control and/or
```

Page 193

 1   possess approximately $200,000 in cash, a truck,

 2   and some intellectual property and a domain name

 3   in the name of Abish-husbondi; is that correct?

 4        A.   I've already answered that question.

 5        Q.   I just want to make sure, Mr. Bundy,

 6   that I understand correctly.  Is that correct?

 7   And I'm going on testimony you've already

 8   provided.  So I would just like you to confirm if

 9   that understanding is correct, which sums up your

10   testimony?

11        A.   I think -- yeah, I think that that is

12   somewhat of an accurate summary.

13        Q.   Okay.  Is there any -- anything that

14   you would tweak to make it more accurate from that

15   statement?

16        A.   No.

17        Q.   Okay.  Thanks.

18        A.   I don't know exactly how accurate you

19   are, but you generalized it, you summarized it,

20   and I generally -- generally agree to it.

21        Q.   Fair enough.  Fair enough.

22        A.   That will be some good litigation in

23   the future, huh, that you can bill St. Luke's for.

24        Q.   We'll go to the schedules eventually.

25   And what -- do you contend the schedules that you

Page 210

1        A.   Yes.

2        Q.   Okay.  And his wife?

3        A.   I don't know about his wife.

4        Q.   Mr. Bundy, what -- what is your

5   relationship to Bundy Motors?

6        A.   I am a 1099 employee of Bundy Motors.

7        Q.   Okay.  And how -- how do you get paid

8   by Bundy Motors?

9        A.   I get paid $1,000 cash a week.  He pays

10   for fuel and some food costs, like lunches and

11   dinners and so forth, and then some uniform

12   expenses.

13        Q.   Okay.  And what services do you provide

14   for Bundy Motors?

15        A.   I -- I do most of the managing, some of

16   the technical development of it, and most of the

17   day-to-day stuff.

18        Q.   Have you been promised any ownership

19   interest in Bundy Motors?

20        A.   No.

21        Q.   Okay.  Do you anticipate obtaining any

22   ownership interest in Bundy Motors?

23        A.   I mean, I hope so down the line

24   sometime.  But at this point, no.

25        Q.   Who -- who, to your knowledge, owns

Page 211

```
 1   Bundy Motors?
 2        A.   My brother Ryan.
 3        Q.   Your brother Ryan?
 4             Does Ryan work in the Bundy Motors
 5   business?
 6        A.   He does a little bit, but very little.
 7        Q.   Okay.  So am I understanding correctly
 8   that Ryan Bundy is the owner of Bundy Motors, but
 9   you get paid as a 1099 employee and you manage and
10   run the operation?
11        A.   Yeah, I think that's mostly accurate.
12             I mean, he makes all of the financial
13   decisions.  He, you know, makes the major, major
14   decisions.  And I do the manager level, you know,
15   day-to-day stuff.
16        Q.   How long -- how long have you worked --
17   let me back up.
18             We've used that term a couple of times,
19   1099 employee.  Can you tell me what you
20   understand -- strike that.
21             Can you tell me what you're meaning to
22   convey when you use that phrase "1099 employee"?
23        A.   I think, you know, another term for
24   that is a subcontractor.
25        Q.   Okay.  You consider yourself a
```

Page 212

1  subcontractor?

2       A.   I do.

3       Q.   Okay.  Any -- are you employed either

4  as a subcontractor or employee -- strike that.

5            Have you been employed as a

6  subcontractor or employee in any other -- any

7  business other than Bundy Motors since you

8  relocated to the St. George area?

9       A.   Yes.

10      Q.   And what has that work been, sir?

11      A.   I have subcontracted with many people

12 doing fleet maintenance work, electrical work,

13 various different skills.

14      Q.   Okay.  And has that all been as a 1099

15 employee or subcontractor?

16      A.   Yeah, all of it has been.

17      Q.   So no time as a W-2 employee; is that

18 fair?

19      A.   I haven't been a W-2 employee for, I

20 don't know, 30 years, give or take.  Don't -- you

21 know, don't put that --

22      Q.   No, I -- I understand that to be an

23 estimate, Mr. Bundy.

24            Here is a question that relates to

25 something you claimed the Fifth on in your prior

Page 265

1                    REPORTER'S CERTIFICATE

2              I, BROOKE R. BOHR, CSR No. 753,

3    Certified Shorthand Reporter, certify:

4              That the foregoing proceedings were

5    taken before me at the time and place therein set

6    forth, at which time the witness was put under

7    oath by me.

8              That the testimony and all objections

9    made were recorded stenographically by me and

10   transcribed by me or under my direction.

11             That the foregoing is a true and correct

12   record of all testimony given, to the best of my

13   ability.

14             I further certify that I am not a

15   relative or employee of any attorney or party, nor

16   am I financially interested in the action.

17             IN WITNESS WHEREOF, I set my hand and

18   seal this 3rd day of March, 2025.

19

20

21             Brooke R. Bohr, CSR No. 753

22             Notary Public

23

24

25   Commission Expires:  October 23, 2025