Erik F. Stidham (Idaho Bar No. 5483) (Admitted pro hac vice)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-7714
Telephone: (208) 342-5000
efstidham@hollandhart.com

Darren G. Reid (11163)
Engels Tejeda (11427)
HOLLAND & HART LLP
222 S. Main Street, Suite 2200
Salt Lake City, UT 84101
Telephone: (801) 799-5800
dgreid@hollandhart.com
ejtejeda@hollandhart.com

*Attorneys for St. Luke's Health System, Ltd.,*
*St. Luke's Regional Medical Center, Ltd.,*
*Chris Roth, Natasha Erickson, M.D., and*
*Tracy Jungman, NP*

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| In Re:<br><br>AMMON EDWARD BUNDY,<br><br>Debtor. | Case No. 24-23530-WTT<br><br>Chapter 7 |

**ST. LUKE'S CREDITORS' OBJECTION TO TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT**

St. Luke's Health System, Ltd. ("St. Luke's HS"), St. Luke's Regional Medical Center Ltd. ("St. Luke's RMC"), Chris Roth ("CEO Roth"), Natasha Erickson, M.D. ("Doctor Erickson"), and Tracy Jungman NP ("NP Jungman") (collectively the "St. Luke's Creditors") object to the *Trustee's Motion for Approval of Settlement Agreement* (Dkt. 417) (the "Motion") filed by Mark C. Rose (the "Trustee") in his capacity as the Chapter 7 Trustee in the above-referenced case.

## I. INTRODUCTION

1. The Trustee asks the Court to approve a proposed settlement in which Debtor Ammon E. Bundy ("Debtor Bundy") would pay $120,000 and in exchange the Trustee would waive the estate's right to more than $555,000[1] in prepetition assets ("Known Assets"). In effect, Debtor Bundy would be allowed to keep $435,000, about 80% of the Known Assets.

2. Each of the four factors set out in *C.K. Williams, Inc. v. All Am. Life Ins. Co.* (*In re Kopexa Realty Venture Co.*), 213 B.R. 1020, 1022 (B.A.P. 10th Cir. 1997) favors rejection of the proposed Settlement Agreement. First, the Trustee could seek an order requiring Debtor Budny to turn over all Known Assets. Trustee already has an order requiring Debtor Bundy to turnover many of the assets and should be able to get another such order for the balance of the Known Assets. If Debtor Bundy opposes that request, the evidence shows that the Trustee would easily prevail. Debtor Bundy concedes that $140,300 of the assets belong to the estate. As for the

[1] Trustee does not value the Known Assets in his Motion. The St. Luke's Creditors calculate the value based on Debtor Bundy's Amended Schedules A/B and his deposition testimony. Dkt, 19 at 10; *see also*, Ex. A to Declaration of Erik Stidham dated May 5, 2025 ("Stidham Dec."), filed concurrently. Debtor Bundy includes a $70,000 interest in Abish-Husbondi in his Amended Schedules A/B, but he actually does not have any interest in the company so the $70,000 is included in the estimated value of the Known Assets.

balance of the assets, Bundy's own sworn testimony, the sworn testimony of others, and admissible documents clearly establish that the balance of the assets, $200,000 in cash ("$200,000 Cash") and $215,000 business assets ("Service Assets"), belong to the estate. (Dkt. 19; *see* Stidham Dec. at Ex. A.

3. Second, collection should not be difficult. Debtor Bundy possesses and controls all Known Assets. If Debtor Bundy refuses to turnover the Known Assets, the Court has the power to compel performance through the contempt process. Trustee also possesses tools, like the U.S. Marshals, to aid in the collection.

4. Third, litigation to establish the estate's right to the assets would be simple and inexpensive. The facts are established: Debtor Bundy's own testimony and testimony from others forecloses any legitimate legal opposition. While the Trustee makes no attempt to estimate costs, reasonable litigation costs, in the worst case, should not exceed $100,000. In fact, the Trustee hypothetically could expend $400,000 in litigation costs and still end up with a better recovery than the $120,000 recovery anticipated under the proposed settlement.

5. Fourth, the St. Luke's Creditors, the only creditors in this case, incurred the costs to obtain Debtor Bundy's testimony, testimony of third parties, and the documents which clearly establish that all of the Known Assets belong to the estate. The St. Luke's Creditors, as evidenced in other briefing, have also presented legal arguments which establish that all of the Known Assets belong to the estate. In short, the St. Luke's Creditors' objection should carry significant weight because they have done all of the work to uncover Debtor Bundy's assets and would be uniquely prejudiced if Debtor Bundy's gamesmanship were rewarded.

6. Finally, in addition to failing under the *Kopex* factors, the proposed settlement threatens to make a mockery of the bankruptcy process. Debtor Bundy has engaged and continues to engage in fraudulent conveyances, withholds information, and has a long history of defying court orders, but that should not weigh in favor of an unjust settlement. The Trustee's concern that Debtor Bundy will defy court orders and conceal the $200,000 Cash and other assets permeates the Motion. However legitimate the concerns, the prospect that Debtor Bundy will again defy his legal obligation should carry no weight. To allow Debtor Bundy a windfall here would only legitimize his wrongful conduct and encourage others to do the same.

## II. BACKGROUND

### A. Debtor Bundy has a History of Violating Laws and Court Orders

7. For more than a decade, Debtor Bundy has instigated high-profile, armed standoffs, repeatedly been arrested and convicted of crimes, manufactured false conspiracies to harass his enemies, and defied court orders. *See, e.g.,* "Ammon's Army – Inside the Far-Right 'People's Rights' Network" https://irehr.org/reports/peoples-rights-report/; Dkt. 241.

8. In turn, Debtor Bundy has accumulated thousands of followers, political influence, and wealth. *Id.* Debtor Bundy continues to use armed standoffs and his power to direct thousands of online followers to harass his enemies to avoid accountability and mock legal proceedings. For example, as recently as April 24, 2023, Debtor Bundy instigated an armed standoff to thwart service of a warrant in litigation with the St. Luke's Creditors. See e.g., Ex. B to Stidham Dec. In a front-page article in the Salt Lake Tribune on April 27, 2025, Debtor Bundy bragged that no one dare arrest him despite his outstanding warrants because "[i]t's a political nuclear bomb if they want to make something of it." *See* Ex. D to Stidham Dec. (Salt Lake

Tribune Article Republished on the Idaho Statements). In a video Debtor Bundy posted to his followers on May 3, 2025, he mocked the bankruptcy proceedings stating he was in Arizona "spending some of St. Luke's hard earned money now." https://youtu.be/EHpM352PYE0 (0:34-0:55).

9. The nature of the St. Luke's Creditors judgement against Debtor Bundy is relevant. In 2022, while running for Governor of Idaho, Debtor Bundy manufactured a false conspiracy which exploited the tragic circumstances surrounding a medically neglected infant who had been taken into protective custody by Child Protective Services. Although the infant was near death, Debtor Bundy falsely stated the infant was healthy when taken into custody, and falsely accused St. Luke's HS, its Chief Executive Officer ("CEO"), Dr. Erickson, and NP Jungman of participating in a vast conspiracy that engaged in the widespread kidnapping, trafficking, sexual abuse, and killing of Christian children. *See generally,* Dkt. 241. Debtor Bundy, along with a group of co-conspirators, unceasingly marketed this false conspiracy to millions on the internet to get media attention, recruit members, and solicit donations for his People's Rights Network ("PRN"), and his Gubernatorial campaign. Dkt. 241, Exs. A, C, and D.

10. As part of his attack on the St. Luke's Creditors, Debtor Bundy made video posts for his followers, did interviews with traditional media, went on numerous extremist online programs with hundreds of thousands of subscribers, funded campaign ads that featured the conspiracy, and endorsed and directed his followers to posts made by his co-conspirators. Dkt 241, Ex. A. In his media appearances, Debtor Bundy directed his followers to punish St. Luke's business by flooding hospital phone lines and massing at the hospital to disrupt hospital functions, falsely stated that Dr. Erickson committed malpractice and had threatened patients,

endorsed statements indicating NP Jungman was a pedophile, and that all of the St. Luke's Creditors were engaging in a conspiracy to kidnap and harm Christian children. *See id.*

11. Because of Debtor Bundy's defamation and lies, St. Luke's RMC's phone system was repeatedly overwhelmed with death threats and harassing calls, armed mobs of Debtor Bundy's followers caused the largest hospital in Idaho to go into lockdown, millions viewed false information on the internet which portrayed Docter Erickson and NP Jungman as villains, incompetent, and pedophiles. *See* Dkt. 241.

12. Seeking redress and to stop Debtor Bundy from doing this again, the St. Luke's Creditors brought a lawsuit against Bundy and his co-conspirators in 2022. After the lawsuit was filed, Debtor Bundy redoubled his harassment effort, spreading lies about Dr. Erickson and NP Jungman, apparently thinking he could make it painful enough that they would drop the lawsuit. Dkt. 241, Exs. A, C, and D. Dr. Erickson and NP Jungman endured.

13. During a 10-day trial, the jury and the judge heard testimony detailing how Debtor Bundy and his co-conspirators caused millions in damages to St. Luke's RMC and harm and personal suffering to Dr. Erickson and NP Jungman. Dkt. 241, Ex. A.

14. On August 29, 2023, the Fourth Judicial District Court of Idaho, County of Ada (the "Idaho Court") entered a judgment in favor of the St. Luke's Creditors and against Debtor Bundy for approximately $52,000,000 reflecting compensatory and punitive damages ("Defamation Judgement"). Any funds collected on the Defamation Judgement are to be distributed by the St. Luke's Creditors so that Dr. Erickson, NP Jungman, and St. Luke's charities each get one-third of the collected funds.

**B. Bundy Continues to Conceal Assets and Defy His Obligations as Debtor**

15. Debtor Bundy estimates that his net worth was between $5M and $7M when the Defamation Lawsuit was filed. *See* Ex. A to Stidham Dec. After the Defamation Lawsuit was filed, Debtor Bundy started to conceal his assets to thwart collection. St. Luke's Parties' Compl. ¶¶ 9-14, Adv. Pro. No. 25-02034, Dkt. 1 ("St. Luke's Compl."). To this day, Debtor Bundy continues his pattern of concealing assets through fraudulent transfers to family members and followers, and through the use of shell companies. *Id.*; *See also*, Ex. A to Stidham Dec.

**C. Summary of the Known Assets**

16. While the St. Luke's Creditors believe Debtor Bundy is concealing other significant assets, Debtor Bundy currently posses Known Assets totaling $555,000 which belong to the estate. In his Motion, Trustee uses the term "Other Assets" to refer to certain assets, valued at $140,300, disclosed by Debtor Bundy in his Amended Schedules. Dkt. 19 at10. Debtor Bundy, through a series of fraudulent conveyances, converted about $500,000 in proceeds from the sale of an Arizona property he owned into $200,000 Cash and ownership of a truck service business and some service trucks ("Service Assets") collectively valued at $210,000.

17. **The Other Assets**: the Other Assets consist of ten specific pieces of personal or real property, financial assets, business related property that Debtor Bundy included in his schedules of assets and liabilities. *See* Dkt. 19 at 11-12; *see also*, Motion ¶ 4. These assets include six sport utility vehicles or trucks, real property described as the "Mammoth Creek Property," and certain tools, appliances and guns. *See id*. Trustee provides no valuation for the Other Assets. Debtor Bundy values the Other Assets collectively at $136,300. Dkt. 19 at 10.

18. Initially, Debtor Bundy claimed most of the Other Assets as exempt. *See* Dkt. 19 at pgs. 11-12. But the St. Luke's Creditors objected, *see* Dkt. 22, and at the hearing on the Objection, Debtor Bundy waived all exemptions instead of heeding the Court's recommendation that he seek counsel or amend his schedules to comply with the Code. *See* Dkt. entry dated December 4, 2024; *see also*, Order Setting Deadline for Debtor to File Amended Schedule C and Setting Evidentiary Hearing on St. Luke's Creditors' Objection to Debtor's Claimed Exemptions and Trustee's Objection to Exemptions, Dkt. 152 at ¶ 1.

19. **Arizona Property**: Debtor Bundy owned property located in Arizona (the "Arizona Property"). Debtor Bundy engaged in a series of fraudulent conveyances and actions using Global Trading Incorporated ("Global Trading"), an entity owned by some of his devoted followers, to conceal about $500,000 from the St. Luke's Creditors. Adv. Pro. No. 25-02019 Dkt. 1 (the "Trustee's Action") at ¶¶ 10-28. On January 5, 2024, Global Trading, on one hand, and Debtor Bundy and Lisa Bundy, on the other hand, entered into an Estopped Certificate, Release & Waiver. *See* Trustee Action at ¶¶ 20-21. Pursuant to their agreement, Global Trading dispersed "certain funds belonging to Ammon E. and Lisa M. Bundy" amounting to $487,167.36 (the "Arizona Property Proceeds") into an account held in the name of Abish-Husbondi but controlled by Debtor Bundy. Trustee Action at ¶¶ 20-21. While the Arizona Property Proceeds belonged to him personally, Debtor Bundy hid the funds in the Abish-Husbondi account to conceal the assets from the the St. Luke's Creditors. Trustee Action at ¶¶ 22-26.

20. **The Cash and Service Business**: On February 25, 2025, during a Rule 2004 examination, Debtor Bundy admitted that, during the months immediately preceding his voluntary bankruptcy filing on July 17, 2024, he had engaged in a series of transactions using the

Arizona Proceeds. Ex. A to Stidham Dec. Debtor Bundy testified that he was in possession of $200,000 Cash from the Arizona Property Proceeds. Ex. A to Stidham Dec. Debtor Bundy further testified that he used $215,000 from the Arizona Property Proceeds to purchase a Truck Service business and two service vehicles.

21. The St. Luke's Creditors provided the Trustee a transcript of Debtor Bundy's Rule 2004 Examination, which the Trustee used to file an adversary proceeding to recover the Cash from Debtor Bundy, Abish-husbondi, Lisa Bundy, and GTI. *See* Trustee Action.

22. The Complaint that the Trustee filed in the Trustee's Action is based on the testimony that the St. Luke's Creditors elicited from Debtor Bundy after multiple attempts to examine him and his affiliates or business entities at great expense to the St. Luke's Creditors.

23. In the Trustee's Action, the Court entered an order authorizing the issuance of prejudgment writs of attachment to assist the Trustee to immediately secure the Cash. *See* Trustee's Action, Dkt. 13-15. The Trustee has not executed these writs and has not provided with the Motion any evidence that he has sought to take possession of the Other Assets or even provided a valuation of the same.

24. Instead, the Trustee seeks approval of a settlement under Rule 9019(a) whereby Debtor Bundy would retain all the Other Assets and $80,000 of the $200,000 Cash in exchange for a promise that Debtor Bundy will turn over $120,000 to the estate.

## III. ARGUMENT

25. Rule 9019 prescribes that "[o]n the trustee's motion and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). When considering whether to approve a compromise under Rule 9019(a), courts must make an

"informed and independent judgment" as to whether the terms of the compromise are superior to the likely rewards of litigation. *Protective Comm. For Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). In the Tenth Circuit, that standard requires an analysis of the following four "*Kopexa* factors": (I) the probable success of the underlying litigation on the merits; (II) the possible difficulty collecting a judgment; (III) the complexity and expense of the litigation; and (IV) the interest of creditors in deference to their reasonable views. *Kopexa*, 213 B.R. at 1022. Where, as here, the Trustee moves for approval of a settlement under Rule 9019(a), the Trustee bears the burden of proving that the *Kopexa* factors weigh in favor of approval. *Id*. Here, the Motion shows that the Trustee has not carried his burden as to any of the four *Kopexa* factors.

**A. The Trustee's Probability of Success on the Merits Is Exceptionally High.**

26. Regarding the first *Kopexa* factor, the Bankruptcy Appellate Panel for the Tenth Circuit has held, "[t]here can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *In re Armstrong*, BAP No. UT-01-039, 2002 Banrk. LEXIS 301,*8 (B.A.P. 10th Cir. March 28, 2002).[2] And while the Court is not required to conduct a mini trial on the merits, "the bankruptcy court is also not to merely rubber stamp the trustee's judgment in reaching a settlement." *Id.* at *9.

27. Here, the Trustee proposes to settle for $120,000 the estate's claim to the $200,000 Cash and Other Assets worth at least $425,000. But the probability that the estate

[2] Unpublished opinions are attached as **Attachment 1.**

would succeed if the Trustee were to pursue these claims against Debtor Bundy is exceptionally high from both a legal and evidentiary perspective. Legally, a demand to turn over estate property under section 542 of the Code is straightforward when the property is identifiable and within the debtor's possession. *See Rupp v. Auld (In re Auld)*, 561 B.R. 512, 519 (B.A.P. 10th Cir. 2017). Section 542 contains "mandatory language" that is "self-executing," meaning "a debtor who has at any time during the case been in possession of property of the estate or recorded information about it has an affirmative duty to turn it over, without first requiring a demand or turnover motion by the trustee." *Id*. Here, Debtor Bundy has admitted he has possession of the Known Assets, including the $200,000 Cash, and the Court has already issued writs requiring him to turn over the assets. Thus, the probability of success on legal questions regarding the estate's entitlement to the Assets is high.

28. Moreover, the Trustee has all the evidence he would need to succeed on these claims. For example, Debtor Bundy admitted under oath that he has in his possession $200,000 in cash and owns a business and two service trucks (valued at more than $215,000), all from proceeds he obtained from the sale of his Arizona House. *See* Ex. A to Stidham Decl. Debtor Bundy has already conceded that the Other Assets belong to the estate. *See* Schedules, Dkt. 19 at 11-12. As discussed below, Debtor Bundy has not claimed any exemptions as to the Other Assets, and no third party has asserted any interest in the Assets in this case. *See id.* Thus, the Trustee is not likely to encounter significant obstacles in seeking turnover of the Assets he proposes to gift to Debtor Bundy.

29. The Trustee does not dispute the foregoing analysis, admitting in the Motion that the estate has "very strong claims to recover" the $200,000 in Cash and the Other Assets. Motion

¶ 10. Instead, the Trustee tries to avoid the consequence of that concession under *Kopexa* by imagining a few hypotheticals. *See* Motion ¶¶ 11-14. For example, the Trustee states Debtor Bundy should be entitled to exemptions that Debtor Bundy knowingly waived. Motion ¶ 11. But Debtor Bundy refused to claim an exemption, not because he did not understand the consequences of doing so, but because he did not want to subject himself to the transparency the Bankruptcy Code demands. Even if Debtor Bundy is retroactively given the benefit of exemptions, the Trustee's argument does not make financial sense. The Trustee concedes that potential exemptions would add up to *at most* $21,500 ($10,000 for one motor vehicle, $10,000 for tools of trade, and $1,500 wildcard exemption). *See* Motion ¶ 11. Even if Debtor Bundy is somehow allowed the hypothetical benefit of $21,500 in waived exemptions and pays $120,000, Debtor Bundy is still left with more than $475,000 in assets that rightfully belong to the estate.

30. For similar reasons, the possibility that the estate might incur a 15% commission to liquidate $425,000 of the Known Assets does not support the proposed settlement. Even after incurring a 15% commission, the estate would have $561,250, the combined value of the $200,000 Cash and $361,250 in post-commission liquidated assets. *Cf.* Motion ¶ 12.

31. Lastly, the evidence does not support the Trustee's concern that Debtor Bundy's spouse or Abish-husbondi could claim an interest in the $200,000 Cash. Motion ¶¶ 13-14. Neither of these potential parties-in-interest filed a timely proof of claim in this case, and the deadline to do so was December 2, 2024. *See* Dkt. 17. More importantly, Debtor Bundy's admissions establish that the Assets, including the Cash, belong to the estate, and no third party, including Debtor Bundy's spouse and any of his former or current companies have a claim against them. *See* Ex. A to Stidham Dec.

32. In sum, the first *Kopexa* factor weighs heavily against approval of the settlement because the applicable law and evidence shows that the estate has an exceedingly high chance of succeeding on its claims that Debtor Bundy should turn over the Assets.

**B. Contrary to the Trustee's Argument, the Second *Kopexa* Factor Focuses on the Debtor's Ability, not Willingness, to Pay.**

33. The second *Kopexa* factor – the possible difficulty in collection of a judgment – weighs heavily against approval of the Trustee's proposed settlement for two reasons. *Kopexa,* 213 B.R. at 1022.

34. First, the second *Kopexa* factor focuses on the defendant's ability to pay and costs that would have to be incurred in collecting a judgment. *Velasquez v. Gonzales (In re Velasquez)*, Nos. NM-18-076, 12-10670, 2019 Bankr. LEXIS 1854, at *16-17 (B.A.P. 10th Cir. June 18, 2019). The factor does not support approval of a settlement where, as here, the assets have been liquidated or are easily identifiable. *See e.g.*, *In re Roberts*, 2024 Bankr. LEXIS 85, *53, 2024 WL 1460287 (Bankr. D. Colo. March 28, 2024) (noting that the factor was inapplicable in part because the trustee "has liquidated real and personal property and the proceeds are in a bank account"). Here, the Assets include $200,000 Cash, real property, personal property that is identifiable by serial number, and an identified business. *See* Motion ¶¶ 3-4. The Trustee fails to explain why he cannot simply recover these assets.

35. Second, asserting that the second *Kopexa* factor favors settlement, the Trustee argues that "some or all of the Cash may disappear" because Cash is "highly fungible, transferrable, and susceptible to dissipation and removal." Motion ¶ 16. In effect, Trustee argues that if the Court does not approve the $120,000 settlement, Debtor Bundy will hide the $200,000 Cash, and Trustee will not be able to find it. But it is improper to approve settlement because the

debtor can hide the cash. And the Trustee ignores the multiple enforcement mechanisms available to compel compliance with this Court's orders, including contempt orders from this Court and assistance from the Department of Justice, U.S. Marshals Service, and other federal agencies. *See also*, 11 U.S.C. § 105(a) ("[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title").

36. Here, for example, the Court has already entered an Order Granting Writ of Attachment in the Trustee's Turnover Action, instructing that the Trustee is "authorized to enter (with force if necessary)" Debtor Bundy's property "and seize" the $200,000 Cash. *See* Trustee's Turnover Action, AP No. 25-02019, Dkt. 12 at 2 (emphasis added). Nothing in the Motion indicates that the Trustee has sought to enforce the writ. Instead, the Motion vaguely suggests that Debtor Bundy would likely disobey the Court's order. Such capitulation to Debtor Bundy's disdain for the Court's orders cannot be the basis for approval of a settlement under *Kopexa*, and the Motion does not cite any authority to the contrary.

37. In short, the second *Kopexa* factor weighs against approving the proposed settlement because the Trustee has not shown a significant risk that if forced to litigate, the estate could not recover the Assets.

**C. The Complexity and Expense of the Litigation are Minimal.**

38. The third *Kopexa* factor – the complexity and expense of the litigation – also weighs against approval of the Trustee's proposed settlement. *Kopexa,* 213 B.R. at 1022.

39. Regarding this factor, the Trustee admits that "the issues are not complicated," but essentially argues that Debtor Bundy could drive up the expense of litigation through a number

of bad faith tactics, including having his spouse or companies frivolously claim an interest in the Assets, or obstructing recovery of the $200,000 Cash. Motion ¶¶ 17-18.

40. But as discussed above, the Trustee has tools to recover the Assets, including the Court's order approving his motion for prejudgment writs. And any expense of litigation must be weighed against the potential recovery. Here, the Trustee fails to provide any proper evidence regarding the value of assets that the Trustee proposes to gift Debtor Bundy. Moreover, the Trustee does not estimate the assumed litigation costs associated with defeating potential frivolous arguments by Debtor Bundy and others. Again, the Trustee has failed to carry his burden.

41. Contrary to promoting judicial economy, approving this settlement would actually encourage future debtors to conceal assets and then negotiate discounted settlements. Enforcing the existing turnover obligations through the Court's already-authorized writs would be more efficient for the bankruptcy system as a whole because it would deter similar bad faith conduct in future cases.

42. In short, the third *Kopexa* factor weighs against approval of the proposed settlement because the Trustee has not shown that the risks outweigh the potential benefits of litigation with Debtor Bundy.

**D. The Interest of Creditors Weighs Heavily Against Approval Because the Settlement Would Reward Debtor Bundy for Breaking the Basic Bargain of Bankruptcy Law.**

43. The fourth *Kopexa* factor – the interest of creditors in deference to their reasonable views – also weighs against approval of the proposed settlement. *See Kopexa,* 213 B.R. at 1022; *see also, In re Wiley*, No. 7-07-13053 SL, 2010 Bankr. LEXIS 781, at *15 (Bankr.

D.N.M. Mar. 11, 2010) (citation omitted) ("[t]he interests of the creditors – and their perspectives on a proposed settlement are of critical importance").

44. The fourth *Kopexa* factor weighs particularly against approval of the proposed settlement here because the St. Luke's Creditors are the only significant creditor of the estate, have carried the burden of investigating Debtor Bundy's assets, and would be greatly prejudiced if Debtor Bundy were allowed to exit bankruptcy with all his prepetition assets in exchange for a nominal settlement amount. Such outcome would reward Debtor Bundy's gamesmanship and encourage him to continue to disobey the multiple orders requiring him to stop defaming the St. Luke's Creditors. The creditors' interest in this case is not merely financial, it is also the interest in upholding the integrity of the bankruptcy system itself. *United States v. Hale*, 762 F.3d 1214, 1222 (10th Cir. 2014) (citations omitted) ("[t]he success of our bankruptcy laws requires a debtor's full and honest disclosure"). Approval of this settlement would create a dangerous precedent where debtors who engage in the most egregious conduct—hiding assets, transferring property to insiders, and refusing to comply with court orders—receive more favorable treatment than those who honestly disclose their financial affairs.

45. In short, none of the four *Kopexa* factors weigh in favor of approving the settlement here.

## IV. CONCLUSION

For the foregoing reasons, the St. Luke's Creditors respectfully request that the Court deny the Motion.

Dated this 5th day of May, 2025.

HOLLAND & HART LLP

By:*/s/ Erik F. Stidham*
Erik F. Stidham, of the firm

HOLLAND & HART LLP

By:*/s/ Engels J. Tejeda*
Darren G. Reid, of the firm
Engels J. Tejeda, of the firm
*Attorneys for the St. Luke's Creditors*

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2025, I electronically filed the foregoing with the United States Bankruptcy Court for the District of Utah by using the CM/ECF system. I further certify that the parties of record in this case, as identified below, are registered CM/ECF user.

| | |
|---|---|
| Matthew James Burne | matthew.burne@usdoj.gov; james.gee@usdoj.gov; lindsey.huston@usdoj.gov; rinehart.peshell@usdoj.gov; rachell.e.d.hughes@usdoj.gov; brittany.deweitt@usdoj.gov |
| George B. Hoffmann | ghofmann@ck.law; mparks@ck.law |
| David W. Newman | david.w.newman@usdoj.gov; james.gee@usdoj.gov; lindsey.huston@usdoj.gov; rinehart.peshell@usdoj.gov; rachell.e.d.hughes@usdoj.gov; brittany.deweitt@usdoj.gov |
| Mark C. Rose | trustee@mbt-law.com; UT32@ecfcbis.com |
| U.S. Trustee | USTPRegion19.SK.ECF@usdoj.gov |

**And on May 6, 2025 by U.S. First Class Mail with postage pre-paid:**

Ammon Edward Bundy
P.O. Box 1062
Cedar City, UT 84721-0991

Ammon Edward Bundy
896 E 400 S
New Harmony, UT 84757

*/s/ Engels Tejeda*
Engels Tejeda

34731651_v3

# Attachment 1

(unpublished opinions)

# Armstrong v. Rushton (In re Armstrong)

United States Bankruptcy Appellate Panel for the Tenth Circuit

March 28, 2002, Filed

BAP No. UT-01-039

**Reporter**
2002 Bankr. LEXIS 301 *

IN RE DONALD E. ARMSTRONG, Debtor. DONALD E. ARMSTRONG, Appellant, v. KENNETH A. RUSHTON, Trustee, and STEVEN R. BAILEY, Trustee, Appellees.

**Notice:** [*1] RULES OF THE BANKRUPTCY APPELLATE PANEL OF THE TENTH CIRCUIT MAY LIMIT CITATION TO UNPUBLISHED OPINIONS.

**Subsequent History:** Case Also Reported at: 2002 Bankr. LEXIS 1348.

**Prior History:** Appeal from the United States Bankruptcy Court for the District of Utah. Bankr. No. 00-26592, Chapter 11.

In re Armstrong, 2001 Bankr. LEXIS 951 (Bankr. D. Utah July 31, 2001).

**Disposition:** Affirmed. Appellee's motion to strike supplemental designation of record denied. Appellant's motion to supplement the record and for extension of time to respond to appellee's brief granted.

**Counsel:** For DONALD E. ARMSTRONG, Appellant: Donald E. Armstrong, Park City, UT.

For KENNETH A. RUSHTON, Appellee: Penrod W. Keith, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Salt Lake City, UT.

For STEVEN R. BAILEY, Appellee: Duane H. Gillman, McDowell & Gillman, Salt Lake City, UT.

**Judges:** Before PUSATERI, BOHANON, and MICHAEL, Bankruptcy Judges.

**Opinion by:** Bohanon

## Opinion

ORDER AND JUDGMENT [1]

BOHANON, Bankruptcy Judge.

Appellant Donald E. Armstrong appeals the order of the bankruptcy court approving the Appellees' settlement agreement. The settlement agreement resolved claims between the Appellant's Chapter 11 estate (hereinafter "Armstrong [*2] estate") and the Chapter 7 estate of Willow Brook Cottages, L.L.C. (hereinafter "Willow Brook estate"). [1] The Appellant argues that the bankruptcy court abused its discretion in approving the settlement because the evidence presented at the hearing on the approval of the settlement did not show the settlement was fair and equitable and in the best interests of the estate. For reason set forth below, we AFFIRM the bankruptcy court's decision. [2]

I. Appellate Jurisdiction

The Bankruptcy Appellate Panel has jurisdiction over this appeal. The bankruptcy court's decision is subject to appeal under [*3] 28 U.S.C. § 158(a)(1). Neither party elected to have this matter heard by the district court; therefore, the parties have assented to the jurisdiction of this Court. See 28 U.S.C. § 158(c).

II. Standard of Review

The standard of review for the approval of the settlement by the bankruptcy court is the abuse of discretion standard. See In re Kopexa Realty Venture Co., 213 B.R. 1020, 1022 (10th Cir. BAP 1997). The Appellant's contention that the de novo standard is the proper standard of review is erroneous. The Tenth Circuit Court of Appeals has held, "A bankruptcy court's

---

[1] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. 10th Cir. BAP L.R. 8018-6(a).

[1] Appellee Kenneth A. Rushton is trustee for the Appellant's Chapter 11 estate, and Appellee Steven A. Bailey is trustee for the Chapter 7 estate of Willow Brook Cottages, L.L.C.

[2] We also DENY the Appellee's Motion to Strike Supplemental Designation of Record, filed August 8, 2001, and GRANT the Motion to Supplement the Record and for Extension of Time to Respond to Appellee's Brief, filed November 15, 2001.

approval of a compromise may be disturbed only when it achieves an unjust result amounting to a clear abuse of discretion." Reiss v. Hagmann (In re Reiss), 881 F.2d 890, 891-92 (10th Cir. 1989).

III. Background

This case began when an involuntary Chapter 11 petition was filed against Willow Brook Cottages, L.L.C. Appellee Bailey (hereinafter "Bailey") was named Chapter 11 trustee for the Willow Brook estate. Bailey hired Duane Gillman (hereinafter "Gillman") as legal counsel. Later, the Willow Brook case was converted from one under [*4] Chapter 11 to one under Chapter 7.

In May 1999, the Appellant brought a complaint against Bailey and his counsel Gillman in their personal capacity as well as their representative capacities for the Willow Brook estate. The Appellant was president of Mountainview Pacific Ventures (hereinafter "MPV"), an entity that had formed Willow Brook and is, itself, a debtor. In the complaint, the Appellant alleged negligent breach of fiduciary duty, willful and deliberate breach of fiduciary duty, breach of fiduciary duty to maximize the estate, and waste of estate assets. In addition, the Appellant sought removal of Bailey as trustee of the Willow Brook Estate, but this Court held that the Appellant had no standing to seek that remedy.

The complaint against Bailey and Gillman was later dismissed with prejudice. In the Willow Brook case, the bankruptcy court held the Appellant in contempt for violating the automatic stay by bringing the complaint, and it awarded Bailey $ 3,620.50 in actual damages and $ 5,000 in punitive damages. Thus, a judgment for $ 8,620.50 was entered in favor of Bailey. After entry of the judgment, Bailey initiated garnishment proceedings against the Appellant by serving [*5] Roger Segal, trustee for the MPV estate, with garnishment documents. Segal held $ 8,620.50 owed by the MPV estate to the Appellant. Additionally, the bankruptcy court in the Willow Brook case enjoined the Appellant from asserting claims against Bailey or Gillman without prior court approval.

The Appellant appealed the award of damages to the district court. It reversed the $ 5,000 award for punitive damages but upheld the $ 3,620.50 award for actual damages. The Appellant appealed the district court's ruling on the actual damages to the Tenth Circuit Court of Appeals, and Bailey cross-appealed the district court's decision on punitive damages. A decision on this appeal has not yet been entered.

In the meantime, the Appellant himself had filed a Chapter 11 petition. The Appellant was removed as debtor-in-possession, and Appellee Rushton was appointed as trustee. Bailey, acting as trustee for the Willow Brook estate, filed a proof of claim in the Armstrong case for approximately $ 150,000 based on a promissory note that the Appellant had executed in favor of Willow Brook.

Acting on behalf of the respective estates, Rushton and Bailey reached a settlement agreement, which resolved [*6] the litigation pending before the Tenth Circuit Court of Appeals. Bailey filed a motion to approve the settlement in the Armstrong case. Rushton did not initially join in Bailey's motion, but he later filed a memorandum in support of it.

The settlement called for Segal to pay Rushton as trustee for the Armstrong estate $ 5,000. Segal also was to pay the Armstrong estate $ 3,620.50 for a recovery of a preferential transfer. Bailey reserved the right to file a claim against the Armstrong estate for $ 3,620.50. Bailey also reserved his right to pursue the proof of claim filed against the Armstrong estate for $ 150,000 relating to the validity of a promissory note. Likewise, Rushton retained the right to object to the $ 150,000 proof of claim. Bailey and Rushton were to waive their estates' claims against one another with two specified exceptions. [3]

On May 14, 2001, the bankruptcy [*7] court held a hearing on the motion to approve the settlement. On the same day, Rushton filed his joinder for the approval of the settlement. The Appellant objected to the settlement. Both Bailey and Rushton presented evidence in favor of the settlement. The Appellant actively participated in the proceeding. Upon conclusion of the evidence and argument, the bankruptcy court approved the settlement.

IV. Discussion

Although the Appellant advances many propositions of error, they can be reduced to one issue: whether the bankruptcy court abused its discretion by approving the settlement in determining if the settlement was fair and equitable and if it was in the best interests of the

[3] Those two exceptions were the final resolution of the $ 150,000 proof of claim and the resolution of the $ 3,620.50 proof of claim.

Armstrong estate.

Rule 9019(a) of the Federal Rules of Bankruptcy Procedure governs compromises of controversies. It provides: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct." Fed. R. Bankr. P. 9019(a).

The Supreme Court has recognized that, "There can be no informed and [*8] independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 20 L. Ed. 2d 1, 88 S. Ct. 1157 (1968). To this end, the bankruptcy court must weigh the following factors in deciding whether to approve a compromise: (1) the probable success of the underlying litigation on the merits; (2) the potential difficulty in collecting on a judgment; (3) the complexity and expense of the litigation; and (4) the best interests of creditors. See In re Kopexa Realty, 213 B.R. at 1022.

In approving a settlement, the bankruptcy court is not required to conduct a "mini-trial on the merits." Comm. of Unsecured Creditors of Interstate Cigar Co., Inc. v. Interstate Cigar Distribution, Inc. (In re Interstate Cigar Co., Inc.), 240 B.R. 816, 822 (Bankr. E.D. N.Y. 1999). Indeed, at least one appellate court has noted that Rule 9019(a) does not even require the bankruptcy [*9] court to hold an evidentiary hearing on approval of a settlement. See Depoister v. Mary M. Holloway Foundation (In re Depoister), 36 F.3d 582, 586 (7th Cir. 1994). Nevertheless, the bankruptcy court is also not to merely rubber stamp the trustee's judgment in reaching a settlement. See 36 F.3d at 587.

A thorough review of the transcript of the hearing on the approval of the settlement reveals that the bankruptcy court conducted an evidentiary hearing on the motion to approve the settlement. The hearing lasted several hours. The bankruptcy court heard testimony from Bailey and Rushton. The Appellant also presented his own testimony.

The bankruptcy court considered the likelihood of success on the merits by Rushton on behalf of the Armstrong estate. Rushton, an experienced bankruptcy trustee, testified that he had doubts that the claims against Bailey and Gillman had any merit. Moreover, it is uncertain whether Rushton could assert those claims on behalf of the Armstrong estate considering that this Court has ruled that the Appellant has no standing to assert claims against the Willow Brook estate. The bankruptcy court weighed the potentially high expenses in [*10] pursuing the appeals pending before the Tenth Circuit, a factor that is very salient here because the dispute concerns only $ 8,600.

The Appellant urges that the bankruptcy court should not have approved the settlement because it did not include any resolution on the $ 150,000 proof of claim by the Willow Brook estate against the Armstrong estate. The bankruptcy court considered the Appellant's argument that Rushton should use this settlement as leverage to also resolve the $ 150,000 proof of claim dispute. The bankruptcy court rejected that approach as improper, and we find no basis to reverse the bankruptcy court's informed judgment in that regard.

The record shows that the bankruptcy court had the benefit of testimony from numerous witnesses, two of whom are experienced bankruptcy trustees. Moreover, the bankruptcy court was fully apprised of all circumstances surrounding the Armstrong bankruptcy case. The Appellant has not pointed to anything in the record that leads us to conclude that the bankruptcy court abused its discretion. Accordingly, the bankruptcy court's approval of the settlement is AFFIRMED.

---

**End of Document**

# Velasquez v. Gonzales (In re Velasquez)

United States Bankruptcy Appellate Panel for the Tenth Circuit

June 18, 2019, Filed

BAP No. NM-18-076, Bankr. No. 12-10670, Chapter 7

**Reporter**
2019 Bankr. LEXIS 1854 *; 2019 WL 2511557

In re GEORGE VELASQUEZ, Debtor.GEORGE VELASQUEZ, Appellant, v. YVETTE GONZALES, Chapter 7 Trustee, & LOS ALAMOS NATIONAL BANK, Appellees.

**Notice:** RULES OF THE BANKRUPTCY APPELLATE PANEL OF THE TENTH CIRCUIT MAY LIMIT CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** [*1] Appeal from the United States Bankruptcy Court for the District of New Mexico.

In re Velasquez, 2018 Bankr. LEXIS 4185 (Bankr. D.N.M., July 6, 2018)

**Counsel:** For GEORGE VELASQUEZ, Non-Adversary Appellant - Appellant: Vanessa L. Deniro, Attorney, Vanessa L. Deniro, Albuquerque, NM.

For YVETTE GONZALES, Chapter 7 Trustee, Non-Adversary Appellee - Appellee: Edward Mazel, Askew & Mazel, LLC, Albuquerque, NM.

For LOS ALAMOS NATIONAL BANK, Non-Adversary Appellee - Appellee: Paul M. Kienzle, III, Scott & Kienzle, P.A., Albuquerque, NM; Duncan Scott, Albuquerque, NM.

**Judges:** Before SOMERS, MOSIER, and MARKER,[1] Bankruptcy Judges.

**Opinion by:** MOSIER

## Opinion

OPINION[*]

Submitted on the briefs.[**]

**MOSIER**, Bankruptcy Judge.

Successfully challenging a trustee's decision to settle litigation is a difficult task. To do so, the party opposing the settlement must establish that the settlement falls below the lowest point in the range of reasonableness.[2] The Appellant did not make that showing, and we therefore affirm the Bankruptcy Court's decision.

### I. FACTUAL AND PROCEDURAL HISTORY

#### A. The Business Loan

Debtor George Velasquez owned and operated a corporation called Professional Business Assistants, Inc. (PBA), which borrowed $396,000 from Los Alamos National Bank (LANB) in August 2006 (Business Loan). The Business Loan had [*2] a thirty-year term and a variable interest rate. LANB secured the Business Loan with a mortgage against PBA's commercial building in Santa Fe, New Mexico. The Debtor also personally guaranteed the Business Loan.

PBA defaulted on the Business Loan but LANB agreed to renew the note, re-amortizing principal and interest, though retaining the same maturity date. After PBA defaulted on the first renewal, LANB and PBA executed a second renewal note in June 2010, which provided PBA would make one balloon payment of the remaining loan balance on December 1, 2010 (June Renewal). PBA defaulted on the June Renewal's balloon payment,

[1] Joel T. Marker, U.S. Bankruptcy Judge, United States Bankruptcy Court for the District of Utah, sitting by designation.

[*] This unpublished opinion may be cited for its persuasive value, but is not precedential, except under the doctrines of law of the case, claim preclusion, and issue preclusion. 10th Cir. BAP L.R. 8026-6.

[**] After examining the briefs and appellate record, the Court has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. See Fed. R. Bankr. P. 8019(b). The case is therefore submitted without oral argument.

[2] *Rich Dad Operating Co.v. Zubrod (In re Rich Global, LLC)*, 652 F. App'x 625, 631 (10th Cir. 2016) (unpublished).

resulting in a final renewal, which extended the maturity date until April 1, 2011 (December Renewal). On March 1, 2011, the Debtor and PBA signed a one-month promissory note for $13,846.14, due April 1, 2011 (Short Term Loan).

**B. The Personal Loan**

The Debtor borrowed $273,000 from LANB in March 2007 (Personal Loan). LANB secured the Personal Loan with a mortgage against the Debtor's residence in Santa Fe, New Mexico. The Debtor defaulted on the Personal Loan in March 2010. The Debtor and LANB executed a modification agreement, re-amortizing the principal balance of, [*3] and accrued interest on, the Personal Loan.

**C. LANB's Collection Actions and the Debtor's Bankruptcy**

By the spring of 2011, the Debtor and PBA had defaulted on the Business, Personal, and Short Term Loans and all subsequent renewals. Accordingly, LANB sent a notice of default in April 2011. The Debtor held six personal bank accounts with LANB, and PBA held two business bank accounts. The deposit account agreements authorized LANB to freeze and offset account balances against outstanding obligations. In early June 2011, LANB froze the Debtor's and PBA's bank accounts and offset $3,840.62 from those bank account balances on account of the outstanding obligations.[3]

LANB filed a state court foreclosure action against PBA and the Santa Fe commercial property to recover on the Business and Short Term Loans in July 2011. The Debtor and PBA paid off the balance of the Business and Short Term Loans in November 2011, and LANB dismissed the foreclosure action.

LANB also filed a state court foreclosure action against the Debtor and his Santa Fe residence to recover on the Personal Loan in August 2011. The Debtor filed his bankruptcy case on February 24, 2012, staying the foreclosure. The Debtor received [*4] a discharge on June 6, 2012, and the case closed later that month on June 18. The Debtor reopened the case nine days later on June 27, alleging LANB had violated the automatic stay. While the case was reopened, the Debtor amended his schedules to list his interest in PBA, valuing it at $1, and to list a claim against LANB for wrongful foreclosure, also valuing it at $1. The state court entered a final foreclosure judgment in August 2016, and the foreclosure sale of the Debtor's home occurred in September 2016. LANB filed a proof of claim for approximately $164,259 on account of the deficiency resulting from that sale.

In February 2017, the Debtor filed a state court lawsuit against LANB alleging thirteen claims relating to the Business Loan and setoff. The Debtor alleged that LANB had breached the terms of the Business Loan and renewals[4] and that the offsets from his bank accounts constituted conversion.

In the meantime, the Debtor's bankruptcy case closed and reopened three times, the last of which occurred in March 2017. Yvette Gonzales was appointed as Chapter 7 trustee (Trustee). The Debtor amended his schedules to value his claims against [*5] LANB at $6,748. He also amended his Schedule C to exempt any recovery on the claims against LANB.[5] The Trustee investigated the lawsuit against LANB and the parties began settlement negotiations.

**D. The Motion to Approve Compromise**

The Trustee filed the *Motion to Approve Compromise of Controversy* on December 11, 2017 (Motion to Compromise).[6] The Trustee and LANB proposed to settle the estate's claims against LANB in exchange for payment of $10,000 to the estate and waiver of LANB's $164,259 proof of claim. The Debtor filed his *Objection to Motion to Approve Compromise of Controversy* (Objection) on January 2, 2018.[7] At a preliminary hearing on April 9, 2018, the Bankruptcy Court set a

[3] LANB initially offset $5,570.13, but returned $1,729.51 upon discovering it was drafted from a joint account held by the Debtor and his daughter.

[4] The Debtor claimed the purpose of the modification was to extend the maturity date and that he did not learn of LANB's misrepresentations until January 2016. *Exhibit D, Affidavit of George Velasquez* at 1-4, *in* Appellant's App. at 163-66.

[5] The Debtor stipulated to the denial of his claim of exemption of any award for the claims against LANB in September 2017.

[6] Appellant's App. at 135.

[7] Appellant's App. at 142.

discovery deadline of June 4, 2018, and scheduled a final hearing on the Motion to Compromise for June 20, 2018.

LANB and the Debtor agreed to an informal extension of discovery deadlines until June 8, 2018. After receiving LANB's discovery responses on June 8, the Debtor filed a motion to continue the hearing (Motion to Continue), arguing he needed an additional two weeks to review the responses. LANB objected to the Motion to Continue and the Bankruptcy Court held a hearing to address the matter on June 18, [*6] 2018. The Bankruptcy Court denied the Motion to Continue the same day, requiring the Debtor to tender his witness list by June 18 at 5:00 pm and his exhibit list by June 19 at 5:00 pm.

The Bankruptcy Court proceeded with the hearing on the Motion to Compromise on June 20, as scheduled. At that hearing the Debtor testified that he was unaware the maturity date of the Business Loan had been reduced by the renewals and he suggested that LANB had fraudulently foreclosed based on altered notes. He also testified that he had suffered damages in the form of lost business profits as a result of the account freeze and offset, estimating his damages between $15,000,000 and $30,000,000.

The Trustee testified that, after evaluating the Debtor's claims against LANB, she believed the likelihood of success on the claims was "slim to none."[8] Furthermore, she did not believe the Debtor's claim that LANB had misrepresented the maturity date was credible or that his damage claim could be supported. Finally, the Trustee testified that she believed the compromise to be in the best interest of creditors because it removed the largest unsecured claim from the estate, allowing remaining creditors to receive [*7] a distribution of over fifty percent.

The Bankruptcy Court made its findings of fact and conclusions of law on the record at a July 6, 2018 hearing.[9] The Bankruptcy Court did not find the Debtor's testimony credible, observing that because the maturity dates were "not buried in the fine print, but [were] set out very plainly at the top of the note," the Debtor, a sophisticated businessman, should have had knowledge of them.[10] Furthermore, the Bankruptcy Court took issue with the Debtor's $6,748 scheduled valuation of his claims against LANB compared to his testimony that he suffered up to $30,000,000 in damages.

The Bankruptcy Court applied the four factors from *Kopp v. All American Life Insurance Company (In re Kopexa Realty Venture Company)*[11]—which are widely referred to in this Circuit as the *Kopexa* factors—and concluded that (1) the Trustee would be unlikely to prevail on the claims; (2) a resulting judgment might only net $25,000 or so for creditors; (3) litigation would require counsel and expert witnesses, making pursuit of the claims cost-prohibitive; and (4) creditors had "more to gain with greater certainty [*8] through the settlement."[12] The Bankruptcy Court entered the *Order Granting Trustee's Motion to Approve Compromise of Controversy* on July 6, 2018 (Order Approving Compromise).[13]

## II. JURISDICTION AND STANDARD OF REVIEW

"With the consent of the parties, this Court has jurisdiction to hear timely-filed appeals from 'final judgments, orders, and decrees' of bankruptcy courts within the Tenth Circuit."[14] An order granting a motion to approve a compromise of claims is final for purposes of 28 U.S.C. § 158(a)(3).[15] None of the parties in this case elected for this appeal to be heard by the United States District Court for the District of New Mexico pursuant to 28 U.S.C. § 158(c). Accordingly, this Court has jurisdiction over this appeal.

We review a bankruptcy court's approval of a settlement agreement brought pursuant to Federal Rule of

[8] *Tr. June 20, 2018 Hearing* at 7, *in* Appellant's App. at 207.

[9] *Tr. July 6, 2018 Hearing, in* Appellant's App. at 228.

[10] *Tr. July 6, 2018 Hearing* at 9-10, *in* Appellant's App. at 231.

[11] 213 B.R. 1020 (10th Cir. BAP 1997).

[12] *Tr. July 6, 2018 Hearing* at 19, *in* Appellant's App. at 233.

[13] Appellant's App. at 199.

[14] *Straight v. Wyo. Dep't of Transp. (In re Straight)*, 248 B.R. 403, 409 (10th Cir. BAP 2000) (first quoting 28 U.S.C. § 158(a)(1), and then citing 28 U.S.C. § 158(b)(1), (c)(1) and Fed. R. Bankr. P. 8002).

[15] *See Korngold v. Loyd (In re S. Med. Arts Cos.)*, 343 B.R. 250, 254 (10th Cir. BAP 2006).

Bankruptcy Procedure Rule 9019[16] for an abuse of discretion.[17] "Under the abuse of discretion standard[,] a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."[18] An abuse of discretion occurs when a trial court "makes an 'arbitrary, capricious or whimsical,' [*9] or 'manifestly unreasonable judgment.'"[19] "A clear example of an abuse of discretion exists where the trial court fails to consider the applicable legal standard or the facts upon which the exercise of its discretionary judgment is based."[20]

We review a bankruptcy court's findings of fact for clear error. "A factual finding is 'clearly erroneous' when 'it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made.'"[21] But if the bankruptcy court's "factual findings are premised on improper legal standards or on proper ones improperly applied, they are not entitled to the protection of the clearly erroneous standard, but are subject to *de novo* review."[22]

We review questions of law *de novo*, which "requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision."[23]

## III. DISCUSSION

### A. The Applicable Law

Rule 9019(a) governs approval of a compromise or settlement. But that rule only provides the procedure used to obtain that approval; it does not contain the standard by which courts evaluate compromises or settlements. [*10] Nor does the Bankruptcy Code offer any statutory guidance on that front. The development of this area of the law has been left to the courts.

The Tenth Circuit Court of Appeals has not yet issued a published decision addressing what standard a Rule 9019 settlement must achieve before it can be approved. Even though there is no controlling circuit law on the subject, the Tenth Circuit has stated in a handful of unpublished decisions that "[a] court's general charge is to determine whether the settlement is fair and equitable and in the best interests of the estate."[24] Put another way, the court should "review the issues and determine whether the settlement falls below the lowest point in the range of reasonableness."[25] In reaching this determination, a court need not conduct a mini-trial or decide the numerous questions of law and fact,[26] but its decision to approve a settlement "must be an informed one based upon an objective evaluation of developed facts."[27]

---

[16] All references to Rule or Rules are to the Federal Rules of Bankruptcy Procedure unless otherwise indicated.

[17] *In re S. Med. Arts Cos.*, 343 B.R. at 256.

[18] *Arenas v. U.S. Tr. (In re Arenas)*, 535 B.R. 845, 849 (10th Cir. BAP 2015) (quoting *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir. 1994)).

[19] *Id.* (quoting *Moothart*, 21 F.3d at 1504-05).

[20] *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1191 (10th Cir. 2018) (quoting *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997)).

[21] *LTF Real Estate Co. v. Expert S. Tulsa, LLC (In re Expert S. Tulsa, LLC)*, 522 B.R. 634, 643 (10th Cir. BAP 2014) (quoting *Las Vegas Ice & Cold Storage Co. v. Far W. Bank)*, 893 F.2d 1182, 1185 (10th Cir. 1990)).

[22] *Minerals Techs., Inc. v. Novinda Corp. (In re Novinda Corp.)*, 585 B.R. 145, 152 (10th Cir. BAP 2018) (quoting *Osborn v. Durant Bank & Trust Co. (In re Osborn)*, 24 F.3d 1199, 1203 (10th Cir. 1994), *abrogated in part on other grounds by Eastman v. Union Pac. R.R.*, 493 F.3d 1151 (10th Cir. 2007)).

[23] *In re Expert S. Tulsa, LLC*, 522 B.R. at 643 (citing *Salve Regina Coll. v. Russell)*, 499 U.S. 225, 238, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991)).

[24] *Rich Dad Operating Co. v. Zubrod (In re Rich Global, LLC)*, 652 F. App'x 625, 631 (10th Cir. 2016) (unpublished) (citing *Official Comm. of Unsecured Creditors of W. Pac. Airlines, Inc. v. W. Pac. Airlines, Inc. (In re W. Pac. Airlines, Inc.)*, 219 B.R. 575, 579 (D. Colo. 1998)). Under the Tenth Circuit Rules, unpublished decisions, such as *In re Rich Global, LLC*, "are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1(A).

[25] *In re Rich Global, LLC*, 652 F. App'x at 631 (quoting 8 *Norton Bankruptcy Law & Practice* § 167:2 (3d ed. 2011)).

[26] *E.g., In re Brutsche*, 500 B.R. 62, 71 (Bankr. D.N.M. 2013).

[27] *Korngold v. Loyd (In re S. Med. Arts Cos.)*, 343 B.R. 250, 256 (10th Cir. BAP 2006) (quoting *Reiss v. Hagmann*, 881

To fulfill the duties articulated by the Tenth Circuit, bankruptcy courts in this Circuit invariably, if not inveterately, review Rule 9019 settlements through the lens of the *Kopexa [*11]* factors. But there is no binding precedent that requires analyses of such settlements to use those factors. The Tenth Circuit has never endorsed them in a published decision, likely because parties have not presented the factors' applicability as an issue on appeal.[28] Even our own prior decisions leave some uncertainty regarding whether the *Kopexa* factors constitute an exhaustive list of criteria. *Kopexa* itself merely stated that it is appropriate to consider the four now well-known factors in evaluating settlements; it did not mandate their application or exclude others.[29] But in 2006 this Court issued a decision that characterized *Kopexa* as having "adopted" the four-factor test "for evaluating the factual circumstances of a compromise."[30]

We have not revisited the issue in a published decision since that time, but in a series of unpublished decisions the BAP incrementally advanced towards mandatory application of the *Kopexa* factors,[31] finally reaching that position in *Isho v. Loveridge (In re Isho)*.[32] In that case, we held that bankruptcy courts must consider the *Kopexa* factors in reviewing proposed settlements, though there was no discussion of whether additional [*12] factors could apply.[33] Subsequent decisions have reached the same conclusion.[34] Although there is no controlling circuit law requiring the application of the *Kopexa* factors on the one hand or precluding consideration of supernumerary factors on the other, we conclude that using the *Kopexa* factors in evaluating Rule 9019 settlements is consistent with the standard stated by the Tenth Circuit in *Rich Global*.

As stated previously, the *Kopexa* factors are: "[1] the probable success of the underlying litigation on the merits, [2] the possible difficulty in collection of a judgment, [3] the complexity and expense of the litigation, and [4] the interests of creditors in deference to their reasonable views."[35] "[T]he court need not

F.2d 890, 892 (10th Cir. 1989)); *see also Armstrong v. Rushton (In re Armstrong)*, 285 B.R. 344 [published in full-text format at 2002 Bankr. LEXIS 301], 2002 WL 471332, at *2 (10th Cir. BAP Mar. 28 2002) (unpublished) ("There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968))), *aff'd*, 99 F. App'x 210 (10th Cir. 2004) (unpublished).

[28] *See, e.g., In re Rich Global, LLC*, 652 F. App'x at 631 ("The parties do not argue that the bankruptcy court erred in identifying [the *Kopexa* factors] as the appropriate factors, and so we assume without deciding that they are."). In fact, the only published Tenth Circuit opinion to cite *Kopexa, Scott v. King (In re Amerson)*, 839 F.3d 1290 (10th Cir. 2016), did not have occasion to address whether the *Kopexa* factors are the correct standard by which to evaluate Rule 9019 settlements because the appellant did not raise the issue. *See In re Amerson*, 839 F.3d at 1298.

[29] *See Kopp v. All American Life Insurance Company (In re Kopexa Realty Venture Company)*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997).

[30] *In re S. Med. Arts Cos.*, 343 B.R. at 256.

[31] *See Allen v. Loveridge (In re Log Furniture, Inc.)*, 356 B.R. 787 [published in full-text format at 2007 Bankr. LEXIS 403], 2007 WL 496784, at *3 (10th Cir. BAP Feb. 16, 2007) (unpublished) (stating that the "[f]actors to consider" in approving a settlement agreement are the *Kopexa* factors), *aff'd* 257 F. App'x 101 (10th Cir. 2007) (unpublished); *Lewis v. McCallum (In re Lewis)*, 378 B.R. 418 [published in full-text format at 2007 Bankr. LEXIS 2500], 2007 WL 2189343, at *4 (10th Cir. BAP July 31, 2007) (repeating the "adopted" language of *Southern Medical Arts*).

[32] 498 B.R. 391 [published in full-text format at 2013 Bankr. LEXIS 1414], 2013 WL 1386208 (10th Cir. BAP Apr. 5, 2013) (unpublished).

[33] 2013 Bankr. LEXIS 1414, [WL] at *3. In fact, the *Isho* panel did not have reason to address whether the *Kopexa* factors had been satisfied; it summarily affirmed the bankruptcy court's approval of the settlement because the appellant failed to provide an adequate record for review on that issue. 2013 Bankr. LEXIS 1414, [WL] at *4.

[34] *See Amerson v. King (In re Amerson)*, No. CO-14-045, 2015 Bankr. LEXIS 2930, 2015 WL 5162763, at *7 (10th Cir. BAP Sept. 2, 2015) (unpublished) ("The Tenth Circuit standard for determining whether a settlement in a bankruptcy case should be approved is a four-part test articulated by this Court in [*Kopexa*]."), *aff'd sub nom. Scott v. King (In re Amerson)*, 839 F.3d 1290 (10th Cir. 2016); *Brumfiel v. Lewis (In re Brumfiel)*, No. CO-15-014, 2015 Bankr. LEXIS 3477, 2015 WL 5895213, at *7 (10th Cir. BAP Oct. 8, 2015) (unpublished) (same).

[35] *In re Kopexa Realty Venture Co.*, 213 B.R. at 1022 (citations

resolve all of these issues, but must only identify them 'so that the reasonableness of the settlement may be evaluated.'"[36]

**B. Application of Controlling Law**

The Bankruptcy Court applied the *Kopexa* factors, concluding that they weighed in favor of approving the settlement agreement. After reviewing the Order Approving Compromise, we are not left with [*13] a definite and firm conviction that the Bankruptcy Court made a clear error of judgment or exceeded the bounds of permissible choice under the circumstances. However, as the Debtor assigns multiple errors to the Bankruptcy Court's findings and conclusions, we review each assignment of error in turn, beginning with the Bankruptcy Court's analysis of the *Kopexa* factors.

**1. Factor 1: The Probable Success of the Underlying Litigation**

The Debtor argues that the Bankruptcy Court disproportionately emphasized circumstances that diminished the likelihood of success of the litigation. First, the Debtor argues the Bankruptcy Court incorrectly applied the four-year statute of limitations for oral contracts instead of the six-year statute for written contracts. In particular, he asserts that because the Business Loan and subsequent renewals are ambiguous, evidence of contemporaneous oral agreements would be allowed to interpret the written contract. And since contemporaneous oral agreements of an ambiguous contract merge into the written agreement, the Debtor concludes that the six-year statute of limitations applies.[37] The Debtor argues "there is no question that the contract is ambiguous" because [*14] "the contract states plainly that its purpose is to *extend the maturity date of the loan.*"[38] However, the June Renewal of the Business Loan modified the maturity date to December 1, 2010. Therefore, as the June Renewal eliminated the thirty-year term, the December Renewal served to extend the maturity date from December 1, 2010, to April 1, 2011. Regardless, the Bankruptcy Court correctly identified the statute of limitations defense, at the very least, as an impediment to the Trustee's success in the litigation.[39]

Next, the Debtor argues that the Bankruptcy Court erred in assessing his credibility and finding no evidence of fraud in the acceleration of the maturity date. We defer to the Bankruptcy Court's judgment of a witness's credibility.[40] In addition to its assessment of the Debtor's testimony, the Bankruptcy Court based its credibility findings on the Debtor's own contradictions, noting that he scheduled the value of the litigation claims at $6,748 but testified he suffered approximately $30,000,000 in damages. The record supports this finding. With respect to the Debtor's fraud claim, he argues that the Bankruptcy Court failed to consider the twenty-year banking relationship he [*15] had with LANB, which he claims lends credibility to his "contention that he was advised by LANB the renewal agreement was . . . an agreement *extending* the maturity date."[41] Although courts may rely on circumstantial evidence to deduce fraudulent intent,[42] the banking relationship is insufficient to support the Debtor's claim of fraud. The Bankruptcy Court's decision must "bear a 'rational relationship to the supportive evidentiary data.'"[43] It is

omitted).

[36] *Official Comm. of Unsecured Creditors of W. Pac. Airlines, Inc. v. W. Pac. Airlines, Inc. (In re W. Pac. Airlines, Inc.)*, 219 B.R. 575, 579 (D. Colo. 1998) (quoting *In re The Hermitage Inn, Inc.*, 66 B.R. 71, 72 (Bankr. D. Colo. 1986)).

[37] *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, 114 N.M. 778, 845 P.2d 1232, 1235 (N.M. 1993) ("The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear." (citing *C.R. Anthony Co. v. Loretto Mall Partners*, 1991-NMSC-070, 112 N.M. 504, 817 P.2d 238, 242-43 (N.M. 1991))).

[38] Appellant's Br. 17.

[39] *See In re W. Pac. Airlines, Inc.*, 219 B.R. at 579 (explaining the bankruptcy court is not required to resolve issues but only identify and weigh them as factors).

[40] *See* Fed. R. Civ. P. 52(a)(6), made applicable in adversary proceedings by Fed. R. Bankr. P. 7052; *Gillman v. Ford (In re Ford)*, 492 F.3d 1148, 1157 (10th Cir. 2007) ("When findings are based on determinations regarding the credibility of witnesses, [Fed. R. Civ. P.] 52(a) demands even greater deference to the trial court's findings." (quoting *Dalton v. IRS*, 77 F.3d 1297, 1302 (10th Cir. 1996))).

[41] Appellant's Br. 19.

[42] *Job v. Calder (In re Calder)*, 907 F.2d 953, 956 (10th Cir. 1990).

[43] *In re Ford*, 492 F.3d at 1157 (quoting *Gillman v. Sci. Research Prods. Inc. of Del. (In re Mama D'Angelo, Inc.)*, 55

clear from the record that LANB worked with the Debtor, providing him two extensions on the acceleration of the Business Loan. Furthermore, LANB's subsequent foreclosure suggests that it intended to collect on the defaulted obligation despite the longstanding relationship.

The Debtor also assigns error to the Bankruptcy Court's conclusion that the claims were likely barred by a preclusion doctrine. The Debtor points out that LANB and the Trustee argued the claims were mandatory counterclaims in the foreclosure of the Personal Loan, not the Business Loan. The Bankruptcy Court admitted such a defense may not be "bulletproof" because LANB's initial foreclosure claim subject to mandatory counterclaims was dismissed. Thus, the Bankruptcy Court did [*16] not place substantial weight on this defense but instead recognized it as an additional nuisance the Trustee would have to overcome to prevail on the estate's claims.

Finally, the Debtor argues the Bankruptcy Court erred in (1) determining LANB was entitled to offset; and (2) failing to recognize the account freeze was just as harmful as the offset. The record does not support the suggestion the Debtor was not in default. The promissory notes and subsequent renewals evidence the maturity dates on their face and the Debtor's uncorroborated and incredible testimony does not suggest otherwise. Furthermore, the Debtor admitted to defaulting on the Business, Personal, and Short Term Loans in an affidavit attached to the Objection. Accordingly, even if the Bankruptcy Court failed to consider the impact of the account freeze, nothing in the records supports finding the freeze was unauthorized. Thus, the Debtor's argument fails.

**2. Factor 2: The Possible Difficulty in Collection of a Judgment**

The Debtor asserts the Bankruptcy Court did not analyze the difficulty of collecting on a judgment but instead suggested recovery must exceed $400,000 to offer a greater distribution to creditors than under [*17] the settlement. While analysis of the second factor typically focuses on the defendant's ability to pay, it can also encompass problems that the Bankruptcy Court identified, including costs that would have to be incurred in pursuing the judgment.[44] Those costs undoubtedly make collection more difficult, and we assign no error to the Bankruptcy Court's consideration of those costs. But even if the second *Kopexa* factor refers exclusively to the defendant's ability to pay, "the court need not resolve all of [the factors] but must only identify them 'so that the reasonableness of the settlement may be evaluated.'"[45] Failure to consider the defendant's ability to pay, by itself, is not grounds for reversal.

Moreover, the Bankruptcy Court's discussion of the second factor goes to the heart of the Rule 9019 inquiry: a cost-benefit analysis.[46] The Bankruptcy Court's review of the cost-benefit analysis contributed to its decision to approve the settlement, and we find no error with that analysis.

**3. Factor 3: The Complexity and Expense of the Litigation**

The Debtor assigns error to the Bankruptcy Court's conclusion that hiring expert witnesses and counsel

F.3d 552, 555 (10th Cir. 1995)).

[44] Analysis of the second factor in this case acutely brings to the forefront the question of whether the *Kopexa* factors are exhaustive. As a contrast to *Kopexa*, the court *In re Remsen Partners, Ltd.*, 294 B.R. 557 (Bankr. S.D.N.Y. 2003), for example, phrased the second factor as "the difficulties, if any, to be encountered in the matter of collection." *Id.* at 565. The use of the plural broadens the categories of problems parties and bankruptcy courts may consider in evaluating the second factor. As the Bankruptcy Court's analysis in this case demonstrates, problems other than the defendant's ability to pay can be relevant to the Rule 9019 inquiry. Reading *Kopexa*—with its singular "difficulty"—to refer only to the defendant's ability to pay could ignore other collectability issues that may bear on the reasonableness of settlement and therefore circumscribe a judge's purview. We do not read "difficulty" so narrowly and, indeed, have on occasion used the plural form in prior decisions. *See Lewis v. McCallum (In re Lewis)*, 378 B.R. 418 [published in full-text format at 2007 Bankr. LEXIS 2500], 2007 WL 2189343, at *4 (10th Cir. BAP July 31, 2007) (unpublished) (rendering the second *Kopexa* factor as the "possible problems in collecting the judgment"). But these interpretative problems highlight the need to answer the question whether *Kopexa*'s standard must be followed to the letter, or whether its factors can be modified or even added to.

[45] *In re W. Pac. Airlines, Inc.*, 219 B.R. at 579 (quoting *In re The Hermitage Inn, Inc.*, 66 B.R. at 72).

[46] *See Suter v. Goedert*, 396 B.R. 535, 547-48 (D. Nev. 2008).

would be cost-prohibitive. [*18] The Debtor argues his experience as a "sophisticated businessman" qualified him to serve as an expert on damages.[47] Again, we defer to the Bankruptcy Court's findings as to the Debtor's credibility, and the record does not persuade us to believe the Debtor's unsupported testimony regarding potential damages. The Debtor also suggests the Trustee could prosecute the claims herself instead of hiring counsel. This argument also asks the Court to substitute its judgment for the judgment of the Bankruptcy Court, which we determine made an informed decision based on an objective analysis of the facts. No matter which counsel pursued the claims against LANB, it would not be done without compensation. The Trustee considered prosecution of the claims cost-prohibitive based on the likelihood of success on the merits and the Bankruptcy Court agreed. We see no reason to overturn this finding.[48]

#### 4. Factor 4: The Interest of Creditors

The Debtor argues the Bankruptcy Court erred in concluding that a settlement for $10,000 was in the creditors' best interest when potential damages exceeded total claims. The Debtor's arguments highlight the conflict between his personal interests and the Trustee's [*19] duty to maximize the estate.[49] The only evidence to support the Debtor's valuation of the claims is his uncorroborated testimony that damages were between $15,000,000 and $30,000,000. However, the Bankruptcy Court found the Debtor's scheduled valuation of the claims—$6,748—contradicted his later testimony. Furthermore, the Debtor testified he was not willing to purchase the claims from the bankruptcy estate despite their purported value, casting doubt on his valuation. These findings are not clearly erroneous. The Debtor's argument also discounts the withdrawal of LANB's $164,259 claim in addition to payment of $10,000. The Trustee testified that the only remaining claims were for credit card debt totaling approximately $7,300, and none of the holders of those claims objected to the settlement. Since the withdrawal of LANB's claim substantially increased the distribution to the remaining creditors, approval of the settlement was in the best interest of the estate and the Bankruptcy Court did not abuse its discretion in concluding that creditors "stand more to gain with greater certainty through the settlement."[50]

#### 5. Remaining Findings and Conclusions

The Debtor [*20] also argues the Bankruptcy Court erred in finding the Debtor had knowledge of the modified maturity dates and concluding the Debtor was liable for PBA's debts. The Debtor mischaracterizes the Bankruptcy Court's findings: instead of finding the Debtor knew of the modified maturity dates, the Bankruptcy Court found the Debtor "should have known" of the dates as his signature was on the documents he signed and LANB instituted foreclosure proceedings.[51] The Debtor argues LANB did not authenticate any of the promissory notes or renewals. However, the Debtor did not object to the admission of the promissory notes or renewals and such documents are self-authenticating pursuant to Federal Rule of Evidence 902(9).[52]

The Debtor also argues that N.M. Stat. Ann 1978 § 53-

[47] Appellant's Br. 26.

[48] *See, e.g., Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1146 (1st Cir. 1992) ("[I]t is not surprising that appellants are attracted by the glitter of further litigation financed at the expense of the chapter 7 estate . . . . [I]t is apparent that appellants' intuitive confidence in their own ability to outguess the chapter 7 trustee's settlement decision . . . has more . . . to do with the insignificance of their stake in the settlement.").

[49] *Id.* ("[The debtors'] purpose is inapposite to the duty imposed on a chapter 7 trustee under the [Bankruptcy] Code, since it is not so much the interests of the chapter 7 estate, as it is their self-interest, which [they] would have the chapter 7 trustee champion by refusing to settle the . . . litigation.").

[50] *Tr. July 6, 2018 Hearing* at 19, *in* Appellant's App. at 233. *See Slovak Republic v. Loveridge (In re EuroGas, Inc.)*, 755 F. App'x 825, 833 (10th Cir. 2019) (unpublished) (affirming approval of settlement that eliminated $113,000,000 in burdensome claims and providing payment of $250,000); *Korngold v. Loyd (In re S. Med. Arts Cos.)*, 343 B.R. 250, 257-58 (10th Cir. BAP 2006) (finding no abuse of discretion where settlement provided 60% distribution to creditors that otherwise would have received nothing); *Geltzer v. Original Soupman Inc. (In re Soup Kitchen Int'l Inc.)*, 506 B.R. 29, 43 (Bankr. E.D.N.Y. 2014) (approving settlement that allowed unsecured creditors to receive a 43% distribution on their claims).

[51] *Tr. July 6, 2018 Hearing* at 15, *in* Appellant's App. at 232.

[52] *Niederquell v. Bank of Am. N.A.*, 696 F. App'x 321, 324 (10th Cir. 2017) (citing 31 Charles Alan Wright & Arthur R. Miller, *Fed. Practice and Pro.* § 7143 (1st ed. 2017)).

11-4.1 shielded him from liability for PBA's debts. However, the Debtor's personal guaranty of PBA's debts is in the record and included "any extensions, renewals, modifications and substitutions" of the original debt.[53] The Debtor did not object to the Bankruptcy Court's review of the personal guaranty. Therefore, the Bankruptcy Court's finding that the Debtor guaranteed PBA's obligations is not clear error, and the Debtor's argument fails.

**6. Denial** [*21] **of Motion to Continue Hearing**

Finally, the Debtor argues the Bankruptcy Court erred in denying his Motion to Continue. Denial of a motion to continue is reviewed for an abuse of discretion, and reversal is not appropriate unless "the denial was arbitrary or unreasonable and materially prejudiced the appellant."[54] The Tenth Circuit provides several factors to consider in determining whether denial of a continuance constitutes an abuse of discretion. Those factors include:

> the diligence of the party requesting the continuance; the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; [and] the need asserted for the continuance and the harm that appellant might suffer as a result of the [bankruptcy] court's denial of the continuance.[55]

The Debtor argues he did not have sufficient time to review the renewal notes prior to the hearing based on LANB's delays in turning them over. Yet these documents were not new to the Debtor as they bear his signature and served as the basis of LANB's July 2011 foreclosure action. [*22] Furthermore, the Debtor failed to provide a transcript of the hearing on the Motion to Continue in the record, thus we summarily affirm the denial of the Motion to Continue.[56]

**IV. CONCLUSION**

The Bankruptcy Court developed facts and made an objective evaluation of those facts, as required by Tenth Circuit law, in reviewing the proposed settlement. Its conclusion that the settlement fell well within the range of reasonableness was informed by an analysis of the *Kopexa* factors. We assign no error to the use of those factors, the Bankruptcy Court's application of them to the facts of this case, or the Bankruptcy Court's ultimate decision to grant the Motion to Compromise and approve the underlying settlement. Because we do not have a definite and firm conviction that the Bankruptcy Court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances, the Order Approving Settlement is AFFIRMED.

---

End of Document

[53] *Exhibit I to Amended Complaint for Foreclosure of Mortgages and For Debt and Money Due, Guaranty* at 1, *in* Appellant's App. at 64.

[54] *Rogers v. Andrus Transp. Servs.*, 502 F.3d 1147, 1151 (10th Cir. 2007) (quoting *United States v. West*, 828 F.2d 1468, 1469 (10th Cir. 1987)).

[55] *Id.* (quoting *West*, 828 F.2d at 1470).

[56] *Tollefsen v. US Bank Nat'l Ass'n (In re Tollefsen)*, No. NO-07-057, 2008 Bankr. LEXIS 528, 2008 WL 762487, at *1 (10th Cir. BAP Mar. 11, 2008) (unpublished) ("[T]he failure to provide a trial transcript on appeal warrants affirming the trial court when the issue on appeal requires the appellate court to review the record in the trial court." (citing *McGinnis v. Gustafson*, 978 F.2d 1199, 1201 (10th Cir. 1992))); *OU Fed. Credit Union v. Inkster (In re Inkster)*, Nos. WO-00-063, 00-12923, 2001 Bankr. LEXIS 170, 2001 WL 169758, at *2 (10th Cir. BAP Feb. 21, 2001) (unpublished) ("Without a transcript, we have an inadequate record, giving us grounds to summarily affirm the bankruptcy court.").