George Hofmann (10005)
**Cohne Kinghorn, P.C.**
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378

Attorneys for Mark C. Rose,
Chapter 7 Trustee

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re<br><br>AMMON EDWARD BUNDY,<br><br>Debtor. | Bankruptcy No. 24-23530 (WTT)<br><br>Chapter 7 |

### REPLY MEMORANDUM IN SUPPORT OF MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT BETWEEN THE TRUSTEE, THE DEBTOR, AND MRS. BUNDY

Mark C. Rose, in his capacity as Chapter 7 Trustee (the "Trustee") of the bankruptcy estate of Ammon Edward Bundy (the "Debtor"), respectfully submits this Reply Memorandum in support of his Motion for Approval of Settlement Agreement Between the Trustee, the Debtor, and Mrs. Bundy (the "Settlement Motion"), and in further support of the Settlement Motion, the Trustee represents to the Court as follows.

The St. Luke's Creditors' Objection to Trustee's Motion to Approve Settlement Agreement (the "<u>Objection</u>") fundamentally misapprehends what is presented to the Court through the Settlement Motion. The key paragraph of the Agreement[1] is paragraph 3. It does not provide a general release of claims to the Debtor. It is a very specific release, of any rights or claims of the Estate to the defined term "Assets". The "Assets" are not all of the Debtor's assets. They are certain specific assets defined on the first page of the Agreement. The last sentence of paragraph three makes this abundantly clear: "For the avoidance of doubt, the Trustee, the Debtor and Mrs. Bundy have other potential claims and controversies between them, and this Agreement is intended to resolve only the parties' disputes with respect to the Assets and in particular the Trustee's claims to recover the Cash and the other Assets."

The "Assets" under the Agreement are specifically:

- $200,000 cash in the Debtor's possession (the "Cash"), which the Trustee contends is the proceeds of the sale of the sale of the former residence of the Debtor and Mrs. Bundy in Arizona
- 2019 Ford Expedition
- 2020 Ford F250
- 2007 Chevy Silverado
- 2010 Polaris Sportsman 550
- 2020 Polaris Sportsman 550
- 2006 Gear Box Trailer
- Mechanic's Tools and Cases
- Mammoth Creek Property
- Appliance, Furniture, Safe, Electronics
- Exercise Equipment, Guns and Clothing

---

[1] Capitalized terms used in this Reply Memorandum and not otherwise defined have the meanings ascribed to them in the Settlement Motion.

2

The Objection obfuscates what is actually being resolved only by pretending that the Agreement provides a general release to the Debtor of any and all rights and claims of the Trustee against the Debtor or his property. That is not the case at all. The Agreement resolves claims of the Trustee against the Assets, period. It does not resolve any potential fraudulent transfer claims. It does not resolve the Trustee's claims or rights to any other assets, with the exception of the defined "Assets".

The Objection thus complains that the Trustee is waiving "the estate's right to more than $550,000 in prepetition assets ("Known Assets")." Objection at page 1. The Trustee cannot understand what is meant by the "Known Assets". The $550,000+ value cited by the Objection for the "Known Assets" is not to be found in the sources cited in footnote 1 of the Objection.

From there, the Objection confusingly defines many other types of assets that the Debtor may have, but these assets are not among the "Assets" as defined in the Agreement. For example, footnote one mentions that "$70,000 is included in the estimated value of the Known Assets" for the Debtor's interest in Abish-Husbondi, Inc. ("Abish"), but the Debtor's interest in Abish (if any) is not among the "Assets".

Similarly, the Objection refers and defines the "Service Assets", which it variously says are worth $215,000 or $210,000. Objection at pages 2 and 6. This is also likely the same as the "business and two service trucks" mentioned on page 10 of the Objection, which says they are "valued at more than $215,000". But the "Service Assets" are again not among the "Assets".

3

The actual Assets which are resolved by the proposed settlement (with the exception of the Cash and the Mammoth Creek Property, which will be separately analyzed below), and their estimated values according to the Trustee, are these:

| | |
|---|---|
| Ford Expedition | $19,000 |
| Ford F250 | $37,000 |
| Chevy Silverado | $9,000 |
| Polaris | $2,500 |
| Polaris | $2,500 |
| Trailer | $4,200 |
| Tools | $12,500 (range $10,000-$15,000) |
| Appliance, Furniture, Safe, Electronics[2] | $1,000 (gun safe only) |
| Exercise equipment, guns, and clothing | $2,600 (firearms only)[3] |
| **Sub total** | **$90,300** |
| Less 15% commission | $76,755 |
| Vehicle exemption | ($10,000) |
| Tools exemption | ($10,000) |
| Wild card | ($1,500) |
| **Total** | **$55,595** |

---

[2] In the experience of the Trustee and his undersigned counsel, and also based on the Debtor's descriptions, the used appliances, furniture, and electronics either have insignificant value (including taking into account the costs of liquidation, transportation, and related legal expenses) or they are exempt.

[3] Under Idaho law, specifically Idaho Code § 11-605(8), a debtor is entitled to exempt one firearm up to a maximum amount of $1,500; this $2,600 figure deducts $450 for what is believed to be the Debtor's most valuable firearm, a Sig Sauer pistol valued at $450. In experience of the Trustee and his counsel, the used exercise equipment and clothing either have no value or they are exempt.

4

For most, but not all of these Assets, the Trustee has relied on an appraisal report prepared by Erkelens & Olson Auctioneers in August 2024 for the values, which report is attached as Exhibit A.  For the remaining Assets that are not included in the report, the Trustee has relied on subsequent inquiries with Erkelens & Olson Auctioneers and also his own experience and that of his counsel in liquidating similar assets at auction.

While the Objection states that "Bundy knowingly waived" any exemptions, the Trustee does not agree with that analysis.  The Trustee believes that as a policy matter all debtors should have the benefit of reasonable exemptions as afforded under state law.  Furthermore, at any time the Debtor could amend his bankruptcy schedules and claim the exemptions as the Trustee has described above.  While the Objection states at page 11 that the Debtor "refused to claim an exemption, not because he did not understand the consequences of doing so, but because he did not want to subject himself to the transparency the Bankruptcy Code demands", this argument does not make sense.  First of all there is no evidence to support this statement, which appears to be pure speculation as to the Debtor's motivations.  Second, a debtor has no reason to conceal a claim of exemption.

The analysis above concerning the Assets (other than the Cash and the Mammoth Creek Property, which are addressed below) totally ignores (a) the cost and risk of litigation concerning those assets, (b) the costs of transporting the assets and obtaining this Court's approval for their sale, and (c) the risk that the Debtor's wife Lisa Bundy ("Mrs. Bundy") could claim to own 50% or 100% of some of those assets.

With regard to the Mammoth Creek Property, it effectively has no value to the Estate. That is a parcel of 20 acres of undeveloped land in Beaver County, Utah. The Debtor has a 1/8 interest in that property, together with Mrs. Bundy, Dave H. Bundy, Marylynn S. Bundy, Dan R. Reber, and Christine Reber (the Rebers each own 1/4 and the other joint tenants including the Debtor each have a 1/8 interest in the Mammoth Creek Property). The tax assessed value of the Mammoth Creek Property is $63,525. 1/8 of that value is $7,940.63.

Thus, unless the other joint tenants voluntarily agreed to sell their interest in that real property, which seems very unlikely, the Trustee would be required to file a lawsuit in a partition action to sell the Estate's 1/8 interest in that property. Even if that lawsuit were uncontested, the costs associated with that process, including court filing fees, filing and prosecuting a complaint, obtaining a judgment, subdividing the land, and selling the land, would exceed the $7,940.63 value of the land. And if the lawsuit were contested (which seems likely), the costs of litigation would definitely be far greater than the value of the land.

The only remaining Asset is the Cash. The Cash presents numerous litigation and collection risks that are detailed below. The first question is to whom the Cash belongs. Both Abish and Mrs. Bundy could claim an interest in the Cash. While the Objection notes on page 11 that neither of them have filed a proof of claim in the Debtor's bankruptcy case, which is true, it is not necessary to file a proof of claim in order to claim to own an asset which may or may not be property of a bankruptcy estate.

6

The Debtor testified consistently at his Rule 2004 examination conducted by the St. Luke's creditors that the Cash belongs to Abish.  The Trustee disagrees with that for a number of reasons and believes that the Cash is property of the Estate.  But regardless, there is a dispute between the Trustee and the Debtor as to who owns the Cash.  The Trustee believes he has a high likelihood of success in this dispute, which he estimates at a 75% chance.

The other potential dispute is with Mrs. Bundy, who could claim to own 50% or more of the Cash.  At a minimum, the Cash is the proceeds of the sale of the former residence of the Debtor and Mrs. Bundy in Arizona.  The buyer of that residence executed a promissory note to both the Debtor and Mrs. Bundy.  Again, the Trustee believes he has a high likelihood of success in this dispute, but all litigation is uncertain.  The Trustee estimates a 75% probability that he would prevail as against Mrs. Bundy and recover all of the Cash.

Accordingly, in the Trustee's estimation, with a 75% probability of success against Abish, the $200,000 Cash has a value to the Estate of 75% of that, or $150,000.  As to Mrs. Bundy, with a 75% chance of the Trustee prevailing, a 75% probability of receiving $150,000 is worth $112,500.  The 25% percent probability of the Trustee receiving half and Mrs. Bundy receiving the other half is worth $18,750.  Adding together these two figures yields $131,250, which is the Trustee's estimate of the value of the Cash to the Estate, not taking into account litigation cost.  The Trustee estimates the litigation cost of pursuing the Cash to be $50,000, thus its net value to the Estate is $81,250.

Adding the net value of the Cash to the Estate ($81,250) to the net value of the other Assets described in in the table on page 4 of this Reply Memorandum above ($55,595) yields a total figure of $136,845. It is of course true that this total figure is greater than the $120,000 settlement amount, but the two dollar amounts are within spitting distance. As the Trustee acknowledged in the Motion, the Agreement is an imperfect settlement. But as is often said, a bad settlement is better than a good lawsuit. And this settlement is not actually bad, it is just not exactly where the Trustee estimates the Estate would land taking into account only the probability of success and the cost of litigation.

But taking into account the collection risks inherent in this case, it is abundantly clear that the Trustee has properly discharged his business judgment in entering into the Agreement. The Objection notes several times that the Debtor has been involved in armed standoffs with law enforcement. The Objection notes several times that the Debtor has disobeyed court orders and could conceal or expend the Cash. But yet the Objection would give no weight to these very practical problems, arguing that the Debtor should not be rewarded for this type of behavior.

The Trustee does not see it that way. Bankruptcy trustees are creatures of practicality and reality. Bankruptcy trustees are not law enforcement. It is true that the Trustee could, as the Objection states, enlist U.S. Marshalls, the Washington County Sheriff's Office, constables, and others, but the question presented is at what cost, at what risk, and for what purpose. The Trustee has a reasonable settlement through the

8

Agreement that avoids all of these potential problems through the Debtor's voluntary cooperation.

And this is to say nothing of the risk that the Cash dissipates in the meantime. This could happen through a number of different mechanisms, ranging from the Cash being buried in an unknown location, transferred to a friend in another state, converted to crypto currency, or simply being spent. The Objection at page 12 entirely discounts this risk when the "assets have been liquidated or are easily identifiable". This argument does not hold water given how simple it is to move, transfer, or spend cash, and that it is virtually impossible to trace cash. There is no question that the collectability of a judgment is a major factor in support of granting the Motion as it pertains to the Cash.

The Objection cites In re Roberts, 2024 WL 1460287 (Bankr. D. Colo. Mar. 28, 2024), for the proposition that the collectability factor "does not support approval of a settlement where, as here, the assets have been liquidated or are easily identifiable." That case is easily distinguishable because the money at issue was in attorneys' trust accounts. Id. at *5. Thus the money at issue in Roberts was not cash, very simple for the court and parties to control, and not subject to expenditure or dissipation.

Finally, there is the interests of creditors in deference to their reasonable views. The key word in that factor is "reasonable" views. It is of course true that the St. Luke's creditors are virtually the only creditors in this case (there are also administrative creditors as well). That is why from an early stage of this case the Trustee reached out to St. Luke's and proposed to "get out of the way", and to sell to St. Luke's the rights to

9

4932-2004-2307, v. 2

the assets and claims which are the subject of the Agreement. Through counsel the Trustee has proposed that several times, and in each instance the concept was rejected by St. Luke's. If St. Luke's truly believed that the proposed settlement is such a bad deal, which according to the Objection at page 1 is leaving $435,000 on the table, then why wouldn't St. Luke's make an offer to the Trustee and pursue these rights and claims for itself?

Indeed, how is it reasonable for St. Luke's to demand the Trustee to pursue rights and claims that St. Luke's itself is not willing to pursue? A bankruptcy trustee is not a slave to creditors, bound to expend limitless resources (up to $100,000, and even up to $400,000 would be reasonable according to the Objection at page 2) to pursue claims of a bankruptcy estate, without any assurance of a recovery sufficient to reimburse those expenditures.

Unlike St. Luke's, which appears to have nearly limitless resources, the Trustee is administering an estate which is currently administratively insolvent, and he must take that into account.

Given all of these factors, again the proposed settlement is not perfect, but it is eminently reasonable and well within the Trustee's exercise of reasonable business judgment. The Trustee asks the Court to grant the Motion and overrule the Objection.

DATED: May 15, 2025

                              **COHNE KINGHORN, P.C.**

                              /s/ George Hofmann
                              GEORGE HOFMANN

                              Attorneys for the Trustee

# EXHIBIT "A"

# **APPRAISAL REPORT**

**DATE: August 26th 2024**
**RE: Ammon Bundy**
**Trustee: Mark Rose**

|   | DESCRIPTION | LIQ |
|---|---|---|
| 1 | 2019 Ford Expedition w/ 106,728 Miles  Vin #1FMJU2AT2KEA04193 | $19,000.00 |
| 2 | 2020 Ford F250 w/ 49,244 Miles  VIN #1FT8W2BT2LEC10398 | $37,000.00 |
| 3 | 2007 Chevy Silverado w/ 144,345 Miles (Body damage)  Vin #1GCHK23D77F165753 | $9,000.00 |
| 4 | 2010 Polaris Sportsman 550 | $2,500.00 |
| 5 | 2010 Polaris Sportsman 550 | $2,500.00 |
| 6 | 2006 Gear Box Trailer Vin #S1949833 | $4,200.00 |
|   | **Total Values** | **$74,200.00** |



David Olson C.A.G.A.



Erkelens & Olson Auctioneers & Appraisers

954 S 4400 West, Ste. 390
Salt Lake City UT 84104
(801) 355-6655
www.salesandauction.com

