FILED* US Bankruptcy Court-UT
MAY 22 2025 PM 12:01

Ammon Bundy
P.O. Box 1062
Cedar City, Utah
84720-1062

## UNITED STATES BANKRUPTCY COURT,
## DISTRICT OF UTAH

| | | |
|---|---|---|
| Ammon Edward Bundy | ( | Case No. 24-23530-WTT |
| | ( | Chapter 7 |
| | ( | WILLIAM T. THURMAN |

## RESPONSE TO ST. LUKE'S CREDITORS' OBJECTION TO TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT

**Ammon Edward Bundy**, submits this response to the Objection (Dkt. 420) filed by St. Luke's Health System, Ltd., St. Luke's Regional Medical Center Ltd., and related parties (collectively, "St. Luke's Creditors"), and in support of the Chapter 7 Trustee's Motion to Approve Settlement Agreement (Dkt. 417), states as follows:

### BACKGROUND

In March 2022, Ammon Bundy received a distress call from Marissa Anderson, a close family friend, who was surrounded by law enforcement officers threatening to take custody of her infant son, Cyrus. Mr. Bundy and the Bundy family have maintained a long-standing relationship with the Anderson-Chavoya family, whom they regard as deeply caring, politically engaged, and committed to the welfare of their community.

During the COVID-19 pandemic in 2020, Mr. Bundy and Diego Rodriguez (Marissa's father) emerged as vocal critics of Governor Brad Little's prolonged emergency orders and the influx of federal COVID-19 funds into Idaho's public and private institutions. As prominent figures in this public discourse, both families attracted heightened scrutiny from state authorities.



Amid this climate, officers from the Meridian Police Department, acting on a referral from the Idaho Department of Health and Welfare (IDHW), initiated by a St. Luke's Health System employee, removed baby Cyrus from his parents under the assertion of medical neglect. However, as later proceedings demonstrated, the allegations were unfounded. Within days, the child was returned to his family, and all related charges against his parents and aunt were dismissed. (See Exhibits A–C.)

Mr. Bundy, alarmed by the sudden removal of the child and what he perceived as a miscarriage of justice, went to St. Luke's Meridian Medical Center where the child was being held. There, he peacefully demanded that the baby be reunited with his family. Instead, he was arrested and incarcerated by Meridian Police. Mr. Bundy maintains that he acted out of concern for the welfare of a child he believed was wrongfully taken.

Later, as the facts emerged, it became clear that Cyrus was never in medical danger. Medical records, EMS reports, and bodycam footage all showed a stable, well-cared-for child. The original plan, documented by hospital staff, was not to treat a medical emergency—but to transfer Cyrus from his parents to foster care under the cover of a hospital setting. (See Exhibits D–F.)

In an extraordinary admission caught on body camera, the attending physician, Dr. Rachel Thomas, stated:

> *"What I want to do is admit this baby to Boise—not because it is medically necessary... but to create more degrees of separation to protect this poor foster mom who's going to take this kid."*

She added plainly:

> *"He's totally stable."* (See Exhibit H.)

EMTs confirmed this, writing:

> *"This is a healthy baby with no interventions... no acute life threats noted."* (See Exhibit I.)

Medical records further admit that the transfer to Boise was not for the child's medical needs, but to avoid protesters and shield the foster placement from public scrutiny. (See Exhibits J–K.)

Despite this and other overwhelming documentation, St. Luke's Health System, the private hospital at the center of the event, later sued Mr. Bundy and Mr. Rodriguez—claiming that their statements about the incident were false and defamatory. Rather than correcting the missteps that led to the traumatic and unnecessary seizure of a healthy stable child, St. Luke's leadership doubled down—turning their legal power on those who dared to speak out.

Mr. Bundy soon found himself buried under a flood of legal paperwork. Holland & Hart LLP, the high-powered law firm representing St. Luke's, Governor Little, and the IDHW, began an aggressive and sustained campaign of litigation. Documents were delivered by sheriff's deputies, private servers, FedEx, UPS, and the U.S. Postal Service—to his home, business, and even associates. One law firm told Mr. Bundy it would take *three full-time attorneys* to respond to the legal onslaught. (See Exhibit L.)

According to credible sources—including a high-ranking Ada County official and an attorney with ties to St. Luke's—hospital CEO Chris Roth authorized Holland & Hart to proceed with *"a blank check,"* with the express purpose of financially destroying Mr. Bundy and Mr. Rodriguez for daring to criticize the hospital's actions.

Instead of directing resources toward ensuring such an incident never happens again, St. Luke's used charitable donations to fund a multi-million-dollar legal attack. One Idaho resident poignantly remarked:

> *"People donate to St. Luke's to help sick children, not to pay $600-an-hour attorneys to punish whistleblowers and political dissenters."*

Mr. Bundy later said:

*"St. Luke's CEO has given Holland & Hart a blank check to financially destroy Diego and me. They're misusing the courts to put us under constant threat of losing everything we've worked for. I owe them nothing—my family has never even received care from their facility. Yet they want to take everything."*

*"Everything I said was true—or what I believed to be true. They're using the courts to chill free speech and retaliate against those who expose them."*

Ultimately, St. Luke's secured a $53 million default judgment against Mr. Bundy and Mr. Rodriguez. Mr. Bundy, then in the midst of a gubernatorial campaign, declined to participate in what he viewed as a politically motivated attack designed to drain him of time, resources, and voice.

This case is not just about legal arguments—it is about the raw power of institutions being used to crush those who stand up for the vulnerable. It is about a baby—healthy, stable and loved—being taken from his mother's arms under false pretenses, and the silencing of those who dared to demand justice.

## INTRODUCTION

The Chapter 7 Trustee's proposed settlement is a product of informed discretion and sound business judgment. Contrary to the hyperbolic claims made in the Objection, the settlement is not a "mockery" of the process, but rather a responsible and court-supervised resolution that avoids costly, uncertain, and time-consuming litigation. The Objection should be overruled.

## THE KOPEXA FACTORS FAVOR APPROVAL OF THE SETTLEMENT

The proposed compromise satisfies the four-factor test established in *In re Kopexa Realty Venture Co.*, 213 B.R. 1020 (B.A.P. 10th Cir. 1997):

**A. Likelihood of Success in Litigation**

The St. Luke's Creditors overstate the strength of their position. Material factual and legal disputes exist over the ownership and classification of the alleged "Known Assets." The inclusion of assets such as Debtor's purported interest in Abish-Husbondi, Inc.—a company in which Debtor presently holds no equity—is misleading and underscores the need for compromise. Litigation outcomes are uncertain, and the Trustee is justified in avoiding that risk.

### B. Difficulty in Collection

The notion that asset recovery would be simple or automatic underestimates the complexities of enforcement, particularly given disputed ownership claims and practical challenges in locating or recovering alleged cash assets.

### C. Complexity, Expense, and Delay of Litigation

Litigation would impose significant administrative costs on the estate and delay any meaningful recovery to creditors. Contrary to the Objectors' claims, this matter is not simple—it would involve multiple hearings, testimony, document discovery, and possible appeals.

### D. Interests of Creditors and the Estate

While the St. Luke's Creditors are the most vocal creditor group, their narrow interests cannot override the broader duty the Trustee owes to the entire estate. The proposed $120,000 settlement provides a substantial and guaranteed benefit, without the drain of litigation and risk of non-recovery.

Furthermore, the St. Luke's creditors either fail to understand the limited nature of Mr. Bundy's assets or have intentionally misrepresented his holdings to the Court. They assert that the estate is valued at over $555,000 and that the proposed settlement agreement would allow Mr. Bundy to retain $435,000—approximately 80% of the known assets. This assertion is simply not accurate.

### SETTLEMENT IS A FAIR AND EQUITABLE RESOLUTION

The Trustee has acted in good faith, with full knowledge of the underlying issues. The proposed agreement reflects a fair compromise that provides closure and value. St. Luke's objections appear more punitive than constructive and reflect dissatisfaction that no amount of litigation may fully resolve.

### CONCLUSION

For the foregoing reasons, Debtor respectfully requests that the Court:

1. **Overrule** the Objection (Dkt. 420) of the St. Luke's Creditors;
2. **Approve** the Settlement Agreement as requested in the Trustee's Motion (Dkt. 417); and
3. Grant such other and further relief as the Court deems just and proper.

**DATED THIS DAY,** the 6th of May, 2025.

*/s/ Ammon Bundy*

Ammon Bundy

CERTIFICATE OF SERVICE

I certify that on this day I served a copy of the attached to:

UNITED STATES BANKRUPTCY COURT, DISTRICT OF UTAH

| | | | |
|---|---|---|---|
| | 350 S Main St, Salt Lake City, UT 84101 | [X] | USPS Mail |
| Mark C. Rose, Trustee | mrose@mbt-law.com | [X] | Email |
| Erik Stidham | efstidham@hollandhart.com | [X] | Email |

**DATED THIS DAY,** the 6th of May, 2025.

*/s/ Ammon Bundy*

Ammon Bundy

Exhibit A
https://freedomman.gs/cyrus/videos/

Exhibit B
https://pplsrghts.net/f6984a7c-eafc-4082-a3b4-e99dfe129733

Exhibit C
https://freedomman.gs/cyrus/story/

Exhibit D



## Exhibit E

and declared immediately. He was brought to the Meridian ED for evaluation. Health and welfare identified a foster family but due to protesters surrounding the hospital regarding this case, it was felt that discharge with the foster family from the ED was unsafe for all involved. For this reason, the patient was transferred to Boise for further care.

*"He [Baby Cyrus] was brought to the Meridian ED [emergency department] for evaluation. Health and welfare identified a foster family but due to protesters surrounding the hospital regarding this case, it was felt that discharge with the family foster family from the ED was unsafe for all involved."*

## Exhibit F

| Time | B.R. / B.R. Method | B.P. / Method | RA SpO2 / LOC | Resp / Resp Effort | Activity Rhythm | GCS / GCS Goal | ECG Method | Temp / Ambient Temp | Prtcl | Pain | CRM? |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01:59 | | | | | | | | | | | |
| Action Comment | Staged in the front of SLMHC at the request of the sending physician. | | | | | | | | | | |
| 02:00 | | | Alert | Normal | | 4/5/6 Legitimate values w/o interventions such as intubation and sedation | | 36.6°C | | 0 | 81 |
| Comment | The sending physician handed us the pt secured in his car seat. She indicated the pt was in stable condition and requested that we leave promptly. She stated, "Just go! This is a healthy baby with no interventions." Joint Commission Time Out: Complete, Right Consent, Right Patient. | | | | | | | | | | |
| 02:02 | | | | | | | | 23 | | | |
| Comment | The pt, in his car seat, was secured to our gurney. Pt is a 10 month old male acting appropriately for age. Pt is looking around at surroundings and interacting appropriately. Skin is PWD. Primary assessment completed. Airway is patent and maintainable by pt. Breathing appears non-labored with no accessory muscle use noted. Brachial pulse is normal and of normal strength. No acute life threats noted. | | | | | | | | | | |
| 02:05 | | | Alert | 28 / Normal | | 4/5/6 Legitimate values w/o interventions such as intubation and sedation | | | PM | 0 | 81 |
| Comment | Pt does not appear to be in any physical distress. | | | | | | | | | | |
| 02:13 | | | | | | | | | | | |
| Operations | Transport was uneventful to SLRMC. Operations: Patient Offload - Cold by . Pt unloaded and moved via stretcher/car seat secured to pediatric unit. No change in pt condition. | | | | | | | | | | |
| 02:19 | | | Alert | Normal | | 4/5/6 Legitimate values w/o interventions such as intubation and sedation | | | | 0 | 81 |



## Exhibit G



**DOCTOR SAYS BABY 'WOULD HAVE DIED'**

Thomas has worked with an organization called Flourish Collective to provide medical care to people in Haiti. She said she has treated hundreds of children for malnutrition and dehydration, two of the biggest killers of Haitian children. So strongly did she feel about her work there, according to Thomas, that she got a tattoo of the organization's motto: "Little by little, we'll get there."

Thomas said in court that when Rodriguez's 10-month-old grandchild was brought to the St. Luke's emergency room — where she was the lead physician at the time — her first thought was that "he looked like a baby from Haiti." The baby's stomach was distended, his eyes were hollow and he was unable to sit up, she testified.

After the defendants began attacking Thomas online, saying she had lied and posting private information about her — including her photo, address and phone number — the doctor said she had to have difficult conversations with her daughter and her daughter's school about their family being in potential danger. Her daughter became anxious enough that she began seeing a counselor.

After all the actions of Bundy's far-right followers, Thomas said she is leaving Idaho to try to heal from the emotional toll of the past year.

## Exhibit H



Watch video here: https://youtu.be/R4YfWZNRdds

## Exhibit I



The report, as seen above, from Baby Cyrus's medical records plainly declare:

*The sending physician handed us the pt [i.e. patient] secured in his car seat. She indicated the pt was in stable condition and requested that we leave promptly. She stated, "just go! This is a healthy baby with no interventions"...no acute life threats noted.*

## Exhibit J

---

**H&P by Natasha D. Erickson, MD at 3/12/2022 0304**

### PEDIATRIC HOSPITALIST ADMISSION NOTE

**ADMITTING ATTENDING**
Natasha D. Erickson, MD

**ADMISSION DIAGNOSES**
Active Problems:
  Malnutrition (HCC)
  Failure to thrive (child)

**CHIEF COMPLAINT**
Weight loss

**HISTORY OF PRESENT ILLNESS**
Cyrus is a 10 m.o. male discharged from the hospital on 3/4, who presents with weight loss in the setting of failure to thrive. Patient was admitted from 3/1-3/4 after being referred for admission due to severe malnutrition. Initially the patient required NG feeds, but at discharge, he was taking bottle feeds without issue. He was discharged home with an NG in place and family was provided syringe feeding supplies in case the patient's po intake dropped off. Family did not go home with a feeding pump as they declined this, citing cost (they are self-pay). He was scheduled to see his PCP on 3/6, but did not show for the appointment. Home health was also not able to get in touch with the family. Case was discussed on 3/11 with Tracy Jungman with CARES who reported the child had not been seen and despite multiple attempts to contact the family, the patient had not returned for a weight check. Ultimately, health and welfare and law enforcement became involved. It is my understanding a warrant was issued and the child was removed from the home and declared immediately. <mark>He was brought to the Meridian ED for evaluation. Health and welfare identified a foster family but due to protesters surrounding the hospital regarding this case, it was felt that discharge with the foster family from the ED was unsafe for all involved.</mark> For this reason, the patient was transferred to Boise for further care.

Generated on 3/24/22 10:33 AM                                                                                          Page 119

---

## Exhibit K



Anderson, Cyrus James
MRN: 4289116, DOB: 5/1/2021, Sex: M
Acct #: 455708612
Adm: 3/12/2022, Adm: 3/12/2022, D/C: 3/15/2022

---

**03/12/2022 - ED to Hosp-Admission (Discharged) in Boise Pediatrics (continued)**

All Encounter Notes (group 1 of 3) (continued)

no frenulum injury, fontanelles are appropriate. Patient is tearful but consolable with being held. A bottle was offered to the child at this time the child immediately took a eating 6 ounces without difficulty. Weight was obtained and patient's weight is currently 6.31 kg, at discharge on the fourth patient was 6.545 kg. Blood work was obtained and patient is hypoglycemic which is consistent with poor feeding. Child has demonstrated that he is able and willing to feed while here in the department. <mark>At this time there are social difficulties in this situation, it was felt the patient was most appropriate for admission as there is concern about CPS attempting to leave the hospital with the child being followed to the foster care family's home.</mark> Furthermore child has significant findings of dehydration and malnutrition. I do not feel IV fluid resuscitation is necessary as child is able to take feeds without difficulty. Patient was transferred to St. Luke's Boise at this time for admission.

Exhibit L

https://freedomman.gs/cyrus/kidnappers/laurie-fortier-laurathompson/

CERTIFICATE OF SERVICE

I certify that on this day I served a copy of the attached to:

UNITED STATES BANKRUPTCY COURT, DISTRICT OF UTAH

| | | | |
|---|---|---|---|
| | 350 S Main St, Salt Lake City, UT 84101 | [X] | USPS Mail |
| Mark C. Rose, Trustee | mrose@mbt-law.com | [X] | Email |
| Erik Stidham | efstidham@hollandhart.com | [X] | Email |

DATED THIS DAY, the 6th of May, 2025.

*/s/ Ammon Bundy*

Ammon Bundy